UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV 20-4451-MWF (MRWx)          **Date:  June 8, 2020**
Title:     Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

Present:   The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

          Deputy Clerk:                         Court Reporter:
          Rita Sanchez                          Not Reported

          Attorneys Present for Plaintiff:      Attorneys Present for Defendant:
          None Present                          None Present

**Proceedings (In Chambers):**         ORDER DENYING EX PARTE
                                       APPLICATION FOR TEMPORARY
                                       RESTRAINING ORDER AND ORDER TO
                                       SHOW CAUSE RE: PRELIMINARY
                                       INJUNCTION [10]

     This action is the collision of the Eighth Amendment guarantee that prisoners must be incarcerated in minimal safety with the limits on judicial authority codified in and symbolized by the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626. Specifically, COVID-19 has reached a federal prison, FCI Terminal Island, with at least nine prisoners dead and many prisoners and staff infected despite what the Warden describes as elaborate efforts to curb the disease.  This Court has already faced this collision in making decisions on compassionate leave under the First Step Act.  In some cases, the Court has denied compassionate leave; in others, the Court has ruled that the statutory factors justified release of a particular inmate, including one at FCI Terminal Island.

     Now before the Court is Plaintiffs-Petitioners Lance Wilson, Maurice Smith, and Edgar Vasquez's Ex Parte Application for a Temporary Restraining Order ("TRO") and an Order to Show Cause re Preliminary Injunction (the "TRO Application") against Defendants-Respondents Felicia L. Ponce, in her official capacity as Warden of Terminal Island (the "Warden"), and Michael Carvajal, in his official capacity as Director of the Bureau of Prisons, filed on May 22, 2020.  (Docket No. 10).  On May

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

<u>CIVIL MINUTES—GENERAL</u>

**Case No.  CV 20-4451-MWF (MRWx)**            **Date:  June 8, 2020**
Title:     Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

27, 2020, Respondents filed an Opposition.  (Docket No. 24).  On June 1, 2020,
Petitioners filed a Reply.  (Docket No. 30).

      The TRO Application is **DENIED.**  The PLRA forbids the relief that Petitioners
seek in the TRO Application because the relief sought is not legally cognizable as a
habeas claim.  The Sixth Circuit and other district courts disagree.  Because this
determination is a pure issue of law, the Court makes it now so the that Ninth Circuit
may determine this issue.

      Were it not for its legal determination, the Court would grant as a TRO much of
the equitable relief that is sought immediately and grant an OSC as to the rest.
Respondents are mistaken to argue that exhaustion prevents the requested relief and are
likewise mistaken that, on the facts, the *Winter* factors do not support equitable relief.
Therefore, the Court would order Respondents to implement an immediate evaluation
of the prisoners for potential release or enlargement, similar to that in *Wilson v.
Williams*, but order enlargement.  The Court would then issue an OSC on further relief
to allow Respondents to present further evidence and have the opportunity to be heard.

## I.    <u>INTRODUCTION AND BACKGROUND</u>

      COVID-19, a disease caused by a novel coronavirus named SARS-CoV-2, is an
ongoing, once-in-a-century public health crisis.  As of June 7, 2020, there have been
1.9 million confirmed cases and 109,901 deaths from COVID-19 in the United States
alone.  *Cases in the U.S.*, CDC.gov (last updated June 1, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.  COVID-
19 is highly infectious and poses significant health risks, especially for the medically
vulnerable population.  There is currently no vaccine against the disease and no known
medication to prevent or treat infection from COVID-19.  As the virus has become
more widespread, the Centers for Disease Control and Prevention ("CDC") and the
government has recommended that the public take preventative measures including
careful hygiene practices and social distancing, to curb the spread of the virus.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 20-4451-MWF (MRWx)            Date:  June 8, 2020
Title:      Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

        The COVID-19 pandemic has presented a unique challenge for correctional
facilities, where social distancing measures are only minimally available.
Unfortunately, FCI Terminal Island ("Terminal Island") is no exception and COVID-
19 has spread widely among prisoners and staff at the facility.  As of May 15, 2020,
the Bureau of Prison ("BOP") reported that 697 out of 1,042 (or nearly 67%) of the
prisoners had recently tested positive for coronavirus.  (Complaint ¶ 6, n.5) (citing
Federal Bureau of Prisons, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/
(last accessed May 15, 2020)).  While this number is alarming on its own, Petitioners
argue that the situation is even more dire because many prisoners at Terminal Island
have underlying medical conditions, which put them at a higher risk of serious illness
or death from COVID-19.  (*Id.* ¶¶ 49, 50).  In fact, nine prisoners have already died at
Terminal Island from COVID-19.  (TRO Reply at 4; Federal Bureau of Prisons,
COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (last accessed June 2,
2020)).  Petitioners assert that Respondents still have considered only ***46 out of over a
thousand prisoners*** for home confinement, and only ***5 of these*** have been released for
home confinement as of the Complaint's filing.  (TRO Application at 34; TRO Reply
at 10).

        Petitioners contend that the conditions at Terminal Island pose an unacceptable
risk to the health and safety of the incarcerated, and bring this action seeking
declaratory and injunctive relief, enlargement of custody to include home confinement,
and release.  (Complaint ¶ 15).  In response, Respondents assert that they have taken a
number of actions to address COVID-19 and that the situation at Terminal Island has
significantly improved.  Further, they contend that Petitioners' claims are not properly
before the Court because they are barred by the Prison Litigation Reform Act
("PLRA").

        The facts are drawn from allegations and from the supporting evidence
submitted by both sides.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 20-4451-MWF (MRWx)**          **Date:  June 8, 2020**
Title:      Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

### A.     <u>The Petitioners</u>

Petitioners are three prisoners currently incarcerated at Terminal Island. (Complaint ¶¶ 16-18).

Petitioner Lance Aaron Wilson is 35 years old, suffers from hypertension and asthma, and has tested positive for COVID-19.  (*Id.* ¶ 16).  Wilson alleges that he was experiencing symptoms, including migraines, body chills, and sweating in his sleep, but has not been given any treatment and has not been able to see a doctor.  (*Id.*). Respondents rebuts this claim, asserting that Wilson was asymptomatic and that he did not complain of any symptoms to staff.  (Declaration of Rosita Leen ¶ 7a (Docket No. 27)).  Wilson submitted an application for Compassionate Release and/or Home Confinement to Respondent Ponce on April 27, 2020, but he did not receive a response.  (Complaint ¶ 16).

Petitioner Maurice Smith is 50 years old, suffers from asthma and hypertension, and is pre-diabetic.  (*Id.* ¶ 17).  Smith has also tested positive for COVID-19.  (*Id.* n.14).  After the COVID-19 outbreak began at Terminal Island, Smith was transferred to a makeshift living space in an old warehouse, which was allegedly infested with vermin and without potable water, hot water for showers, or heating.  (*Id.*).  He has raised his concerns about living conditions to prison staff, including the Warden, but his complaints have gone unanswered.  (*Id.*).

Petitioner Edgar Vasquez is 32 years old.  (*Id.* ¶ 18).  Around the same time as Smith, Vasquez was transferred to the warehouse.  (*Id.*).  Due to unsanitary conditions, he started feeling sick and became afraid that he had contracted COVID-19.  (*Id.*). Despite numerous requests for medical attention, he was simply told to "hang in there" because his temperature was not high enough.  (*Id.*).  Vasquez later tested negative for COVID-19.  (TRO Application at 20).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 20-4451-MWF (MRWx)          Date:  June 8, 2020
Title:     Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

### B.   The COVID-19 Pandemic at Terminal Island

Terminal Island's COVID-19 outbreak is one of the largest of any federal prison. (Complaint ¶ 46).  As of May 11, 2020, 693 of 1,042 prisoners at Terminal Island tested positive for COVID-19, and 8 prisoners died from the from complications related to the coronavirus.  (*Id.* ¶¶ 4-6).  BOP has since reported that a vast majority of these prisoners have since recovered.  (*Id.*).  However, the BOP website does not show what criteria it is using to consider someone "recovered."  (*Id.*).  Moreover, since this action was filed, an additional prisoner who was deemed "recovered" by the BOP, has died after feeling chest pains and anxiety.  (TRO Reply at 1).  Therefore, regardless of the recovery statistics reported by the BOP, it appears that prisoners still face significant risk at Terminal Island.

Petitioners argue that this remarkable size and speed of the Terminal Island outbreak is due to the vulnerability caused by the combination of three aggravating factors: overcrowding, communal living spaces, and vulnerability of the prisoner population.  (Complaint ¶ 46).

First, Petitioners note that Terminal Island is overcrowded.  (*Id.* ¶ 47).  Although the prison has a rated capacity of 779, it housed 1,042 prisoners as of May 15, 2020.  (*Id.*)  As Petitioners note, this amounts to an overcrowding rate of 133%, which is higher than the average federal overcrowding rate of 124%.  (*Id.*).  Although Terminal Island has attempted to mitigate the overcrowding issue by moving some prisoners to makeshift living spaces, Petitioners assert that the crowding combined with unsanitary makeshift living spaces have led to the virus spreading at a rapid rate.  (*Id.*).

Second, virtually all prisoners at Terminal Island are housed in open dormitory-style setting or cell tiers with communal areas, where social distancing is not possible.  (*Id.* ¶ 48).  One petitioner asserts that he shares his cell tier with 50 prisoners, who share a single bathroom containing four urinals, four showers, and four sinks.  (*Id.*).  Moreover, prisoners' only excursions out of their cells are to a limited set of communal areas, where they retrieve food and pills, congregate in the television room, or share a phone.  (*Id.*).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 20-4451-MWF (MRWx)                Date:  June 8, 2020
Title:      Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

Third, Terminal Island is a Care Level 3 medical facility, designed to provide specialized or long-term medical or mental health care in a correctional environment. (*Id.* ¶ 49).  According to the BOP's Care Level Classifications Guide, many prisoners with underlying conditions that increase vulnerability to COVID-19 default to Care Level 3.  (*Id.*).

Petitioners argue that Terminal Island has faced a unique challenge in combating the spread of COVID-19 outbreak because of all three factors: overcrowding, open and communal living spaces, and vulnerable prisoner population.  (*Id.* ¶ 51).

### C.      BOP and the Warden's Efforts to Contain the Outbreak

Respondents have implemented measures nationwide to lessen the COVID-19 threat.  Specifically, the BOP developed a seven-phase action plan to in response to COVID-19, which it began implementing in January 2020.  (Declaration of Ronell Prioleau ("Prioleau Decl.") ¶¶ 5-6 (Docket No. 28).  The action plan included (1) getting guidance from health authorities and establishing a task force to begin strategic planning for COVID-19 Bureau-wide (Phase I); (2) suspending certain activities, such as social and legal visits and prisoner facility transfers, and screening prisoners who have traveled from or through high-risk COVID-19 locations (Phase II); (3) inventorying all cleaning, sanitation, and medical supplies (Phase III); (4) requiring all newly admitted prisoners to the Bureau to be assessed using a screening tool and temperature check (Phase IV); (5) securing all prisoners in their assigned cells/quarters from April 1, 2020 to June 20, 2020, while permitting limited group gathering to the extent practical to facilitate commissary, laundry, showers, telephone, and computer success (Phase V, VI, VII); (6) mandating BOP staff to comply with "respiratory protection program" (Phase VI); and (7) limiting to significant decrease incoming and internal movement by confining prisoners to their cells for the majority of the day (Phase VII).  (*Id.* ¶¶ 7-20).

Respondents also note that they have implemented specific steps at Terminal Island to address COVID-19.  (*Id.* ¶¶ 24-64).  However, the parties dispute the factual details regarding these measures as well as current conditions within Terminal Island.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 20-4451-MWF (MRWx)              Date:  June 8, 2020
Title:      Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

As a general matter, the Court recognizes that Respondents have implemented a
number of steps during the past two months to contain the outbreak and make the
conditions safer for the prisoners at Terminal Island.  Despite their efforts, however,
the evidence demonstrates that COVID-19 has not been contained, and in fact, has
spread widely across the prisoners.  The Warden's efforts and the Petitioners'
allegations regarding their insufficiency are described in more detail below.

        1.      Social Distancing

        Respondents note that Terminal Island has implemented various measures to
increase social distancing.  For example, all prisoners at Terminal Island have been
confined to their cells for the majority of the day since April 1, 2020 and will remain
so confined until June 30, 2020.  (TRO Opposition at 8-10; Prioleau Decl. ¶¶ 17-20).
Meals are currently directly delivered to the housing units, and prisoners are permitted
to leave their cells in small groups on a rotating basis at designated times in order to
engage in activities, such as showers, exercise, phones, and internal BOP computer and
electronic message platform.  (TRO Opposition at 8-10; Prioleau Decl. ¶¶ 17-20).

        Nonetheless, Petitioners assert that Terminal Island's communal living spaces in
addition to its overcrowding make social distancing difficult, if not impossible, without
a significant reduction in the prison population.  (Complaint ¶ 55).  Although Terminal
Island has set up temporary living spaces, such as field tents and converted warehouse,
Petitioners assert that these temporary spaces are even more crowded and unsanitary.
(Id. ¶ 56).  Several petitioners assert that the warehouse is overrun with rodents,
racoons, and possums, and it lacks potable water, hot water for showers, and heating.
(Declaration of Jennifer Van Atta ¶ 6 (Docket No. 10-1, Ex. H); Declaration of
Jackeline Vazquez ¶ 5 (Docket No, 10-1, Ex. I)).  Petitioners contend that the poor
sanitary conditions in the warehouse have simply resulted in trading one hot zone of
infection for another.  (Id. ¶ 57).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 20-4451-MWF (MRWx)            Date:  June 8, 2020**
Title:       Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

### 2.      Hygiene and Personal Protective Equipment ("PPE")

Respondents assert that all prisoners admitted to Terminal Island automatically receive soap, and all prisoners may receive new soap weekly.  (Prioleau Decl. ¶ 57).  For prisoners without sufficient funds to purchase soap in the commissary, soap is provided at no cost to the prisoner.  (*Id.*).  Respondents also assert that all common areas in inmate housing units are cleaned daily, even multiple times throughout the day by inmate orderlies, with a designated disinfectant that kills human coronavirus.  (*Id.* ¶ 58).  Respondents further assert that each housing unit has been stocked with cleaning supplies for use by inmate orderlies and other inmates to clean the common area and their cells.  (*Id.* ¶ 59).  According to Respondents, each prisoner is also provided one surgical mask per week and cloth masks that they are required to wear.  (*Id.* ¶ 63).  All staff are also provided with two surgical masks weekly and cloth masks.  (*Id.*).

Petitioners challenge several of Respondents' assertions.  For example, despite Terminal Island's promise to distribute new masks once a week, one petitioner asserts that he has gotten one mask closer to once every two weeks.  (Complaint ¶ 58) (citing Declaration of Jaque Wilson ¶ 12 (Docket No. 1, Ex. A)).  Furthermore, Petitioners assert that officials have failed to provide hand sanitizer containing alcohol, hand soap, disinfectants for commonly touched surfaces, and clean clothes, which are measures recommended by the CDC as effective in preventing the spread of COVID-19.  (*Id.* ¶ 59).  Instead, they claim that they are only provided watered-down disinfectant once a week, which frequently runs out, and that they are not provided any paper towels.  (Declaration of Jimmy Threatt ¶ 6 (Docket No. 10-2)).  They also assert that there is no professional cleaning of living areas or bathrooms, and that all the cleaning is done by prisoners with these inadequate cleaning supplies.  (*Id.*).

### 3.      Testing, Quarantine/Isolate, and Treatment

On April 23, 2020, the County of Los Angeles Department of Public Health began COVID-19 testing for all prisoners, and 100 percent of the prisoner population has since been tested.  (Prioleau Decl. ¶ 54).  Respondents assert that this wide testing

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 20-4451-MWF (MRWx)              Date:  June 8, 2020
Title:      Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

has resulted in a high number of COVID-19 positive cases.  Moreover, Respondents
assert that Terminal Island currently has COVID-19 test kits in stock, and it has the
ability to request more tests from its vendor on an as-needed basis.  (*Id.* ¶ 55).

Terminal Island also has been screening all incoming prisoners for COVID-19
symptoms and exposure risk factors since early March 2020.  (*Id.* ¶¶ 35, 36, 40).
Following the initial screening, prisoners are then escorted to an intake/quarantine unit,
where they are automatically quarantined for 14 days.  (*Id.* ¶ 38).  Those without
symptoms may be released into the general population, but those who are symptomatic
and/or those who have tested positive for COVID-19 are sent to designated housing
areas, which serve as "isolation units."  (*Id.* ¶ 39).  All individuals entering Terminal
Island, including staff, delivery, and other visitors, must also undergo a health
screening upon entry, including having their temperature taken and being asked a
number of questions to evaluate their risk of exposure.  (*Id.* ¶ 50; Ex. J).

Furthermore, Terminal Island has been taking a number of measures to screen its
current resident prison population.  (*Id.* ¶ 42).  Respondents assert that all prisoners are
encouraged to self-monitor and report symptoms of illness to unit staff either orally or
via a written request, and that all prisoners are screened at least daily for temperature
and symptom checks.  (*Id.* ¶¶ 44, 45).  Any prisoners who present symptoms with
COVID-19 will be evaluated by a medical provider, and based on this evaluation, a
determination is made as to whether isolation and/or testing is appropriate.  (*Id.* ¶ 45).

Although Petitioners acknowledge that the entire prison population has been
tested, they assert that Terminal Island only began to test its entire prisoner population
after a large portion of the prisoners had already been confirmed as infected.
(Complaint ¶ 61).  Further, they assert that aside from that one-time test of the entire
population, Terminal Island is now not regularly testing prisoners who may have been
exposed to infected persons and it is not testing "recovered" COVID-19 patients before
categorizing them as such and returned to the general population.  (*Id.*).  They also
refute Respondents' assertion that all prisoners are screened for symptom checks;
instead, they assert that Respondents are only conducting temperature checks without
monitoring other symptoms.  (Threatt Decl. ¶ 4).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 20-4451-MWF (MRWx)            Date:  June 8, 2020
Title:     Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

Further, Petitioners assert that Terminal Island has failed to adequately trace and isolate prisoners.  While prisoners who are determined to have contracted the disease are removed from the unit, they assert that no other measures are taken to assess whether others that the prisoner has been in close contact with have also contracted COVID-19.  (Complaint ¶ 62).  Petitioners further assert that there are not enough beds at the hospital for prisoners who have tested positive for COVID-19 or are suspected of having COVID-19.  (Id. ¶ 63; Declaration of Stephen Rines ¶ 8 (Docket No. 1-4)).  Therefore, Petitioners claim that symptomatic prisoners have been commingled with prisoners seeking medical treatment for unrelated problems in the prison's short-stay hospital units.  (Complaint ¶ 63; Declaration of Stephen Rines ¶ 8).  They also assert that symptomatic prisoners who had not yet received test results have been returned them to general population to make room for someone sicker.  (Complaint ¶ 63; Declaration of Stephen Rines ¶ 8).

Petitioners also assert that throughout the entirety of the COVID outbreak at Terminal Island, prisoners rarely have been afforded access to healthcare personnel or medical treatment.  (Id. ¶ 66).  They assert that the officials only provide a response if the prisoner's condition deteriorates to the point that emergency hospitalization is required.  (Id. ¶ 67).  If the condition is not as dire and the fever has not reached 101 degrees, Petitioners assert the correctional officers simply tell the prisoners to "hang in there," no matter how serious the symptoms.  (Id. ¶ 66; Rim Decl., Ex. I ¶ 6 (Docket No. 10-1)).  For example, even though Petitioner Wilson suffers from asthma and hypertension, tested positive for COVID-19, and experienced migraines, body chills, and frequent sweating in his sleep, Petitioners assert that he has not been given proper medical treatment.  (Id.).

### D.    Home Confinement and Compassionate Release

#### 1.    Home Confinement Under the CARES Act

The Bureau of Prisons has statutory authority to transfer prisoners to home confinement under 18 U.S.C. § 3624(c)(2).  Under the statute, the Bureau of Prisons

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 20-4451-MWF (MRWx)              Date:  June 8, 2020
Title:     Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

may "place a prisoner in home confinement for the shorter of 10 percent of the term of
imprisonment of that prisoner or 6 months."

On March 26, 2020, Attorney General William Barr issued a memorandum to
the director of BOP, in which he directed the bureau to prioritize the use of "various
statutory authorities to grant home confinement for prisoners seeking transfer in
connection with the COVID-19 pandemic."  (Docket No. 10-1, Ex. D ("March 26
Attorney General Memorandum") at 1).  Although "[m]any inmates will be safer in
BOP facilities," he noted that "for some eligible inmates, home confinement might be
more effective in protecting their health."  (*Id.*).  The memorandum provided the
following non-exhaustive list of discretionary factors for evaluating inmates for
confinement: "[t]he age and vulnerability of the inmate to COVID-19, in accordance
with the Centers for Disease Control and Prevention (CDC) guidelines"; "[t]he security
level of the facility currently holding the inmate, with priority given to inmates
residing in low and minimum security facilities"; "[t]he inmate's conduct in prison";
"[t]he inmate's score under PATTERN, with inmates who have anything above a
minimum score not receiving priority treatment under this Memorandum"; "[w]hether
the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism
and maximize public safety"; and "[t]he inmate's crime of conviction, and assessment
of the danger posed by the inmate to the community."  (*Id.* at 1-2).

One day later, on March 27, 2020, Congress enacted the Coronavirus Aid,
Relief, and Economic Security Act ("CARES Act"), which authorized the Director of
the Bureau of Prisons to lengthen the amount of time prisoners can be placed on home
confinement under § 3624(c)(2) provided that the Attorney General makes a finding
that "emergency conditions will materially affect the functioning of the Bureau."
CARES Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281 (2020).  On April 3,
2020, Attorney General Barr issued a memorandum to the Director of BOP, in which
he made the requisite finding that "emergency conditions are materially affecting the
functioning of the Bureau."  (Docket No. 10-1, Ex. A ("April 3 Attorney General
Memorandum") at 1).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 20-4451-MWF (MRWx)            Date:  June 8, 2020
Title:    Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

The April 3 Attorney General Memorandum further noted that "we are experiencing significant levels of infection at several of our facilities" and that "[w]e have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions." (*Id.*). Attorney General Barr instructed the BOP to continue processing inmates who are eligible for home confinement under pre-CARES Act standards. (*Id.*). In addition, he directed the BOP to "expand the cohort of inmates who can be considered for home release . . . to the most vulnerable inmates at the most affected facilities" and provided the following guidance. (*Id.*).

First, reflecting the urgency of the situation, Attorney General Barr urged the BOP to take action to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" in "facilities where you determine that COVID-19 is materially affecting operations." (*Id.* at 2). Specifically, he directed the BOP to "immediately review all inmates who have COVID-19 risk factors, as established by the CDC." (*Id.*). Further, he noted that "[g]iven the speed with which this disease has spread through the general public, it is clear that time is of the essence." (*Id.*). Therefore, he urged the BOP to "implement this Memorandum as quickly as possible." (*Id.*).

Second, Attorney General Barr noted that the BOP also has an obligation to protect the public and that "we cannot simply release prison populations en masse onto the streets," which would pose profound risks to the public from released prisoners engaging in additional criminal activity. (*Id.*). Therefore, Attorney General Barr directed the BOP to "continue making the careful, individualized determinations BOP makes in the typical case." (*Id.* at 3).

Despite the explicit statutory authority under the CARES Act to place an expanded group of inmates on home confinement, and despite Attorney General Barr's urgent plea to take immediate action to maximize appropriate home confinement, Respondents' use of their authority has been extremely limited. According to Petitioners, Respondents have considered only ***46 out of over a thousand prisoners*** for home confinement, and only ***5 of these*** have been released for home confinement as of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV 20-4451-MWF (MRWx)          Date: June 8, 2020
Title:     Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

the Complaint's filing. (TRO Application at 34; TRO Reply at 10). Respondents have not refuted this assertion.

### 2.    Compassionate Release

Under 18 U.S.C. § 3582(c)(1)(A), a sentencing court may, upon motion of the Director of the Bureau of Prisons or upon motion of the defendant, reduce a defendant's term of imprisonment if it finds that "extraordinary and compelling reasons warrant such a reduction." This authority is often referred to as "compassionate release." If the Bureau of Prisons does not bring a motion for compassionate release on behalf of a defendant, the defendant may only bring a motion on his or her own behalf after either "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1).

Neither party has provided any information as to whether the BOP has brought a motion for compassionate release on behalf of any of the named Petitioners or any other inmates at Terminal Island. However, the Court notes that Petitioner Wilson has filed a motion for compassionate release on May 5, 2020 in the Eastern District of California, which appears to be still pending. *See United States v. Wilson*, No. 1:15-cr-46-NONE-SKO, ECF No. 242 (E.D. Cal. May 5, 2020). The other two petitioners have not filed a similar motion for compassionate release. (Declaration of Joel Roman ("Roman Decl.") ¶¶ 9, 12, Exs. G, I (Docket No. 26)).

### E.    **Requested Relief**

The Complaint alleges that Respondents are violating the prisoners' Eighth Amendment rights by continuing to incarcerate them in conditions that place them at substantial risk of serious harm from transmission of COVID-19. (Complaint ¶ 90).

Based on the alleged violation of their Eighth Amendment rights, Petitioners seek a wide range of relief, including (1) declaratory relief that Terminal Island's

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 20-4451-MWF (MRWx)                    Date:  June 8, 2020
Title:       Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

custody of Petitioners and the Class violates the Eighth Amendment; (2) a highly
expedited process for Respondents to review members of the Class for enlargement of
custody to home confinement; and (3) injunctive relief to institute appropriate
conditions of confinement to prevent the further spread of COVID-19 and to provide
constitutionally adequate medical care for confirmed COVID-19 cases.  (*Id.* at 50-54,
Relief Requested).

　　In the TRO Application, Petitioners seek imposition of a process for immediate
evaluation of the prisoners for home confinement or compassionate relief and
enlargement (habeas bail) for many of them.

## II.   **DISCUSSION**

　　As a preliminary matter, the Court notes that Petitioners brought two claims: a
habeas claim under 28 U.S.C. § 2241 (seeking an expedited review for enlargement of
custody); and another directly under the Eighth Amendment (seeking injunctive relief
for improvement of conditions of confinement).  (*See generally* Complaint; TRO
Application at 57; TRO Reply at 17).

　　Although the TRO Application appeared to suggest that Petitioners are seeking
immediate relief on both of their claims, they have since clarified that they are
requesting "only the first of the two—the process-based remedy for enlargement" be
considered through their TRO Application.  (TRO Reply at 17).  Therefore, the Court
only examines Petitioners' first claim in this Order.

　　Under Rule 65, the TRO Application is evaluated pursuant to Ninth Circuit's
understanding of the *Winter* factors: Plaintiffs seeking injunctive relief must establish
that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable
harm in the absence of preliminary relief; (3) the balance of the equities tips in their
favor; and (4) an injunction is in the public interest.  Fed. R. Civ. P. 65(c); *Toyo Tire
Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010)
(citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008)).

---

**CIVIL MINUTES—GENERAL**                                                    14

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 20-4451-MWF (MRWx)              Date:  June 8, 2020
Title:     Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

The Court views the TRO Application as raising one fundamental issue of law – whether the habeas claim encompasses the requested relief.  Because the Court determines that habeas does not, the TRO Application must be denied, both because the basis for relief does not exist and, in a technical sense, because the first *Winter* factor could never be met.  Were it not for this legal determination, the Court would grant part of the requested relief as a TRO and set the remainder for an OSC re preliminary injunction.

## A.     **Whether the Habeas Claim Exists**

It is recognized that prisoners have an Eighth Amendment right to certain minimal conditions in prison.  Courts are certainly capable of adjudicating alleged violations of this right.  Whether brought under § 1983 or *Bivens*, such cases are common – there is even a model jury instruction.  9th Cir. Civ. Jury Instr. 9.25 (2007).

What is ***not*** common is for a federal court to use the Eighth Amendment to order releases from an institution, in particular mass releases.  Such releases inevitably raise issues of federalism (if a state institution), separation of powers (if a federal institution), and public safety.  Congress recognized these concerns when it enacted the Prison Reform Litigation Act, 18 U.S.C. § 3626, which imposed numerous conditions on such relief; no one argues that these conditions are met here. The PLRA, however, does not apply to "habeas corpus proceedings challenging the fact or duration of confinement in prison…." 18 U.S.C. § 3626(g)(2); *see also Scott v. LaMarque*, 27 F. App'x 858, 859 (9th Cir. 2001) ("[T]he amendments to 28 U.S.C. § 1915 made by the [PLRA] . . . do not apply in habeas proceedings).

Therefore, the fundamental issue here is whether the relief sought is cognizable as a habeas claim.  At first glance, it would be easy to view the habeas claim as mere wordplay to avoid the PLRA, too clever by half.  Supreme Court and Ninth Circuit caselaw, however, demonstrates that the habeas claim is far from frivolous.

A writ of habeas corpus is the proper avenue for prisoners to challenge the fact or duration of their confinement.  *See Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973)

CIVIL MINUTES—GENERAL                                          15

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 20-4451-MWF (MRWx)          Date:  June 8, 2020
Title:      Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

(a writ of habeas corpus is the sole available federal remedy when a prisoner
challenges "the fact or duration of his confinement").  However, a challenge to
conditions of confinement are generally brought pursuant to a civil rights statute, such
as § 1983 or *Bivens*.  *See Nelson v. Campbell*, 541 U.S. 637, 643 (2004)
("[C]onstitutional claims that merely challenge the conditions of a prisoner's
confinement, whether the inmate seeks monetary or injunctive relief, fall outside of
that core and may be brought pursuant to § 1983 in the first instance."); *Muhammad v.
Close*, 540 U.S. 749, 750 (2004) ("Challenges to the validity of any confinement or to
particulars affecting its duration are the province of habeas corpus . . .; requests for
relief turning on circumstances of confinement may be presented in a § 1983 action.").

       A divided en banc panel of the Ninth Circuit held that "when a prisoner's claim
would not ***necessarily*** spell speedier release, that claim does not lie at 'the core of
habeas corpus.'"  *Nettles v. Grounds*, 830 F.3d 922, 930 (9th Cir. 2016) (quoting
*Skinner v. Switzer*, 562 U.S. 521, 535, n.13 (2011)) (emphasis added).  Based on this
logic, the majority held that a state prisoner who sought to challenge a disciplinary
violation could not bring such a claim under habeas because the expungement of the
disciplinary violation "***could potentially*** affect the duration of [his] confinement," but
did not "necessarily lead to his immediate or earlier release from confinement."  *Id.* at
934-35 (emphasis in original).  However, in a footnote, the Ninth Circuit observed that
its ruling did not apply to federal prisoners; the Supreme Court had yet to address the
issue and federal prisoners had resort to *Bivens*, not to § 1983.  *Id.* at 931 n.6.

       The cases arising from the pandemic are similarly split.  A number of courts
have determined that petitioners seeking similar relief as a result of a COVID-19
outbreak in prisons properly brought the claim under § 2241.  For example, the court in
*Wilson v. Williams* held that prisoners at FCI Elkton properly brought their claim to
release a subclass of medically vulnerable inmates under § 2241 because "the only
truly effective remedy to stop the spread is to separate individuals—a measure that in
our nation's densely populated prisons is typically impossible without the release of a
portion of the population."  No. 4:20-CV-00794, 2020 WL 1940882, at *5 (N.D. Ohio
Apr. 22, 2020), *appeal filed* (6th Cir. Apr. 27, 2020).  Even though the petitioners'

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 20-4451-MWF (MRWx)          Date:  June 8, 2020
Title:     Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

claims were premised on the dangerous conditions within the prison created by the
virus, the court concluded that the claims were ultimately challenging the "fact or
duration of confinement" because eliminating the challenged conditions would be
impossible without releasing the petitioners.  *Id.*

The BOP subsequently filed a motion to stay, which the Sixth Circuit denied.  In
doing so, the Sixth Circuit affirmed the district court's ruling that the petitioners are
seeing a "fact or duration of confinement."  *Wilson v. Williams*, 20-3447, ECF No. 23-
1 at 3 (6th Cir. May 4, 2020).  The Sixth Circuit explained that "[w]here a petitioner
claims no set of conditions would be constitutionally sufficient, we construe the
petitioner's claim as challenging the fact of the confinement."  *Id.*  At the oral
argument on the government's appeal, the panel appeared to take the existence of
habeas for release (but not transfer) as settled and focused on other issues.

A handful of other courts have reached a similar conclusion, determining that
requesting release in the face of the COVID-19 pandemic was a cognizable habeas
claim.  *See e.g., Martinez-Brooks v. Easter*, No. 3:20-CV-00569 (MPS), 2020 WL
2405350, at *16 (D. Conn. May 12, 2020) (holding that prisoners at FCI Danbury
properly brought their requests for release to home confinement under § 2241 because
they "contend[ed] that the fact of their confinement in prison itself amounts to an
Eighth Amendment violation under these circumstances, and nothing short of an order
ending their confinement at FCI Danbury will alleviate that violation."); *Cameron v.
Bouchard*, No. CV 20-10949, 2020 WL 2569868, at *27 (E.D. Mich. May 21, 2020)
("Where a petition claims no set of conditions would be constitutionally sufficient, [the
Sixth Circuit] construes the petitioner's claim as challenging the fact of the
confinement."); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *3 (E.D.
Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020) ("Supreme Court and Sixth Circuit
precedent support the conclusion that where a petitioner claims no set of conditions
would be sufficient to protect her constitutional rights, her claim should be construed
as challenging the fact, not conditions, of her confinement and is therefore cognizable
in habeas.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 20-4451-MWF (MRWx)            Date:  June 8, 2020**
Title:      Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

On the other hand, several courts have reached the opposite conclusion with respect to COVID-19 related petitions.  Those courts have determined that the petitioners were not raising cognizable habeas claims because their claims were ultimately premised on the conditions of confinement.  *See e.g., Alvarez v. Larose*, No. 20-CV-00782-DMS (AHG), 2020 WL 2315807, at *3 (S.D. Cal. May 9, 2020) (holding that a similar habeas petition brought by prisoners at Otay Mesa Detention Center ("OMDC") was not properly brought under section 2241 because the petitioners' claims "[were] based solely on the current conditions inside OMDC given the COVID-19 pandemic"); *Wragg v. Ortiz*, No. CV 20-5496 (RMB), 2020 WL 2745247, at *18 (D.N.J. May 27, 2020) (holding that a similar habeas petition brought by prisoners in FCI Fort Dix were not properly brought as a habeas claim because the petitioners were not contesting "the validity of their convictions or sentences" or the "duration of their confinement," but rather an "injunctive relief based on unconstitutional conditions of confinement, a type of challenge that neither the Supreme Court nor the Third Circuit has yet recognized as a cognizable habeas claim.").

This issue, obviously, will be decided by the Ninth Circuit or the Supreme Court, but this Court still has a duty to use its best judgment in making this legal decision now.  Accordingly, the Court rules that the requested relief here is not cognizable as a habeas claim.  The Court's ruling is based on the following:

- Aside from the recent Sixth Circuit ruling, no court has recognized this relief as being cognizable under habeas corpus;

- Although the Supreme Court has not entirely foreclosed habeas relief here, a careful reading of the Supreme Court cases suggests that habeas cannot be stretched this far, as explained in *Wragg*;

- The nature of the relief coupled with the provisional class certification is simply not what lawyers and judges think of as habeas, even under § 2241, let alone §§ 2254 or 2255;

---

**CIVIL MINUTES—GENERAL                                                   18**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 20-4451-MWF (MRWx)              Date:  June 8, 2020
Title:     Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

- On the other hand, the requested relief here – not the procedure as such, but the goal of enlargement and release – is what Congress considered in the PLRA;

- The First Step Act provides some potential relief;

- In the CARES Act, Congress focused on the executive branch, not the judicial branch; and

- Petitioners have carefully argued that release is the only remedy; however, relief could be obtained by transferring prisoners, including by such extraordinary measures as recalling the *U.S.N.S. Mercy* from San Diego to serve as a prison ship.  Indeed, *Wilson* involves prisoner transfers.

     This ruling represents a legal disagreement with the reasoning of the Sixth Circuit and other district judges.  Respondents would have done better to argue that these cases are unpersuasive rather than attempt to distinguish them.  Respondents' putative distinguishing grounds are that (1) *Wilson* and *Martinez-Brooks* concerned FCI Elkton and FCI Danbury, which were both explicitly named in the April 3 Barr Memorandum as facilities with significant levels of COVID-19 infection; (2) "Petitioners [here] are not arguing that no set of conditions would be constitutionally sufficient, as they are seeking not only the implementation of release procedures, but specific relief to improve their conditions"; and (3) COVID-19 testing at Terminal Island is much more robust than that at FCI Elkton.  (TRO Opposition at 27).

     Petitioners easily dealt with these arguments, which on their face do not deal with the fundamental legal issues at stake.  (TRO Reply at 8-9).

### B.    <u>Other Putative Barriers to Relief</u>

     Respondents raise two additional barriers to the requested relief.  The first is exhaustion of administrative remedies.  (Opposition at 30-34).  The Court is satisfied

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 20-4451-MWF (MRWx)           Date:  June 8, 2020**
Title:     Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

that exhaustion is met or excused here, for the reasons argued by Petitioners.  Indeed, Respondents scarcely argued otherwise.  (Reply at 14-17).

The second burden is that the facts at Terminal Island, as presented by the Respondents, mean that all the *Winter* factors could not be met.  That is a more serious argument, and the Court would ordinarily hold an evidentiary hearing.  Nonetheless, the Court further determines that, if the habeas claim had legal merit, then the Court would grant the requested relief as to starting a procedural review, although the Court would stay any actual enlargement (which is ultimately what Petitioners want).  The Court so determines even though there are disputes of fact in the supporting evidence, for these reasons:

*First,* and most important, the numbers of the infected and dead speak for themselves.

*Second,* despite the new procedures discussed above, it is not clear how Terminal Island can achieve adequate social distancing with its current number of prisoners, which represents 133% overcapacity.

*Third,* Respondents can point to everything they are doing, but at some point, it is just a bandage on a gaping wound.  If a tsunami were inundating the prison, Respondents would talk about how they were trying to move the prisoners to higher ground and give them life preservers instead of boats.  Even crediting all the evidence Respondents submitted and resolving any potential dispute of fact in their favor, it is not clear how their laudable efforts are going to preserve the health and lives of the prisoners as long as there is no real social distancing.

Had the coronavirus not established itself in the prison, then the procedures offered by Respondents might be sufficient.  The Metropolitan Detention Center-Los Angeles has not seen a similar spread of the virus.  Regrettably, Terminal Island is far past that point.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 20-4451-MWF (MRWx)**          **Date:  June 8, 2020**
Title:     Lance Aaron Wilson, et al. v. Felicia L. Ponce, et al.

Therefore, the Court would in a TRO order the relief sought in paragraphs (a) through (k) of the Proposed Temporary Restraining Order (Docket No. 10-3), with the time limits of 48 hours extended to four days, and the remaining deadlines adjusted accordingly.  Paragraphs (a) through (k) describe the evaluative or procedural relief. The Court would issue an Order to Show Cause for the remaining requested relief.

But rather than hold a hearing and determine precisely what the equitable relief would be if it is mistaken in its legal ruling, the Court believes that the important thing now is to posture the case so the Ninth Circuit can rule on the fundamental legal issue. The Court will use discovery to develop the facts and be ready to rule if its legal ruling is reversed.

## III.  **CONCLUSION**

The TRO Application is **DENIED** on the sole ground that a writ of habeas corpus, the only asserted ground for the TRO Application, does not encompass the requested relief.

The Ninth Circuit has the right and duty to determine its own jurisdiction.  To the extent it matters, this Court views the denial of the TRO Application as an appealable order for the reasons stated in *South Bay United Pentecostal Church v. Newsom,* No. 55533 (May 22, 2020).  *See Religious Tech. Ctr., Church of Scientology Int'l, Inc. v. Scott*, 869 F.2d 1306, 1308 (9th Cir. 1989) (internal citation omitted); *see also* 28 U.S.C. § 1292(a)(1).  To the extent that this conclusion is doubted, then the Court certifies the denial pursuant to 28 U.S.C. § 1292(b).  The denial of the TRO is based on a controlling issue of law as to which there is substantial ground for difference of opinion, to say the least, and an immediate appeal may materially advance the ultimate termination of the litigation.

IT IS SO ORDERED.