Terry W. Bird – Bar No. 49038
    tbird@birdmarella.com
Dorothy Wolpert – Bar No. 73213
    dwolpert@birdmarella.com
*Naeun Rim – Bar No. 263558
    nrim@birdmarella.com
Shoshana E. Bannett – Bar No. 241977
    sbannett@birdmarella.com
Kate S. Shin – Bar No. 279867
    kshin@birdmarella.com
Oliver Rocos – Bar No. 319059
    orocos@birdmarella.com
Christopher J. Lee – Bar No. 322140
    clee@birdmarella.com
Jimmy Threatt – Bar No. 325317
    jthreatt@birdmarella.com
BIRD, MARELLA, BOXER,
WOLPERT, NESSIM, DROOKS,
LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Peter J. Eliasberg – Bar No. 189110
    peliasberg@aclusocal.org
Peter Bibring – Bar No. 223981
    pbibring@aclusocal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297


Donald Specter – Bar No. 83925
    dspecter@prisonlaw.com
Sara Norman – Bar No. 189536
    snorman@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

Attorneys for Plaintiff-Petitioners

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

LANCE AARON WILSON;
MAURICE SMITH; EDGAR
VASQUEZ, individually and on behalf
of all others similarly situated,

          Plaintiff-Petitioners,

    vs.

FELICIA L. PONCE, in her capacity as
Warden of Terminal Island; and
MICHAEL CARVAJAL, in his
capacity as Director of the Bureau of
Prisons,

          Defendant-Respondents.

CASE NO. 2:20-cv-04451-MWF-MRWx

**NOTICE OF SUPPLEMENTAL
AUTHORITIES IN SUPPORT OF
PLAINTIFF-PETITIONERS'
OPPOSITION TO DEFENDANT-
RESPONDENTS' MOTION TO
DISMISS**

Assigned to Hon. Michael W. Fitzgerald
Courtroom 5A

**TO THE HONORABLE COURT, AND TO DEFENDANT-RESPONDENTS, BY AND THROUGH THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiff-Petitioners Lance Aaron Wilson, Maurice Smith, and Edgar Vasquez (collectively, "Petitioners") hereby provide notice of two supplemental authorities in support of their opposition to Defendant-Respondents' motion to dismiss.  Both decisions now being submitted were issued after Petitioners filed their opposition papers on July 6.  (ECF No. 56)

The first supplemental authority is *Hope v. Warden York County Prison*, No. 20-1784, --- F.3d ---, 2020 WL 5001785 (3d Cir. Aug. 25, 2020), which counsel raised during today's hearing.[1]  Petitioners submit this decision with respect to the Court's jurisdiction on their habeas claim.  *See Hope*, 2020 WL 5001785, at *6–7.

The second supplemental authority is *Mays v. Dart*, No. 20-1792, --- F.3d --, 2020 WL 5361651 (7th Cir. Sept. 8, 2020).  Petitioners submit this decision for its bearing on their Eighth Amendment deliberate indifference claim, specifically the weight that should be afforded CDC guidelines.  *See Mays*, 2020 WL 5361651, at *9–10 ("[T]he CDC Guidelines, arising from an expert, independent agency, are entitled to greater weight than a police department's internally-crafted regulations.").

/ / /

/ / /

/ / /

---

[1]   Counsel inadvertently provided the citation 956 F.3d 156, which is to a different opinion in the *Hope* matter.

NOTICE OF SUPPLEMENTAL AUTHORITIES IN SUPPORT OF PLAINTIFF-PETITIONERS' OPPOSITION TO DEFENDANT-RESPONDENTS' MOTION TO DISMISS

1    Attached to this Notice are true and correct copies of both decisions.

2

3  DATED:  September 17, 2020          Terry W. Bird
4                                     Dorothy Wolpert
                                       Naeun Rim
5                                      Shoshana E. Bannett
                                       Kate S. Shin
6                                      Oliver Rocos
7                                      Christopher J. Lee
                                       Jimmy Threatt
8                                      Bird, Marella, Boxer, Wolpert, Nessim,
9                                      Drooks, Lincenberg & Rhow, P.C.

10

11                                     By:      /s/ Naeun Rim
                                                Naeun Rim
12                                     Attorneys for Plaintiff-Petitioners

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# FIRST SUPPLEMENTAL AUTHORITY

2020 WL 5001785
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

Aaron HOPE; Iwan Rahardja; Jesus de la
Pena; Rakibu Adam; Duc Viet Lam; Yelena
Mukhina; Nahom Gebretnisae; Ismail
Muhammed; Glenn Weithers; Konstantin
Bugarenko; Brisio Balderas-Dominguez;
Viviana Ceballos; Wilders Paul; Marcos
Javier Ortiz Matos; Alexander Alvarenga;
Armando Avecilla; Coswin Ricardo Murray;
Edwin Luis Crisostomo Rodriguez; Eldon
Bernard Briette; Dembo Sannoh; Jesus
Angel Juarez Pantoja; Alger Francois
v.
WARDEN YORK COUNTY PRISON;
Warden Pike County Correctional
Facility; Director Philadelphia Field
Office Immigration and Customs
Enforcement; Director United States
Immigration and Customs Enforcement;
Secretary United States Department
of Homeland Security, Appellants

No. 20-1784
|
Argued June 18, 2020
|
(Opinion filed: August 25, 2020)

**Synopsis**
**Background:** Immigration detainees filed petition for writ of
habeas corpus seeking immediate release, claiming that due
to their age and various health conditions, their continued
detention during COVID-19 pandemic put them at imminent
risk of death or serious injury. The United States District
Court for the Middle District of Pennsylvania, John E. Jones,
J., 2020 WL 5035725, granted ex parte detainees' motion for
temporary restraining order (TRO) directing their immediate
release, and, 2020 WL 5035724, denied government's motion

for reconsideration. Government filed interlocutory appeal,
which the Court of Appeals, 956 F.3d 156, allowed.

**Holdings:** The Court of Appeals, Hardiman, Circuit Judge,
held that:

[1] detainees were not entitled to ex parte relief;

[2] order mandating release was impermissibly indefinite
and indeterminate, in violation of rule governing restraining
orders and injunctions;

[3] detainees' claim for immediate release based on
unconstitutional conditions of confinement was cognizable in
habeas;

[4] detainees failed to show substantial likelihood of success
on merits of claim that conditions of confinement violated due
process;

[5] detainees failed to show substantial likelihood of success
on claim that government was deliberately indifferent to their
serious medical needs;

[6] district court was required to make individualized findings
as to whether each detainee would suffer irreparable harm
absent injunction;

[7] district court was required to make particularized findings
regarding balancing of harms and public interest; and

[8] district court erred in fashioning preliminary injunction
mandating immediate release.

Vacated and remanded.

West Headnotes (47)

**[1]**    **Injunction** 👉 Grounds in general; multiple
factors

For an injunction to issue, the plaintiffs must
demonstrate (1) that they are reasonably likely
to prevail eventually in the litigation and (2) that
they are likely to suffer irreparable injury without
relief; if these two threshold showings are made

the District Court then considers, to the extent relevant, (3) whether an injunction would harm the defendants more than denying relief would harm the plaintiffs and (4) whether granting relief would serve the public interest. Fed. R. Civ. P. 65.

1 Cases that cite this headnote

**[2]**   **Injunction**  ⬥  Mandatory injunctions; restoration of status quo

**Injunction**  ⬥  Actual success on merits

**Injunction**  ⬥  Clear, unequivocal or existing right to relief

Plaintiffs bear a particularly heavy burden when seeking a mandatory injunction, requiring them to show a substantial likelihood of success on the merits and that their right to relief is indisputably clear.

**[3]**   **Federal Courts**  ⬥  Questions of Law in General

**Federal Courts**  ⬥  "Clearly erroneous" standard of review in general

**Federal Courts**  ⬥  Injunction

Court of Appeals reviews the district court's findings of fact for clear error, its legal conclusions de novo, and its decision to grant injunctive relief for abuse of discretion.

**[4]**   **Federal Courts**  ⬥  Abuse of discretion in general

An abuse of discretion exists when the decision rests on an erroneous view of the law or on a clearly erroneous assessment of the evidence, which includes an improper application of the correct law to the facts.

**[5]**   **Federal Courts**  ⬥  "Clearly erroneous" standard of review in general

Clear error exists when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

**[6]**   **Aliens, Immigration, and Citizenship**  ⬥  Judicial Review or Intervention

Immigration detainees were not entitled to ex parte temporary restraining order (TRO) or preliminary injunction ordering their immediate release during COVID-19 pandemic, in proceedings on petition for habeas corpus against detention facilities, Immigration and Customs Enforcement (ICE), and other parties, where detainees did not seek ex parte relief, their counsel did not include certification required for ex parte relief, district court failed to explain why order had to issue without affording government opportunity to be heard, and district court issued order notwithstanding detainees' request for hearing and its awareness of counsel for respondents. Fed. R. Civ. P. 65(b)(1)(B), (b)(2).

**[7]**   **Civil Rights**  ⬥  Preliminary Injunction

On government's motion for reconsideration of district court's ex parte order granting immigration detainees' motion for temporary restraining order (TRO) and ordering detainees' immediate release from state facilities during COVID-19 pandemic, government was not required to show cause as to why detainees were not entitled to mandatory injunction, nor was government required to meet reconsideration standards of showing new evidence, change in the law, and need to correct clear error of law or prevent manifest injustice, in accordance with due process, but rather burden remained with detainees to prove clear entitlement to injunctive relief. U.S. Const. Amends. 5, 14; Fed. R. Civ. P. 65(b)(3).

**[8]**   **Injunction**  ⬥  Presumptions and burden of proof

Burden to prove clear entitlement to injunctive relief always stays with the party requesting that relief. Fed. R. Civ. P. 65.

**[9]**   **Aliens, Immigration, and Citizenship** 👉 **Judicial Review or Intervention**

Contingent nature of state of emergency ordered by Governor of Pennsylvania rendered district court's order mandating immediate release of immigration detainees housed at detention facilities in Pennsylvania during COVID-19 pandemic indefinite contrary to 14-day time limit for temporary restraining order (TRO) and indeterminate in violation of the specificity requirement that every injunction or restraining order state its terms specifically and describe in reasonable detail the act or acts restrained or required. Fed. R. Civ. P. 65(b)(2), (d).

1 Cases that cite this headnote

**[10]**   **Injunction** 👉 **Specificity, vagueness, overbreadth, and narrowly-tailored relief**

**Injunction** 👉 **Contempt**

Requirements that every order granting an injunction and every restraining order must state its terms specifically and describe in reasonable detail the act or acts restrained or required are not mere technicalities, but rather they relate to the district court's awesome civil and criminal contempt powers, and persons may not be placed at risk of contempt unless they have been given specific notice of the norm to which they must pattern their conduct. Fed. R. Civ. P. 65(d)(1)(B, C).

1 Cases that cite this headnote

**[11]**   **Injunction** 👉 **Scope and duration of relief**

While temporary and preliminary injunctive relief orders issue in the context of exigent circumstances and at times may lack the precision of final decrees, to comply with the rule requiring that every such order must state its terms specifically and describe in reasonable detail the act or acts restrained or required, a party must receive fair and precisely drawn notice of what the injunction actually prohibits or requires. Fed. R. Civ. P. 65(d).

**[12]**   **Aliens, Immigration, and Citizenship** 👉 **Judicial Review or Intervention**

Terms of district court's orders mandating immediate release of immigration detainees during COVID-19 pandemic, which permitted government to impose "reasonable" nonconfinement terms of supervision, and permitted government to re-detain detainees if "they commit any further crimes" or "violate the terms of their release," were too indefinite to satisfy requirements that every injunction or restraining order must state its terms specifically and describe in reasonable detail the act or acts restrained or required; "reasonable" was capacious enough to provoke disagreement between detainees and government regarding propriety of any additional terms of supervision, and terms regarding re-detention were over- and under-inclusive, requiring government to act at its peril in re-detaining detainees. Fed. R. Civ. P. 65(d).

**[13]**   **Injunction** 👉 **Form and requisites**

An injunction should be phrased in terms of objective actions, not legal conclusions. Fed. R. Civ. P. 65.

**[14]**   **Aliens, Immigration, and Citizenship** 👉 **Judicial Review or Intervention**

Terms of district court's orders mandating immediate release of immigration detainees during COVID-19 pandemic, which required detainees to "self-quarantine" for 14 days after their release, to comply with all national, state, and local "guidance" regarding staying at home, sheltering in place, and social distancing, and to report their whereabouts to their counsel, who in turn were required to report absconsion, that every injunction or restraining order must state its terms specifically and describe in reasonable detail the act or acts restrained or required; order did not explain what self-quarantine entailed, did not specify what constituted "guidance," and did not specify what affirmative acts were required

by detainees or their counsel. Fed. R. Civ. P. 65(d).

**[15]  Injunction ❧ Necessity and waiver in general**

Absence of a bond precludes issuance of an injunction. Fed. R. Civ. P. 65(c).

**[16]  Habeas Corpus ❧ Aliens**

Immigration detainees' claim seeking only release on the basis that unconstitutional conditions of confinement at two detention facilities during COVID-19 pandemic required it was cognizable in § 2241 habeas petition; detainees were not challenging convictions or sentences, and extraordinary circumstances existed because of COVID-19 pandemic. 28 U.S.C.A. § 2241.

**[17]  Federal Civil Procedure ❧ Complaint**

Party who brings a suit is master to decide what law he will rely upon.

**[18]  Habeas Corpus ❧ Release from restraint**

Traditional function of the writ of habeas corpus is to secure release from unlawful executive detention.

**[19]  Habeas Corpus ❧ Release from restraint**

Where a petitioner seeks release from detention, habeas, not a § 1983 action seeking release, is proper. 42 U.S.C.A. § 1983.

**[20]  Action ❧ Nature and subject matter of actions in general**

Even where a complaint seeks both damages pursuant to § 1983 and habeas relief, the damages action should be stayed while habeas is exhausted. 42 U.S.C.A. § 1983.

**[21]  Habeas Corpus ❧ Purpose and Use of Writ**

"Habeas corpus" is an extraordinary remedy whose operation is to a large extent uninhibited by traditional rules of finality and federalism, its use has been limited to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate. 28 U.S.C.A. § 2241.

**[22]  Constitutional Law ❧ Arrest, detention, supervision, and parole**

Immigration detainees are entitled to the same due process protections as pretrial detainees. U.S. Const. Amends. 5, 14.

**[23]  Constitutional Law ❧ Arrest, detention, supervision, and parole**

Immigration detainees who are in federal custody pursuant to the INA and housed in state facilities are protected by the Due Process Clauses of the Fifth and Fourteenth Amendments. U.S. Const. Amends. 5, 14; Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101 et seq.

**[24]  Constitutional Law ❧ Arrest, detention, supervision, and parole**

Substantive due process guarantees afforded immigration detainees are at least as robust as Eighth Amendment protections afforded prisoners. U.S. Const. Amends. 5, 8, 14.

**[25]  Aliens, Immigration, and Citizenship ❧ Judicial Review or Intervention**

Immigration detainees seeking preliminary injunction requiring their immediate release during COVID-19 pandemic failed to show substantial likelihood of success on merits of claim that conditions of their confinement in state facilities constituted punishment in violation of due process, notwithstanding assertions that

they were detained in unsanitary, tightly-packed environments; detainees' confinement implicated multiple legitimate governmental objectives, including ensuring detainees' appearances at removal proceedings, protecting the public, and managing detention facilities, government had instituted responsive measures to detect and prevent spread of virus, and detainees did not assert that government subjected them to conditions intended to harm them. U.S. Const. Amends. 5, 14; Immigration and Nationality Act § 236, 8 U.S.C.A. § 1226(c).

1 Cases that cite this headnote

**[26]    Constitutional Law**  Arrest, detention, supervision, and parole

Immigration detainees may not be punished before they are adjudicated guilty, in accordance with due process. U.S. Const. Amends. 5, 14.

**[27]    Constitutional Law**  Arrest, detention, supervision, and parole

Touchstone for the constitutionality of immigration detention in accordance with due process is whether conditions of confinement are meant to punish or are but an incident of some other legitimate governmental purpose. U.S. Const. Amends. 5, 14.

**[28]    Constitutional Law**  Arrest, detention, supervision, and parole

The ultimate question of whether immigration detention comports with the requirement of due process or is a punishment is whether conditions of confinement are reasonably related to a legitimate governmental objective. U.S. Const. Amends. 5, 14.

**[29]    Constitutional Law**  Arrest, detention, supervision, and parole

If immigration detainees are subject to conditions unrelated to a legitimate governmental objective, the court may infer that the purpose of the governmental action

is punishment that may not be constitutionally inflicted upon detainees qua detainees in accordance with due process. U.S. Const. Amends. 5, 14.

**[30]    Constitutional Law**  Arrest, detention, supervision, and parole

In determining whether the conditions of confinement for immigration detainees are reasonably related to a legitimate governmental objective purpose, as required by due process, or are a punishment, the court considers the totality of the circumstances of confinement, including any genuine privations or hardship over an extended period of time, and whether conditions are (1) rationally related to their legitimate purpose or (2) excessive in relation to that purpose. U.S. Const. Amends. 5, 14.

**[31]    Constitutional Law**  Arrest, detention, supervision, and parole

In assessing whether conditions and restrictions of confinement of immigration detainees are excessive given their purposes, as would violate due process, the courts must acknowledge that practical considerations of detention justify limitations on many privileges and rights. U.S. Const. Amends. 5, 14.

**[32]    Constitutional Law**  Arrest, detention, supervision, and parole

Though not a convicted prisoner, an immigration detainee does not possess the full range of freedoms of an unincarcerated individual, for purposes of determining whether the conditions of confinement violate due process; thus, the fact of confinement as well as the legitimate goals and policies of the institution limits detainees' retained constitutional rights. U.S. Const. Amends. 5, 14.

**[33]    Aliens, Immigration, and Citizenship**  Judicial Review or Intervention

**Constitutional Law** 🖛 Arrest, detention, supervision, and parole

In determining whether restrictions or conditions of confinement are reasonably related to the government's interest in maintaining security and order and operating the immigration-detention institution in a manageable fashion, so as to be in accordance with due process, such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters. U.S. Const. Amends. 5, 14.

**[34]** **Aliens, Immigration, and Citizenship** 🖛 Judicial Review or Intervention

**Constitutional Law** 🖛 Arrest, detention, supervision, and parole

Courts considering whether conditions of confinement for immigration detainees comport with due process defer to administrators on matters of correctional facility administration not merely because the administrator ordinarily will have a better grasp of his domain than the reviewing judge, but also because the operation of correctional facilities is peculiarly the province of the legislative and executive branches of the government not the judicial. U.S. Const. Amends. 5, 14.

1 Cases that cite this headnote

**[35]** **Constitutional Law** 🖛 Conditions

If a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment" that would violate due process; conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not

constitutionally be inflicted upon detainees qua detainees. U.S. Const. Amends. 5, 14.

**[36]** **Constitutional Law** 🖛 Arrest, detention, supervision, and parole

Detention of aliens pending their removal in accordance with the INA is constitutional and is supported by legitimate governmental objectives, in accordance with due process. U.S. Const. Amends. 5, 14; Immigration and Nationality Act §§ 236, 241, 8 U.S.C.A. §§ 1226(c), 1231(a)(2, 6).

**[37]** **Aliens, Immigration, and Citizenship** 🖛 Judicial Review or Intervention

Immigration detainees seeking preliminary injunction requiring their immediate release from state facilities during COVID-19 pandemic failed to show substantial likelihood of success on merits of claim that government was deliberately indifferent to their serious medical needs based on their vulnerability to COVID-19 because of their ages and medical conditions, in violation of due process, despite assertion that detainees were incapable of social distancing; government's conduct had to be evaluated in context of highly unusual and unique circumstances of COVID-19, Centers for Disease Control and Prevention (CDC) provided guidance specific to detention facilities when social distancing was not possible, and government increased its efforts to minimize risk by improving hygiene and decreasing exposure. U.S. Const. Amends. 5, 14.

**[38]** **Constitutional Law** 🖛 Arrest, detention, supervision, and parole

To establish deliberate indifference to a serious medical need, as would violate due process, immigration detainees must show the government knew of and disregarded an excessive risk to their health and safety. U.S. Const. Amends. 5, 14.

**[39]** **Constitutional Law** 👉 Arrest, detention, supervision, and parole

Mere disagreement as to the response to the risk to immigration detainees in light of their medical conditions will not support constitutional infringement based on deliberate indifference to a serious medical need in violation of due process. U.S. Const. Amends. 5, 14.

**[40]** **Constitutional Law** 👉 Arrest, detention, supervision, and parole

Deliberate indifference to a serious medical need of an immigration detainee, as would violate due process, requires significantly more than negligence. U.S. Const. Amends. 5, 14.

**[41]** **Constitutional Law** 👉 Arrest, detention, supervision, and parole

"Deliberate indifference" to a serious medical need of an immigration detainee, as would violate due process, is a subjective standard of liability consistent with recklessness as that term is defined in the criminal law. U.S. Const. Amends. 5, 14.

**[42]** **Constitutional Law** 👉 Arrest, detention, supervision, and parole

Context of the government's conduct is essential to determine whether it shows the requisite deliberate indifference to an immigration detainee's serious medical need that shocks the conscience for a substantive due process violation. U.S. Const. Amends. 5, 14.

**[43]** **Aliens, Immigration, and Citizenship** 👉 Detention in general

**Constitutional Law** 👉 Arrest, detention, supervision, and parole

Exposure of immigration detainees housed in state facilities to COVID-19 was not per se unconstitutional in violation of due process, on claim that government was deliberately indifferent to serious medical needs based on their vulnerability to COVID-19 based on their ages and medical conditions, though virus had no vaccine or cure. U.S. Const. Amends. 5, 14.

**[44]** **Aliens, Immigration, and Citizenship** 👉 Judicial Review or Intervention

District court was required to make particularized inquiry and individualized findings as to whether each immigration detainee showed that they would suffer irreparable harm absent preliminary injunction mandating their immediate release during COVID-19 pandemic, and, in making that assessment, district court should have considered several factors for each individual detainee beyond their ages and medical conditions, including each detainee's medical risks, healthcare access needs, detention conditions, and release circumstances, instead of considering detainees as a unit.

**[45]** **Aliens, Immigration, and Citizenship** 👉 Judicial Review or Intervention

In determining whether balance of harms and public interest weighed in favor of preliminary injunction mandating immigration detainees' immediate release during COVID-19 pandemic, district court was required to make particularized findings regarding risk of harm to public in terms of immigration detainees' individual criminal histories, each detainees' risk of flight and danger to public, associated burdens on public healthcare by each detainee's release, and practical difficulties involved in locating and re-detaining detainees should the government ultimately prevail on claims that detention conditions violated due process, or should a detainee abscond, commit a crime, or violate another term of release. U.S. Const. Amend. 14.

**[46]** **Injunction** 👉 Injunctions against government entities in general

Considerations of balancing of harms and the public interest merge when the government is the opposing party to a request for a preliminary injunction.

[47]    **Aliens, Immigration, and Citizenship**    🔑 Judicial Review or Intervention

District court erred in fashioning preliminary injunction mandating immediate release of immigration detainees, who were vulnerable to COVID-19 because of their ages and medical conditions, on their own recognizance during COVID-19 pandemic on conditions including that they attend all removal hearings and report their whereabouts to their counsel, who in turn were required to report absconsion; district court granted release without exploring alternatives to avoid any irreparable harm to detainees, and district court did not explain why it rejected government's requests that detainees' counsel report each detainee's whereabouts every seven days and that detainees be placed on home detention with ankle monitoring by the government.

On Appeal from the United States District Court for the Middle District of Pennsylvania (D.C. No. 1-20-cv-00562), District Judge: The Honorable John E. Jones, III

**Attorneys and Law Firms**

David Byerley, United States Department of Justice, Office of Immigration Litigation, P.O. Box 868, Ben Franklin Station, Washington, DC 20044, Jeffrey S. Robins, United States Department of Justice, Office of Immigration Litigation, Room 6040, P.O. Box 878, Washington, DC 20044, Scott G. Stewart [Argued], United States Department of Justice, 950 Pennsylvania Ave., N.W., Washington, DC 20530, Counsel for Appellants

Lawrence J. Joseph, Suite 700-1A, 1250 Connecticut Avenue, N.W., Washington, DC 200, Counsel for Amicus Immigration Reform Institute in favor of Appellants

Eunice H. Cho, David C. Fathi, American Civil Liberties Union, 915 15th St., N.W., 6th Floor, Washington, DC 20003, Carla G. Graff, Kelly A. Krellner, Dechert, 2929 Arch Street, 18th Floor, Cira Centre, Philadelphia, PA 19104, Stephen B. Kang, Cecillia D. Wang, American Civil Liberties Union Foundation, 39 Drumm Street, San Francisco, CA 94111, Erika B. Nyborg-Burch, Vanessa Stine, Muneeda S. Talukder, American Civil Liberties Union of Pennsylvania, P.O. Box 60173, Philadelphia, PA 19106, Witold J. Walczak, Esq. [Argued], American Civil Liberties Union, P.O. Box 23058, Pittsburgh, PA 15222, Counsel for Appellees

Kristin A. Macleod-Ball, American Immigration Counsel, 1318 Beacon Street, Suite 18, Brookline, MA 02446, Counsel for Amicus American Immigration Council in favor of Appellees

Susanna M. Buergel, Paul Weiss Rifkind Wharton & Garrison, 1285 Avenue of the Americas, New York, NY 10019, Counsel for Amicus Robert L. Cohen, M.D., Joe Goldenson, M.D., Michael Puisis, D.O., and Brie Williams, M.D., M.S., in favor of Appellees

Before: SMITH, Chief Judge, HARDIMAN and SCIRICA, Circuit Judges.[1]

OPINION OF THE COURT

HARDIMAN, Circuit Judge.

 **\*1**  On April 7, 2020, the United States District Court for the Middle District of Pennsylvania ordered the immediate release of twenty-two immigration detainees (collectively, Petitioners) from the York County Prison (York) and Pike County Correctional Facility (Pike) amidst the COVID-19[2] pandemic. It did so *ex parte*, by granting Petitioners' motion for temporary restraining order (TRO) without affording the Government an opportunity to be heard. After staying its April 7, 2020 order, the District Court again mandated Petitioners' release on April 10, 2020. The Government appealed both orders. As we explained in *Hope v. Warden York County Prison*, 956 F.3d 156, 161–62 (3d Cir. 2020) (*Hope I*), the District Court's orders—which purported to be TROs—were in effect mandatory preliminary injunctions. Having determined in *Hope I* that we have jurisdiction, we now consider the merits of the Government's appeal.

Hope v. Warden York County Prison, --- F.3d ---- (2020)

I

This case followed closely on the heels of a similar one decided by the District Court. *See Thakker v. Doll*, — F. Supp. 3d ——, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020). In *Thakker*, immigration detainees sought release from their detention in York, Pike, and a third facility. The District Court held the detainees were likely to succeed on their claim that their detention deprived them of substantive due process because of their advanced ages and medical histories. *Id.* at ——, 2020 WL 1671563, at *9. So it ordered their release.

Three days after the District Court issued its order in *Thakker*, Petitioners filed their "Verified Petition for Writ of Habeas Corpus and Complaint for Emergency Injunctive Relief" seeking release from custody and alleging they were at risk of serious harm from COVID-19 while detained at York and Pike. They filed a joint habeas petition even though they: (1) vary in age from 28 to 69, with only one of them older than 65; (2) have divergent health conditions; (3) were detained for various reasons; (4) have unique criminal histories; (5) have individual flight risk profiles; and (6) have diverse home and family situations. Despite those distinguishing characteristics, the petition alleged they are "united by the fact that they are over age 65 and/or adults who have a serious pre-existing medical condition" and that "the United States Centers for Disease Control has determined [their conditions] put[ ] them at significantly higher risk of severe disease and death if they contract COVID-19." App. 28. The petition further averred that conditions at York and Pike place Petitioners at higher risk to contract COVID-19 because "risk mitigation is impossible" there. App. 79. They claimed their confinement deprives them of substantive due process because it constitutes punishment and because Respondents are deliberately indifferent to their serious medical needs. According to Petitioners, only release will rectify their unconstitutional confinement.

*2 Petitioners provided a general description of their health conditions and little detail about their immigration circumstances. The petition stated that some are lawful permanent residents, while others seek adjustment of status through an ill spouse or because they have lived in this country since they were children. The petition described the criminal records and histories for very few of the Petitioners and did so summarily. Federal law required some to be detained while others were detained at the discretion of the Secretary of the Department of Homeland Security or an immigration judge. *See* 8 U.S.C. § 1226(a), (c); and 8 C.F.R. §§ 1003.19, 1236.1(c); *see also Nielsen v. Preap*, —— U.S. ——, 139 S. Ct. 954, 958–59, 203 L.Ed.2d 333 (2019).

The petition was accompanied by a motion for TRO, but Petitioners did not request *ex parte* relief. In fact, they emailed their filings to counsel for the Government and asked the Court to "immediately schedule a hearing." App. 86. Even though Petitioners' counsel promptly (and appropriately) engaged opposing counsel in the adversary process, the District Court entered its April 7 order *ex parte* without a hearing, relying heavily on its prior findings and decision in *Thakker*.

The April 7 order commanded the Government to immediately release Petitioners "on their own recognizance." App. 14. It also required Petitioners to self-quarantine for fourteen days after their release. *Id.* The terms of the injunction were to expire on April 20, 2020 at 5:00 p.m. *Id.* Finally, the Court ordered the Government—from which it had not yet heard—to show cause "why the [order] should not be converted into a preliminary injunction." *Id.*

Less than five hours after the April 7 *ex parte* order was entered on the docket, the Government entered its appearance, filed a motion to stay the immediate release order, and sought reconsideration based on the declaration of Assistant Field Office Director Joseph Dunn. The District Court granted a temporary stay of its *ex parte* order and ordered Petitioners to respond to the motion for reconsideration, which they did on April 8. That same day, the Government responded to the petition and motion for TRO. Also on April 8, the Court scheduled a status conference for April 9, which it apparently held off the record. On April 10, the Government filed another declaration of Director Dunn.

Later on April 10, and again without holding a hearing and without discussing the Government's response in opposition to Petitioners' filings, the District Court entered an order: (1) denying reconsideration of its April 7 order; (2) lifting the temporary stay; and (3) reiterating the relief provided by the April 7 order, again mandating the release of Petitioners that day. App. 20–21. Like the April 7 order, the April 10 order instructed Petitioners to self-quarantine for fourteen days after their release. App. 21.[3]

The April 10 order purported to expire on April 20, 2020, but contradicted itself in two ways. It extended the "release period ... until such time as the COVID-19 state of emergency

as declared by the Governor of the Commonwealth of Pennsylvania is lifted, or by further Order of this Court." *Id.* at 21. And it terminated the release period "immediately if a Petitioner absconds." *Id.*

The April 10 order also imposed new conditions on both parties, stating:

> a. This Order requires Petitioners to comply with all Executive Orders ... as well as national, state and local guidance regarding staying at home, sheltering in place, and social distancing;
>
> **\*3** b. This Order *does not prevent* the government from taking Petitioners back into *custody* should they commit *any further crimes* or otherwise *violate the terms* of their release;
>
> c. The Petitioners *shall report* their whereabouts once per week *to their attorneys*, who in turn *shall report* to the Respondents *if a Petitioner has absconded*;
>
> d. The Petitioners must appear at all hearings pertaining to their removal proceedings, and in the event that they are subject to a final order of deportation for which arrangements have been finalized within the period of this Order, they shall fully comply with the said order of deportation and all instructions pertaining thereto; and
>
> e. Respondents may impose other *reasonable nonconfinement* terms of supervision that would not require Petitioners to violate national, state and local guidance regarding staying at home, sheltering in place, and social distancing.

App. 21–22 (emphases added).

The Government timely appealed the April 7 and April 10 orders.

## II

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1292(a)(1). *Hope I*, 956 F.3d at 159 n.5, 162.

## III

**[1]** **[2]** We review the District Court's orders under the standard of review for preliminary injunctions because they granted preliminary injunctive relief within the meaning of 28 U.S.C. § 1291(a)(1). *See Hope I*, 956 F.3d at 162. Rule 65 of the Federal Rules of Civil Procedure imposes preconditions on the issuance of injunctions, including TROs. For an injunction to issue:

> the plaintiffs had to demonstrate (1) that they are reasonably likely to prevail eventually in the litigation and (2) that they are likely to suffer irreparable injury without relief. If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiffs and (4) whether granting relief would serve the public interest.

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (internal quotations and citations omitted). Because the Court granted a mandatory injunction, a heightened standard applies. *Bennington Foods, LLC v. St. Croix Renaissance Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008). So Petitioners bore a "particularly heavy" burden, *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994), requiring them to show a substantial likelihood of success on the merits and that their "right to relief [is] indisputably clear," *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) (quoting *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235, 93 S.Ct. 16, 34 L.Ed.2d 64 (1972)).

**[3]** **[4]** **[5]** We review the District Court's findings of fact for clear error, its legal conclusions de novo, and its decision to grant injunctive relief for abuse of discretion. *See K.A. ex rel. Ayers*, 710 F.3d at 105. An abuse of discretion exists when the decision rests "on an erroneous view of the law or on a clearly erroneous assessment of the evidence," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), which includes an improper application of the correct law to the facts, *United States v. Reyes-Romero*, 959 F.3d 80, 92 (3d Cir. 2020). Clear error exists "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

## IV

**\*4** With the legal framework just described in mind, we begin with the Government's procedural challenges. It contends the District Court erred by granting relief *ex parte*. The Government also claims the District Court erred when the Court absolved Petitioners of their duty to show entitlement to injunctive relief by ordering the Government to show cause why the Petitioners were not entitled to a mandatory injunction and by applying reconsideration standards.

A

"As the Supreme Court has observed, 'our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted [to] both sides of a dispute.' " *Hope I*, 956 F.3d at 160 (quoting *Granny Goose Foods Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974)). And the Court has described due process in this way:

> Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.

*Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (internal quotations and citations omitted).

Despite these principles, a TRO may be entered *ex parte*, but only if safeguards in Rule 65(b) are met. For example, Rule 65(b)(3) requires an expedited preliminary injunction hearing after an *ex parte* TRO is entered. And a court may not convert an *ex parte* TRO into a preliminary injunction without a hearing or issue an *ex parte* preliminary injunction. *See Granny Goose*, 415 U.S. at 439 & n.14, 94 S.Ct. 1113 (Rule 65(b)'s stringent requirements restrict *ex parte* TRO's to "preserving the status quo" and "preventing irreparable harm" only for the time "necessary to hold a hearing, and no longer").

[6] Although Petitioners stated their prayer for relief alternatively as a request for a TRO or for a preliminary injunction, they never sought *ex parte* relief and their counsel advised the Court that they promptly served the Government. Accordingly, Petitioners' counsel did not include a Rule 65(b)(1)(B) certification required for *ex parte* relief. The Court failed to explain why the order had to issue without affording the Government an opportunity to be heard, in violation of Rule 65(b)(2). And it did so even though Petitioners requested

a hearing and counsel for Respondents were well known to the Court from their involvement in the *Thakker* case.[4] All this was contrary to law.

B

[7] The District Court's initial failure to include the Government in the proceedings created problems downstream when it issued the April 10 order. Instead of acknowledging the Government's substantive response to the petition and motion consistent with the prerequisites for issuing injunctive relief, the Court not only shifted the burden to the Government, but also required it to surmount the high hurdle applicable to a motion for reconsideration. *Hope I*, 956 F.3d at 162. Petitioners counter that the Government invited the error by filing its reconsideration motion. We disagree.

**\*5** [8] The District Court turned due process on its head when it required the party against whom it ordered injunctive relief to prove why such relief should not be continued. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006) ("The point remains that the burdens at the preliminary injunction stage track the burdens at trial."); *see also* Fed. R. Civ. P. 65(b)(3) (in expediting preliminary injunction hearing held after TRO issues "the party who obtained the order must proceed with the motion"). The burden to prove clear entitlement to injunctive relief always stays with the party requesting that relief. So the District Court erred when its April 10 order required the Government to show: (1) new evidence before it was ever afforded the chance to present any evidence before the April 7 order was issued; (2) a change in the law before it was allowed to brief the Court; and (3) the need to correct a clear error of law or prevent manifest injustice. App. 18 (citing *Max's Seafood Café by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)). For these reasons, we hold that the District Court abused its discretion when it applied reconsideration standards to issue the April 10 order.

C

[9] The April 10 order violates other provisions of Rule 65. It mandates Petitioners' release until the Governor of Pennsylvania lifts the state of emergency or the Court orders otherwise, while purporting to expire on April 20, 2020. The contingent nature of the Governor's state of emergency

rendered the order indefinite contrary to the fourteen-day time limit in Rule 65(b)(2). *See Hope I*, 956 F.3d at 162. And it also rendered the provision indeterminate in violation of the specification requirements of Rule 65(d).

[10]    [11]    Rule 65(d) provides that "[e]very order granting an injunction and every restraining order *must* state its terms specifically" and "describe in reasonable detail ... the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B) & (C) (emphasis added). These requirements are not mere technicalities. They "relate[ ] to the court's awesome civil and criminal contempt powers. Persons may not be placed at risk of contempt unless they have been given specific notice of the norm to which they must pattern their conduct." *Inmates of Allegheny Cnty. Jail v. Wecht*, 754 F.2d 120, 129 (3d Cir. 1985) (citations omitted). We recognize that temporary and preliminary injunctive relief orders issue in the context of "exigent circumstances and at times may lack the precision of final decrees." *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 84 (3d Cir. 1982). But "Rule 65(d) was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). In short, a party must "receive fair and precisely drawn notice of what the injunction actually prohibits [or requires]." *Granny Goose*, 415 U.S. at 444, 94 S.Ct. 1113.

[12]    [13]    Other terms of the District Court's April 7 and 10 orders are too indefinite to satisfy Rule 65(d). Under that subsection, an injunction "should be phrased in terms of objective actions, not legal conclusions." *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1362 (11th Cir. 2019) (internal quotations and citations omitted). The April 10 order permits the Government to impose "reasonable nonconfinement terms of supervision." App. 22. But "reasonable" is capacious enough to provoke disagreement between Petitioners and the Government regarding the propriety of any additional terms of supervision. The order also permits the Government to re-detain Petitioners if "they commit any further crimes" or "violate the terms of their release." App. 21. That provision raises more questions than it answers, however. Do "further crimes" include traffic violations? We doubt that was the District Court's intention. Perhaps the Court meant only felonies? But Petitioners could "violate the terms of their release" without committing any crime at all. So the April 10 order is not just vague, it is also over- and under-inclusive.

The Government would be acting at its peril if it were to re-detain Petitioners.

**\*6    [14]**    The April 7 and April 10 orders also require affirmative acts by Petitioners, subject to contempt and re-detention if they fail to comply. Both orders mandate self-quarantine without explaining what that entails. The April 10 order requires Petitioners "to comply with all ... national, state and local guidance regarding staying at home, sheltering in place, and social distancing," *id.*, but does not specify what constitutes "guidance." It also compels Petitioners to report their whereabouts to their counsel, who in turn are required to report absconsion. App. 21–22. Must counsel report only known absconsion? What about likely absconsion or a failure to report each week? The lack of specificity as to affirmative acts required by Petitioners and their counsel in the order also contravenes Rule 65(d).

[15]    Finally, the District Court failed to order bond. Under Rule 65(c), the absence of a bond precludes issuance of an injunction. *See Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) (court can excuse bond required for injunction only on "specific finding" that "rare exception" applies). These violations of Rule 65 were legal error.

V

[16]    Procedural missteps often lead to substantive errors, and that is true in this case as well. The District Court abused its discretion when it held that Petitioners showed a substantial likelihood of success on the merits of their claims. Before we address that issue, however, we must determine whether Petitioners properly brought their claims via petition for writ of habeas corpus.

[17]    The parties dispute whether release sought on the basis of *conditions* of confinement is cognizable under the habeas statute. "Of course, the party who brings a suit is master to decide what law he will rely upon." *Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913). Petitioners brought an action seeking only the writ of habeas corpus pursuant to 28 U.S.C. § 2241, and they reiterate on appeal that they do not "seek[ ] to *modify* their conditions [of confinement]" and "the only relief sought by Petitioners —the only adequate relief for the constitutional claims—is release, which is unequivocally a habeas remedy." Pet'rs' Br. 50 (internal quotations and citations omitted).

The Government contends that "[h]abeas [ ] is an improper vehicle ... for detainees to challenge their conditions of confinement." Gov't's Br. 29. If the Government is correct, Petitioners cannot show likelihood of success. The District Court held that Petitioners properly brought their petition for release as one seeking the writ of habeas corpus. We agree.

**[18]** **[19]** **[20]** The traditional function of the writ of habeas corpus is to secure release from unlawful executive detention. *Munaf v. Geren*, 553 U.S. 674, 693, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008). Where a petitioner seeks release from detention, habeas (not a § 1983 action seeking release) is proper. Even where a complaint seeks both damages pursuant to § 1983 and habeas relief, the damages action should be stayed while habeas is exhausted. *Tedford v. Hepting*, 990 F.2d 745, 749 (3d Cir. 1993).

The Government argues that under *Leamer v. Fauver*, 288 F.3d 532, 542 (3d Cir. 2002), Petitioners cannot challenge their conditions via habeas. Leamer was a prisoner who filed a § 1983 action challenging prison restrictions that denied him required treatment. We determined that Leamer's claim was properly brought under § 1983. *Leamer*, 288 F.3d at 542. Our discussion of challenges requiring resort to habeas and our holding that the use of § 1983 was appropriate in that case does not undermine the availability of habeas to Petitioners here, however.

In addressing the nature of habeas and § 1983, we observed:

Although both § 1983 and habeas corpus allow prisoners to challenge unconstitutional conduct by state officers, the two are not coextensive either in purpose or effect. Habeas relief is clearly quite limited. "The underlying purpose of proceedings under the 'Great Writ' of habeas corpus has traditionally been to 'inquire into the legality of the detention, and the only judicial relief authorized was the discharge of the prisoner or his admission to bail, and that only if his detention were found to be unlawful.' " *Powers of Congress and the Court Regarding the Availability and Scope of Review,* 114 Harv. L. Rev. 1551, 1553 (2001)....
There is only a narrow subset of actions that arguably might properly be brought as either, that is, where the deprivation of rights is such that it necessarily impacts the fact or length of detention. In a series of decisions, the Supreme Court has made it clear that for those cases, the narrower remedy, the habeas petition, is the only available avenue of relief.
**\*7** *Leamer,* 288 F.3d at 540. We expressly recognized that where the remedy sought was release from detention, the party was required to "proceed by way of habeas petition."

*Id.* at 540–41 (citing *Edwards v. Balisok*, 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997)).

As early as 1949, our Court recognized the potential for habeas as a means of challenging unconstitutional conditions of confinement. *See Johnson v. Dye*, 175 F.2d 250, 256 (3d Cir. 1949) (en banc) (holding that habeas relief releasing petitioner was the appropriate remedy to avoid cruel and unusual punishment inflicted in Georgia prisons), *rev'd on other grounds*, *Dye v. Johnson*, 338 U.S. 864, 70 S.Ct. 146, 94 L.Ed. 530 (1949) (exhaustion required). And in *Preiser v. Rodriguez*, 411 U.S. 475, 499, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), the Supreme Court recognized that a challenge to conditions of confinement rendering otherwise lawful custody unconstitutional arguably would lie in habeas. As recently as 2017, the Supreme Court observed that this remains an open question, however. *Ziglar v. Abbasi*, ––– U.S. ––––, 137 S. Ct. 1843, 1862–63, 198 L.Ed.2d 290 (2017).

We have never held that a detainee cannot file a habeas petition to challenge conditions that render his continued detention unconstitutional. Although the context of the vast majority of habeas cases involve challenges to criminal judgments, the language of the habeas statute justifies resort to the writ by non-prisoner detainees. Under 28 U.S.C. § 2241, district courts may grant the writ, but their power to grant it is restricted. For example, the writ is unavailable to persons detained as enemy combatants. *See* 28 U.S.C. § 2241(e). This suggests that, where the exclusion in § 2241(e) does not apply, the writ is available to immigration detainees like Petitioners here, who are not challenging convictions or sentences. So the fact of Petitioners' present confinement at York and Pike and the constitutionality of their conditions of confinement is a matter properly challenged by petition for the writ. *Accord Wilson v. Williams*, 961 F.3d 829, 838 (6th Cir. 2020).

**[21]** In recognizing the viability of this § 2241 claim we are not creating a garden variety cause of action. As the Supreme Court has instructed: "habeas corpus is an extraordinary remedy whose operation is to a large extent uninhibited by traditional rules of finality and federalism, its use has been limited to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate." *Hensley v. Mun. Court, San Jose Milpitas Judicial Dist.*, 411 U.S. 345, 351, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973). We acknowledged as much. *See Ali v. Gibson*, 572 F.2d 971 (3d Cir. 1978), *superseded by statute on other grounds as recognized in Callwood v. Enos*, 230 F.3d 627, 633 (3d Cir. 2000). There, we noted that the petitioner,

who had been convicted in the Virgin Islands of several counts of first-degree murder, assault, and robbery, and who was later incarcerated in Georgia, might not be able to assert a § 2241 claim. We observed that, at best, his claim rose "to a possible habeas attack on the conditions of confinement, cognizable in a federal habeas action *only in extreme cases*." *Id.* at 975 n.8. (emphasis added). Given the extraordinary circumstances that existed in March 2020 because of the COVID-19 pandemic, we are satisfied that their § 2241 claim seeking only release on the basis that unconstitutional confinement conditions require it is not improper.[5]

**\*8** For these reasons, we hold that Petitioners' claim that unconstitutional conditions of confinement at York and Pike require their release is cognizable in habeas.

## VI

**[22]  [23]  [24]** We turn now to likelihood of success on the merits. Petitioners claim their conditions of confinement violate the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. As immigration detainees, Petitioners are entitled to the same due process protections as pretrial detainees. *E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019). Petitioners are in federal custody pursuant to the INA and housed in state facilities, so they are protected by the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Plyler v. Doe*, 457 U.S. 202, 210, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Although the Eighth Amendment does not apply here, *Whitley v. Albers*, 475 U.S. 312, 318, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), the substantive due process guarantees afforded detainees like Petitioners are at least as robust as Eighth Amendment protections afforded prisoners, *Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir. 1987). Applying this framework, we conclude the District Court abused its discretion when it held that Petitioners showed a substantial likelihood of success on the merits of their claims.

## A

Petitioners advanced their substantive due process claim under two separate but related theories: (1) because of their age and healthcare needs, the conditions at York and Pike subject them to punishment; and (2) the Government was deliberately indifferent to their serious medical needs. The District Court determined Petitioners were likely to succeed under both theories.

The Government contends Petitioners can proceed only under the deliberate indifference theory, citing to *Sharkey*, 928 F.3d at 309. There are two problems with this argument. First, in *Sharkey*, we held the detainee plausibly stated a claim for unconstitutional punishment for an alleged sexual assault by a detention facility employee. Our discussion of deliberate indifference related to the detainee's claim against Sharkey's *fellow employees* and *supervisor* for their failure to protect the detainee against the known risk of serious harm. 928 F.3d at 308. Second, we held long ago that substantive due process proscribes punishment of non-prisoners. *See Hubbard v. Taylor*, 399 F.3d 150, 158 (3d Cir. 2005) (*Hubbard I*). So the District Court was correct to address both theories.

## B

**[25]  [26]** We first address Petitioners' claim that their detention is unconstitutional punishment. In accordance with the Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520, 549, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), detainees may not be punished before they are adjudicated guilty. *Hubbard v. Taylor (Hubbard II)*, 538 F.3d 229, 231 (3d Cir. 2008). Petitioners asserted—and the District Court found—that, *if* Petitioners are exposed to COVID-19 and *if* they contract the virus, their ages and medical conditions put them at "imminent risk" of serious illness, including possible death. App. 2, 9, 39–40 & nn. 2–3; Supp. App. 7. The District Court articulated its findings as to the conditions of each Petitioner that subjected the Petitioner to increased risk if they contracted COVID-19. These individual findings are not clear error. Nevertheless, the District Court erred in holding that because age and medical conditions put them at increased risk if they contracted the virus, Petitioners were likely to show the Government subjected them to punishment.

**\*9 [27]  [28]  [29]  [30]** The touchstone for the constitutionality of detention is whether conditions of confinement are meant to punish or are "but an incident of some other legitimate governmental purpose." *Hubbard II*, 538 F.3d at 232 (quoting *Bell*, 441 U.S. at 538, 99 S.Ct. 1861). "[T]he ultimate question" is whether conditions are "reasonably related to a legitimate governmental objective." *Id.* at 236 (quoting *Bell*, 441 U.S. at 549, 99 S.Ct. 1861). If Petitioners are subject to conditions unrelated to a legitimate governmental objective, "we may infer 'that the purpose

of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees.' " *Sharkey*, 928 F.3d at 307 (quoting *Hubbard II*, 538 F.3d at 232). *Hubbard I* further instructs that we consider the totality of the circumstances of confinement, including any genuine privations or hardship over an extended period of time, and whether conditions are (1) rationally related to their legitimate purpose or (2) excessive in relation to that purpose. *Hubbard I*, 399 F.3d at 159–160; *see, e.g., Union Cnty. Jail Inmates v. DiBuono*, 713 F.2d 984, 995–96 (3d Cir. 1983) (though double-bunking involved cramped, crowded cells for sleeping, it was not punishment because it eliminated floor mattresses and permitted more recreational space).

**[31] [32]** In assessing whether conditions and restrictions are excessive given their purposes, the courts must acknowledge that practical considerations of detention justify limitations on "many privileges and rights." *Bell*, 441 U.S. at 545–46, 99 S.Ct. 1861. Though not a convicted prisoner, a detainee "simply does not possess the full range of freedoms of an unincarcerated individual." *Id.* at 546, 99 S.Ct. 1861. Thus, "[t]he fact of confinement as well as the legitimate goals and policies of the [ ] institution limits [Petitioners'] retained constitutional rights." *Id.*

Important here—and largely ignored by the District Court and Petitioners—are the legitimate objectives and difficulties of managing a detention facility, *Hubbard II*, 538 F.3d at 233, and the objectives of immigration detention: ensuring appearance at detention proceedings and protecting the public from harm. *See Di Buono*, 713 F.2d at 993; 8 U.S.C. § 1226(c).

**[33] [34]** As the Supreme Court cautioned in *Bell v. Wolfish*:

> In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

441 U.S. at 540 n.23, 99 S.Ct. 1861 (citations omitted); *see also Block v. Rutherford*, 468 U.S. 576, 584, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (noting the "very limited role that courts should play in the administration of detention facilities"). We defer to administrators on matters

of correctional facility administration "not merely because the administrator ordinarily will ... have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government not the Judicial." *Bell*, 441 U.S. at 520, 99 S.Ct. 1861.

The District Court could see "no rational relationship between a legitimate government objective and keeping Petitioners detained in unsanitary, tightly-packed environments— [because] doing so would constitute a punishment to Petitioners." App. 10 (quoting *Thakker*, —— F. Supp. 3d at ——, 2020 WL 1671563, at *8). But Petitioners' confinement implicates multiple legitimate governmental objectives, including: (1) ensuring Petitioners' appearances at removal proceedings; (2) protecting the public; and (3) managing the detention facilities. The District Court erred when it failed to consider these legitimate objectives.

As to the conclusion that conditions at York and Pike were "unsanitary," the District Court relied on evidence from a prior case and ignored the Government's improvements at the facilities. In its April 7 decision, the Court made the following findings as to conditions at York and Pike based on its findings in *Thakker* and after considering only Petitioners' filings:

> ***10*** • four Pike detainees (other than Petitioners) and four Pike employees tested positive for COVID-19;
>
> • one York detainee tested positive;
>
> • staff leave the facilities and return but do not reliably wear gloves and masks when interacting with inmates;
>
> • temperature checks, even as to those thought to be exposed to the virus, were infrequent;
>
> • cell blocks housing individuals testing positive are not thoroughly evacuated and cleaned; and
>
> • symptomatic inmates remain in general housing for days, and even once quarantined, others exposed to them were not tested.

App. 7–8, 10. The Court observed (before the Government could respond) that it saw no indication from Petitioners' filings that conditions had improved since its decision in *Thakker* because people tested positive at both York and Pike, and it "assumed" positive COVID-19 cases must be much higher. App. 7.

Then, in its April 10 decision, when the Court considered only the Government's reconsideration motion, it made just one additional comment we construe as a "finding" as to conditions: "[w]hile [the facilities] may have ramped up their sanitation protocols, the simple fact that inmates are incapable of social distancing in the facilities remains." App. 20. The Petition and supporting declarations described as "ideal" the social distancing parameter of six feet. The Court made that "ideal" a *sine qua non* of constitutional detention for individuals at higher risk of serious harm if they contract COVID-19. In doing so, the Court was not "mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Bell,* 441 U.S. at 539, 99 S.Ct. 1861.

Even more fundamentally, the District Court never addressed the Government's substantive response to the petition and motion for TRO. Nor did it meaningfully consider pertinent evidence on conditions provided by the Government, including social distancing efforts at York and Pike. According to the Government's filings, in the wake of COVID-19, it is complying with guidance from the CDC and epidemiologists from ICE Health Services Corps., and both York and Pike were operating at approximately 60 percent capacity (York can hold 2,245 inmates but had 1,341; Pike can hold 375 but had 221). Upon admission, detainees were screened for disabilities and conditions, as well as for fever, respiratory illness, exposure to an area with many COVID-19 cases, and known contact with someone who tested positive within the previous two weeks. If there had been such contact, any exposed detainees would be placed in a cohort for 14 days with daily monitoring for symptoms. If a detainee presented with COVID-19 symptoms, he or she was isolated and tested. Detainees who began to show any COVID-19 symptoms were isolated, as were their cellmates. Those testing positive were placed in medical isolation and quarantined. In addition, York and Pike provided: masks to detainees; hand sanitizer and hygiene education to staff; and soap, water, and hard surface disinfectant to every housing unit. Both facilities encouraged staff to use sanitizer, soap, water, and disinfectant often and liberally. They encouraged staff to clean high traffic and high contact areas multiple times throughout the day and medical staff were on-site around the clock with the ability to admit patients to the local hospital. York and Pike also administered temperature checks to staff and vendors and suspended tours and visitation. Professional visits were contactless. Finally, all staff, contractors, ICE Enforcement and Removal Operations personnel, and medical staff wore N95 masks; kitchen staff wore surgical masks; and isolated detainees wore N95 masks when they left their cohort housing unit. At Pike, movement was staggered and meals were served in cells. All of these efforts were material to the District Court's assessment of the conditions challenged as punishment, yet it addressed none of them.

**\*11  [35]** *Bell* requires us to consider whether the Government imposed the challenged conditions for the express purpose of punishment, and if not, whether they are rationally connected to a legitimate purpose but excessive in relation to its purpose. 441 U.S. at 538, 99 S.Ct. 1861.

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 539, 99 S.Ct. 1861.

Petitioners do not argue the Government subjected them to any conditions at York and Pike intended to harm them. Instead, they contend broadly the Government has no legitimate interest in detaining them in violation of their constitutional rights. But that truism sheds no light on the merits of their claims. Nor did the District Court's determination that the Government has no legitimate interest in detaining Petitioners in "unsanitary, tightly-packed environments." App. 10. In so concluding, the Court ignored legitimate governmental objectives and did not assess the conditions at York and Pike as of April 10.

**[36]** We also reject—as contrary to Supreme Court precedent and federal statute—the District Court's view that, because the Government has means other than detention to effectuate the INA's provisions for exclusion or expulsion of aliens, Petitioners' civil detention cannot be rationally related to a legitimate government purpose. Detention of aliens pending their removal in accordance with the INA is constitutional and is supported by legitimate governmental objectives. *See Demore v. Kim,* 538 U.S. 510, 531, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003); *Wong Wing v. United States,* 163 U.S. 228, 235, 16 S.Ct. 977, 41 L.Ed. 140 (1896). In fact, Congress has deemed the detention of criminal aliens so important that it is required by statute. 8 U.S.C. § 1226(c). These congressional objectives held constitutional by the

Supreme Court—detention of aliens in removal proceedings and mandatory detention of criminal aliens—render unsound the District Court's conclusion that civil detention of aliens in removal proceedings is tantamount to punishment. *See Nielsen*, 139 S. Ct. at 959 (quoting § 1226(a)) (Congress, through 8 U.S.C. § 1226(a), "empowers the Secretary of Homeland Security to arrest and hold an alien 'pending a decision on whether the alien is to be removed from the United States.' "); *see also* 8 U.S.C. § 1226(c) (mandatory detention for those convicted of crimes of moral turpitude, controlled substances offenses, and terrorism offenses); 8 U.S.C. § 1231(a)(2) (mandatory detention for certain aliens ordered removed); 8 U.S.C. § 1231(a)(6) (detention beyond removal period for aliens ordered removed and determined a risk to the public or not likely to comply with the order).

Considering all the responsive measures specifically implemented to detect and to prevent spread of the virus, the challenges of facility administration during an unprecedented situation, and the purposes served by detention—Petitioners did not show a substantial likelihood of success on their claim that the conditions of their confinement constitute unconstitutional punishment. We therefore hold the District Court erred as to its punishment determination.

## C

**\*12** **[37]** **[38]** Petitioners argue in the alternative that the Government deprived them of substantive due process when it acted with deliberate indifference to their serious medical needs (*i.e.*, their vulnerability to COVID-19 because of their ages and medical conditions). *See Helling v. McKinney*, 509 U.S. 25, 34–35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (recognizing claim of deliberate indifference of officials to exposure to tobacco smoke that poses unreasonable health risk); *Palakovic v. Wetzel*, 854 F.3d 209, 224 (3d Cir. 2017) (particular vulnerability to suicide due to mental health conditions); *Natale*, 318 F.3d at 582 (particular vulnerability due to insulin dependent diabetes). To establish deliberate indifference, Petitioners must show the Government knew of *and disregarded* an excessive risk to their health and safety. *Nicini v. Morra*, 212 F.3d 798, 811 (3d Cir. 2000) (citing *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

**[39]** **[40]** **[41]** Our decision in *Palakovic*—which involved a pretrial detainee's "particular vulnerability"— is relevant here. 854 F.3d at 218. There we addressed

allegations that officials showed deliberate indifference toward a detainee's exposure to a substantial risk of serious damage to his future health—that his particular vulnerability to suicide combined with detention conditions created a substantial risk of suicide and attempted suicide. *Id.* at 226. We recognized *even if detention officials afford some care* to the detainee, it still might not satisfy the Constitution's demands in every situation. *Id.* at 228. But "mere disagreement" as to the response to the risk to Petitioners in light of their medical condition will not support constitutional infringement. *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). Deliberate indifference requires significantly more than negligence. *County of Sacramento v. Lewis*, 523 U.S. 833, 849–50, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Indeed, deliberate indifference "is a 'subjective standard of liability consistent with recklessness as that term is defined in the criminal law.' " *Natale*, 318 F.3d at 582 (quoting *Nicini*, 212 F.3d at 811).

**[42]** The context of the Government's conduct is essential to determine whether it shows the requisite deliberate indifference that "shocks the conscience" for a substantive due process violation. *Lewis*, 523 U.S. at 846, 118 S.Ct. 1708. Just as we afford leeway to prison medical officials in diagnosing and treating a detainee's physical and mental health, deference is due prison administrators here. The Supreme Court cautioned in *Lewis*:

> Rules of due process are not ... subject to mechanical application *in unfamiliar territory*. Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.

523 U.S. at 850, 118 S.Ct. 1708 (emphasis added).

The District Court correctly observed that COVID-19 presents "highly unusual and unique circumstances," App. 12, that have "radically transformed our everyday lives in ways previously inconceivable," App. 6, and have "altered [our world] with lightning speed ... and unprecedented [results.]" App. 13. So we must evaluate the Government's response to the virus in that context. But the Court's orders do not indicate any serious consideration of the Government's recent efforts at York and Pike, save for a passing reference in the April 10 order that the Government had "ramped up [ ] sanitation protocols." App. 20.

[43]  In this context, Petitioners urge that because the virus has no vaccine or cure, exposure to it is per se unconstitutional. They also claim "[s]ocial distancing and proper hygiene" are the only "effective means" to prevent Petitioners from contracting the virus in detention, and "[p]reventative measures remain impossible at [York and Pike]." App. 106. In essence, they argue that the Government must eliminate *entirely* their risk of contracting COVID-19. That task is not the constitutional standard, however. Although the District Court criticized the Government for the lack of "effective containment measures," and for not doing "nearly enough" to combat COVID-19, App. 7–9, those critiques are not tantamount to establishing the Government's deliberate indifference.

 **\*13**  Nor does a failure to eliminate all risk establish that the Government was deliberately indifferent to their serious medical needs. Recognizing challenges inherent in the detention setting, CDC guidance suggests placing detainees into cohorts where social distancing is not practical. CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, (last visited Aug. 3, 2020), https://www.cdc.gov/coronavirus/2019ncov/community/correction-detention/guidance-correctionaldetention.html (explaining that social-distancing strategies "will need to be tailored to the individual space in the facility and the needs of the population and staff" and that "[n]ot all strategies will be feasible in all facilities"). The petition and supporting declarations rely on CDC literature and recommendations. And the District Court relies heavily on its decision in *Thakker*, which in turn relies on CDC guidance for support. Yet the Court said nothing about CDC guidance specific to detention facilities.

The record shows that the Government increased its efforts to minimize risk by improving hygiene and decreasing exposure even as information on the virus changed. But the Court undertook no analysis of those efforts. Instead, the Court summarily concluded that the efforts were not enough. The Court made no specific findings regarding how each Petitioner was housed. Instead, it determined "that inmates are incapable of social distancing in the facilities." App. 20.

In sum, we hold that Petitioners fell well short of establishing that the Government was deliberately indifferent toward their medical needs. Considering the record as a whole, we have a definite and firm conviction that a mistake has been committed. Petitioners did not show a likelihood of success,

much less a strong likelihood of success, that their substantive due process rights were violated by either punishment or deliberate indifference to their serious medical needs.

## VII

In addition to its errors regarding Petitioners' likelihood of success on the merits, the District Court erred in evaluating irreparable harm to Petitioners in the absence of relief, balancing the harms to each side, considering the public interest, and fashioning an "all-or-nothing" remedy.

### A

 [44]  Assuming Petitioners could succeed in showing likelihood of success, before balancing the harms and considering the public interest, the District Court was required to find that each Petitioner showed they would suffer irreparable injury absent relief. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 176, 179 (3d Cir. 2017).

After finding Petitioners are "all at heightened risk for severe complications from COVID-19," the District Court found they faced irreparable harm "should they contract" the virus. App. 9. This circular reasoning does not support relief because it applies regardless whether Petitioners are detained or released.

Moreover, in assessing irreparable harm, the Court should have considered several factors for each individual (beyond just their ages and medical conditions) because "the personal nature of constitutional rights" is a "cardinal principle[ ] of our constitutional order," *New York v. Ferber*, 458 U.S. 747, 767, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Yet a fundamental problem pervades the District Court's analysis: it treated Petitioners as a unit instead of as individuals with their own unique medical histories, medical risks, healthcare access needs, detention conditions, and release circumstances. It should have assessed all of these factors for each Petitioner to determine whether they would suffer more harm in detention than if released.

For example, the District Court did not consider the particular confinement conditions of each Petitioner at York and Pike. Nor did it compare the conditions of the particular communities to which each Petitioner would be released. Questions abound on this point. How prevalent was the virus

in their home communities? Would they live in close quarters with many family members or others? Were their families or roommates exposed to the virus or at risk of exposure? How would their access to healthcare at home compare to that provided at York and Pike? In other words, were they more likely to contract the virus than if they remained detained? In sum, the District Court's failure to make a particularized inquiry and individualized findings as to the comparative risk faced by each Petitioner inside and outside of detention was error.

B

**\*14** **[45]** **[46]** The District Court's failure to make particularized findings also pervaded its balancing of harms, which likewise was error. The comparison of harm to the Government as opposed to the harm to Petitioners turns mostly on matters of public interest because these considerations "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). And the District Court's consideration of risk to the public's safety before providing preliminary injunctive relief is crucial. Yet the District Court did not address risk of harm to the public in terms of the Petitioners' individual criminal history and risk of flight nor did it adequately consider associated burdens on public healthcare by each Petitioner's release.

The District Court said it "cannot find, in the face of the scope of the COVID-19 pandemic that is washing through this country and the subject facilities, that the public interest favors continued detention of civil immigration detainees with underlying health conditions that render them particularly vulnerable were they to contract COVID-19." App. 19–20. This analysis of the public interest suffers from the same flaw we addressed in *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351 (3d Cir. 1980), where the public interest "was expressed only in general and abstract terms." *Id.* at 357. By merely acknowledging that the public's interest is not served by the Government violating constitutional rights, the District Court rendered the public interest "no more than a makeweight for the court's consideration of the moving party's probability of eventual success on the merits." *Id.* at 358. The Court thereby improperly eliminated the public interest from the required showing for preliminary injunctive relief.

Although the District Court ordered Petitioners to self-quarantine, it neither specified what that entails nor assessed each Petitioner's ability to do so, and it undertook no consideration of the risk that Petitioners might spread COVID-19 when released into the public. The notion that release lessens burdens on local healthcare resources requires a comparison of individual circumstances. Because nearly all Petitioners contended they have urgent and continuing health needs, the District Court should have considered burdens associated therewith on public healthcare resources.

In its April 10 decision, the Court stated it "respects the Respondents' position that certain Petitioners pose a flight risk or danger to the community," App. 19, and surmised that because of travel restrictions associated with COVID-19, including worldwide travel restrictions, the risk of absconding "is low," App. 12. So the District Court treated Petitioners as if they all had the same low flight risk, and it did so without even considering whether any of them had a prior history of failing to appear or danger to the community.

Moreover, the Court made no findings as to risks posed in light of each Petitioner's criminal history. Instead, in its April 10 decision it stated to "allay some of the Respondents' fears," App. 20, it would include terms of release to "quell[ ]" concerns of flight risk and danger, App. 19. Petitioners' individual criminal histories directly relate to the harm to the public by their release and the District Court's failure to analyze those histories is especially problematic since many Petitioners were detained by congressional mandate or after an immigration judge had determined that detention was required to protect the public. Indeed, some of their criminal histories involve serious offenses, such as aggravated assaults, threatening sexual assault, first degree robbery, and weapons violations.

Finally, the District Court erred in not considering as part of the balancing of harm practical difficulties involved in locating and re-detaining Petitioners should the Government ultimately prevail or should a Petitioner abscond, commit a crime, or violate another term of release. *See Hope I*, 956 F.3d at 162.

C

**\*15** **[47]** The District Court also erred in fashioning relief. The Court too readily accepted the Petitioners' all-or-nothing

proposition that anything short of immediate release cannot remedy their plight.[6]

Because it improperly elevated ideal social distancing to a constitutional standard, the District Court granted release without fully considering other options potentially available to it. Without a hearing and without considering the Government's opposition under the appropriate standard, it's no surprise that in addition to failing to consider the Government's increased social distancing and sanitation efforts at York and Pike in response to evolving circumstances, the Court failed to explore alternatives to avoid any irreparable harm to Petitioners.

The Petitioners' quest for nothing short of release appeared to leave little room for a remedy short of the most extreme one. *See, e.g., Wilson v. Williams*, 961 F.3d 829, 838 (6th Cir. 2020) (habeas vehicle limits type of relief); *O.M.G. v. Wolf*, 2020 WL 4201635, at *8 (D.D.C. 2020) (immigration detainees seeking only "wholesale release" in light of risk of contracting COVID-19 by application for preliminary injunction not entitled to relief because they failed to show that nothing short of that relief can redress their injuries). In view of the legitimacy of mandatory and discretionary detention, even after a district court makes findings on the merits sufficient to support preliminary relief, it must carefully consider whether alternatives to release are appropriate before ordering release.

As to the terms of Petitioners' release, the Court did not explain why it rejected the Government's alternative request that if the Court ordered release that it should also order that: *the Detainees'* "counsel report each Petitioner's whereabouts every 7 days;" they "be placed on home detention;" and they "wear ankle bracelets affixed by ICE." App. 194 (emphasis added). The need for significant measures designed to ensure the Petitioners, once released, would not be "in the wind"

seems quite obvious,[7] particularly with respect to those who had a history of failing to appear or of flight.

**\*16**  True enough, the District Court's April 10 order imposed some terms on the Petitioners' release to "allay" fears and "quell" concerns, such as reiterating their legally mandated appearance at any removal hearings and adding that they report their whereabouts to their own attorneys. But its orders did not require any report to the Government, which would have provided some additional protection against risk of absconsion. Indeed, when asked at argument about the court-mandated weekly report by each Petitioner, their counsel admitted that Petitioners' reporting obligation had not been regularized. *See* Oral Argument June 18, 2020 at 53:10–53:24. Finally, the Court did not explain its decision to release Petitioners on their own recognizance, instead of, at the very least, ordering home detention and monitoring by the Government.

VIII

We acknowledge difficulties faced by trial courts in emergent matters and the need to act immediately, particularly during a pandemic. But exigent circumstances do not empower a court to jettison fundamental principles of due process or the rules of procedure that govern such matters. For the reasons we have explained, the District Court committed procedural and substantive errors that require us to vacate the April 7 and April 10, 2020 orders and remand the case for further proceedings consistent with this opinion.

**All Citations**

--- F.3d ----, 2020 WL 5001785

Footnotes

1    Judge Shwartz is recused from this proceeding.

2    COVID-19 "is a highly contagious respiratory virus that poses unique risks in population-dense facilities." *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 157 n.2 (3d Cir. 2020) (*Hope I*) (quoting *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020)).

3    The Government agreed to the release of Duc Viet Lam and Iwan Rajardja, so they were not included in the District Court's second release order.

4    The Respondents in *Thakker* and *Hope* are identical except for one party (Clinton County). Each Respondent in *Hope* is represented by the same counsel from *Thakker* and the same attorney entered her appearance on behalf of the Respondent detention facilities involved in both actions. *Compare Thakker v. Doll*, M.D. Pa. Docket No. 1:20-cv-00480, *with Hope v. Doll*, M.D. Pa. Docket No. 1:20-cv-00562.

5    We do not address at this time whether a § 2241 claim may be asserted in less serious circumstances.

Hope v. Warden York County Prison, --- F.3d ---- (2020)

6   Petitioners rely on *Brown v. Plata*, 563 U.S. 493, 521, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011), to justify release as *the* remedy for the asserted unconstitutional conditions of confinement. But that case involved the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626, and a remedial injunction stipulated to by the state to address mental and medical care in overcrowded California prison populations. The PLRA includes release as a potential remedy to address unconstitutional prison conditions, but it does not apply to civil immigration detainees. *See* 18 U.S.C. § 3626(g)(3). And even if it did, Petitioners' quest for immediate release would have been a non-starter because the statute mandates that relief for unconstitutional prison conditions (1) be "narrowly drawn;" (2) "extend no further than necessary to correct the harm the court finds requires preliminary relief;" (3) be "the least intrusive means necessary to correct that harm;" and (4) include release only where a proper order was entered as to conditions, the respondent had a reasonable amount of time to comply with it, and compliance failed. *See* 18 U.S.C. § 3626(a)(2) and (3).

7   Some detainees released on their own recognizance in *Thakker*, ––– F. Supp. 3d ––––, 2020 WL 1671563, at *10, absconded.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# SECOND SUPPLEMENTAL AUTHORITY

2020 WL 5361651
Only the Westlaw citation is currently available.
United States Court of Appeals, Seventh Circuit.

Anthony MAYS, individually and on
behalf of a class of similarly situated
persons, et al., Plaintiffs-Appellees,

v.

Thomas J. DART, Sheriff of Cook
County, Illinois, Defendant-Appellant.

No. 20-1792
|
Argued August 18, 2020
|
Decided September 8, 2020

**Synopsis**
**Background:** Pretrial detainees brought civil rights action challenging, on Fourteenth Amendment due process grounds, the close conditions of their confinement during corona virus pandemic. The United States District Court for the Northern District of Illinois, No. 20-cv-2134, Matthew F. Kennelly, J., 2020 WL 1987007, granted in part the detainees' request for preliminary injunctive relief, and sheriff appealed.

**Holdings:** The Court of Appeals, St. Eve, Circuit Judge, held that:

[1] mandatory preliminary injunction issued by district court, granting detainees certain relief with regard to double celling and group housing, had to be set aside, and

[2] district court could consider the Center for Disease Control (CDC) Guidelines in deciding what, if any, preliminary injunctive relief to order.

Affirmed in part and reversed and vacated in part.

**West Headnotes (21)**

**[1]** **Injunction** Grounds in general; multiple factors

To obtain a preliminary injunction, plaintiff must show that: (1) without this relief, it will suffer irreparable harm; (2) traditional legal remedies will be inadequate; and (3) it has some likelihood of prevailing on merits of its claims.

**[2]** **Injunction** Balancing or weighing hardship or injury

If plaintiff makes the requisite threshold showing of irreparable harm, inadequacy of traditional legal remedies, and likelihood of success on merits, then court, in deciding whether to grant preliminary injunctive relief, proceeds to a balancing analysis, and weighs the harm that denial of preliminary injunction would cause to the plaintiff against the harm to defendant if preliminary injunction is granted.

**[3]** **Injunction** Balancing or weighing factors; sliding scale

On motion for preliminary injunction, the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa.

**[4]** **Injunction** Mandatory preliminary injunctions

Mandatory preliminary injunctions, i.e., those requiring an affirmative act by the defendant, are ordinarily viewed with caution and sparingly issued.

**[5]** **Federal Courts** Preliminary injunction; temporary restraining order

On appeal from district court's grant of preliminary injunctive relief, while the Court of Appeals reviews district court's balancing of the

2020 WL 5361651

harms for abuse of discretion, it reviews district court's legal conclusions de novo and its findings of fact for clear error.

**[6]**   **Federal Courts** 🔑 **Abuse of discretion in general**

Factual or legal error may alone be sufficient to establish that district court abused its discretion.

**[7]**   **Federal Courts** 🔑 **Preliminary injunction; temporary restraining order**

Absent any factual or legal errors in district court's analysis, the Court of Appeals affords district court's decision on whether to issue preliminary injunction great deference.

**[8]**   **Civil Rights** 🔑 **Criminal law enforcement; prisons**

In civil rights action by pretrial detainees challenging, on Fourteenth Amendment due process grounds, the conditions of their confinement in close proximity to other detainees during corona virus pandemic, mandatory preliminary injunction issued by district court, granting detainees certain relief with regard to double celling and group housing, had to be set aside based on district court's errors in reciting incorrect standard for evaluating whether detainees had demonstrated requisite likelihood of success, in failing to accord proper deference to sheriff's interest in implementing policies to preserve discipline and maintain jailhouse security, and in focusing almost exclusively on social distancing in jail, without considering other measures that sheriff had taken to reduce spread of corona virus. U.S. Const. Amend. 14.

**[9]**   **Constitutional Law** 🔑 **Conditions**

To prevail on Fourteenth Amendment due process claim challenging the conditions of his confinement, pretrial detainee need demonstrate only that those conditions are objectively unreasonable, not that public officials were

deliberately indifferent to his rights. U.S. Const. Amend. 14.

**[10]**   **Constitutional Law** 🔑 **Conditions**

"Objective reasonableness" standard used to evaluate pretrial detainees' Fourteenth Amendment due process claims challenging conditions of their confinement cannot be applied mechanically; rather, "objective reasonableness" turns on the facts and circumstances of each particular case. U.S. Const. Amend. 14.

**[11]**   **Civil Rights** 🔑 **Criminal law enforcement; prisons**

In deciding, on motion for preliminary injunctive relief, whether pretrial detainees had demonstrated the requisite likelihood of success in establishing that sheriff had violated their due process rights by housing them in close proximity to other detainees during corona virus pandemic, district court should not have focused almost exclusively on social distancing in jail when evaluating the objective reasonableness of conditions of pretrial detainees' confinement, but should instead have considered totality of the facts and circumstances, including the significant other measures that sheriff had taken to reduce spread of corona virus in jail. U.S. Const. Amend. 14.

**[12]**   **Constitutional Law** 🔑 **Conditions**

When evaluating the objective reasonableness of conditions of pretrial confinement, for purposes of addressing Fourteenth Amendment due process claim by pretrial detainees, courts must afford jail administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. U.S. Const. Amend. 14.

Mays v. Dart, --- F.3d ---- (2020)

2020 WL 5361651

**[13]**  **Civil Rights**  🔑  Criminal law enforcement; prisons

**Constitutional Law**  🔑  Conditions

When evaluating the objective reasonableness of conditions of pretrial confinement, for purposes of addressing Fourteenth Amendment due process claim by pretrial detainees, courts must account for legitimate interests that stem from the government's need to manage the facility in which detainees are held, and in absence of substantial evidence in the record to indicate that officials have exaggerated their response to such considerations, courts should ordinarily defer to their expert judgment in such matters. U.S. Const. Amend. 14.

**[14]**  **Prisons**  🔑  Discipline, security, and safety in general

Correctional administrators must have substantial discretion to devise reasonable solutions to the problems they face, particularly when safety and security interests are at stake.

**[15]**  **Constitutional Law**  🔑  Conditions

As part of district court's "objective reasonableness" analysis, in deciding whether conditions of pretrial detainees' confinement violate their Fourteenth Amendment due process rights, it is appropriate for court to defer to jailhouse policies and practices needed to maintain order and institutional security. U.S. Const. Amend. 14.

**[16]**  **Civil Rights**  🔑  Criminal law enforcement; prisons

In deciding, on motion for preliminary injunctive relief, whether pretrial detainees had demonstrated the requisite likelihood of success in establishing that sheriff had violated their due process rights by housing them in close proximity to other detainees during corona virus pandemic, district court should have considered sheriff's interest in managing jail facilities in manner necessary to preserve order

and discipline and maintain security, when evaluating objective reasonableness of group housing and double celling policies. U.S. Const. Amend. 14.

**[17]**  **Injunction**  🔑  Likelihood of success on merits

To obtain preliminary injunctive relief, plaintiff must demonstrate that its claim has "some likelihood" of success on the merits, and not merely a better than negligible chance of success.

**[18]**  **Injunction**  🔑  Likelihood of success on merits

What amounts to "some likelihood" of success, such as plaintiff must demonstrate to obtain a preliminary injunction, depends on the facts of the case at hand.

**[19]**  **Civil Rights**  🔑  Criminal law enforcement; prisons

In civil rights action by pretrial detainees challenging, on Fourteenth Amendment due process grounds, the conditions of their confinement in close proximity to other detainees during corona virus pandemic, while Center for Disease Control (CDC) Guidelines did not themselves establish a constitutional standard, these Guidelines were certainly relevant to an "objective reasonableness" inquiry into conditions of pretrial detainees' confinement, and district court could consider the CDC Guidelines in deciding what, if any, preliminary injunctive relief to order. U.S. Const. Amend. 14.

**[20]**  **Federal Courts**  🔑  Amendment, correction, or supplementation

On appeal from district court's grant of certain preliminary injunctive relief, such as order requiring sheriff to implement certain policies and procedures relating to sanitation, testing, and face masks in order to protect pretrial detainees from spread of corona virus in jail, the Court of Appeals would not allow sheriff to supplement record on appeal with a Center for Disease

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  3

Control (CDC) report not considered in the first instance by district court.

**[21]**   **Evidence**  🔑  Official proceedings and acts

On appeal from district court's grant of certain preliminary injunctive relief, such as order requiring sheriff to implement certain policies and procedures relating to sanitation, testing, and face masks in order to protect pretrial detainees from spread of corona virus in jail, the Court of Appeals would not take judicial notice of Center for Disease Control (CDC) report regarding sheriff's COVID-19 interventions and their purported impact; contents of the report were not generally known, and the Court of Appeals could not determine whether the report's sources could reasonably be questioned, as the parties disputed who authored the report and district court had not had opportunity to make any factual findings on the author. Fed. R. Evid. 201(b).

Appeal from the United States District Court for the Northern District of Illinois. No. 20-cv-2134 — Matthew F. Kennelly, *Judge.*

**Attorneys and Law Firms**

Easha Anand, Attorney, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, San Francisco, CA, Steven Edwards Art, Attorney, Sarah Grady, Attorney, Jon C. Loevy, Attorney, LOEVY & LOEVY, Locke E. Bowman, III, Attorney, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Alexa Van Brunt, Attorney, MACARTHUR JUSTICE CENTER, Chicago, IL, Charles Gerstein, Attorney, Alec Karakatsanis, Attorney, CIVIL RIGHTS CORPS, Washington, DC, for Plaintiffs-Appellees.

Gretchen Harris Sperry, Attorney, Lari A. Dierks, Attorney, James M. Lydon, Attorney, Robert Thomas Shannon, Attorney, Adam R. Vaught, Attorney, HINSHAW & CULBERTSON LLP, Chicago, IL, for Defendant-Appellant.

Before Sykes, Chief Judge, and Brennan and St. Eve, Circuit Judges.

**Opinion**

St. Eve, Circuit Judge.

**\*1** Plaintiffs—a class of detainees at the Cook County Jail—brought this action against Cook County Sheriff Thomas Dart after the Jail reported an outbreak of COVID-19, the disease caused by the novel coronavirus that has sparked a global pandemic. Plaintiffs contend that the Sheriff has violated their Fourteenth Amendment Due Process rights by failing to provide them with reasonably safe living conditions as the pandemic rages. Plaintiffs seek various forms of relief, including an injunction requiring the Sheriff to implement certain procedures related to social distancing, sanitation, diagnostic testing, and personal protective equipment ("PPE") to protect them from the virus for the duration of the pandemic.

After a hearing, the district court granted a temporary restraining order imposing several forms of relief, including but not limited to, mandates requiring the Sheriff to provide hand sanitizer and soap to all detainees and face masks to detainees in quarantine. The district court declined to order relief in several instances, though: most notably for our decision today, the district court rejected Plaintiffs' request to prohibit double celling and group housing arrangements to permit adequate social distancing.

Plaintiffs subsequently moved for entry of a preliminary injunction, requesting an extension of the relief the district court previously mandated in the temporary restraining order and, among other things, renewing their request for socially distanced housing. After another hearing, the district court switched course from its prior ruling and granted the renewed social distancing request, albeit with certain exceptions. The district court also granted the request for an extension of the relief included in the temporary restraining order. The Sheriff appealed.

We conclude that, in the course of its analysis regarding double celling and group housing, the district court committed three distinct legal errors: the district court failed to consider the Sheriff's conduct in its totality, failed to afford proper deference to the Sheriff's judgment in adopting policies necessary to ensure safety and security, and cited an incorrect legal standard when evaluating the likelihood that Plaintiffs' claims will succeed on their merits. Given these legal errors in evaluating the likelihood of success on the merits of Plaintiffs' claims, we reverse the district court with respect to the portion

of the preliminary injunction mandating socially distanced housing. Regarding the remaining relief, however, the district court made detailed factual findings, properly considered the Sheriff's conduct in its totality, and closely tailored the relief it ordered to the guidelines promulgated by the Centers for Disease Control and Prevention ("CDC"). We therefore affirm all other aspects of the preliminary injunction.


**I. Background**

**A. Factual Background**

At present, COVID-19 requires no introduction: the novel coronavirus causing this disease has spread around the world, resulting in an unprecedented global pandemic that has disrupted every aspect of public life. The virus, SARSCoV-2, causes symptoms ranging from fever to shortness of breath to loss of smell and can lead to serious health effects—including damage to internal organs and, in many cases, death. People over the age of sixty-five and with certain preexisting health conditions face a heightened risk of severe illness resulting from COVID-19. The virus transmits rapidly from person to person, primarily through respiratory droplets emitted by coughing or sneezing that can travel multiple feet and remain in the air for several hours, and also through lingering particles on surfaces. People may transmit the virus despite a lack of symptoms, making it difficult to take necessary precautions.

**\*2** Society has, though, taken many precautions to attempt to curb the spread of COVID-19. Many states, including Illinois, presently require wearing face coverings in public spaces in order to slow the spread of COVID-19. States have ramped up testing capacity and contact tracing to identify those who have interacted with persons who later tested positive for the virus. Illinois and most other states implemented stay-at-home orders that forced people to socially distance, limiting interpersonal contacts and group activities: schools transitioned to remote learning, restaurants and bars closed, and officials largely cancelled public events.

The Cook County Jail is an enormous facility with the population of a small town. The inherent nature of the Jail presents unique challenges for combatting the spread of COVID-19: it is designed to accommodate large and densely-packed populations. Many detainees reside in "dormitory" units, meaning hundreds of detainees sleep in a single room on closely-spaced bunk beds, and there are many common spaces where detainees are in close proximity

to one another. On April 8, 2020, *The New York Times* reported that, at that time, the Jail was the largest known-source of coronavirus infections in the United States. Timothy Williams and Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars* (April 8, 2020) N.Y. Times, https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html (last visited August 27, 2020). When Plaintiffs filed their motion for a preliminary injunction, on April 14, 541 detainees and Jail staff had tested positive for COVID-19. By April 23, only a few days before the district court issued the preliminary injunction that is the subject of this appeal, six detained persons had died from complications.

On March 23, the Center for Disease Control issued Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("CDC Guidelines"). The document "is intended to provide guiding principles for healthcare and non-healthcare administrations of correctional and detention facilities" to "help reduce the risk of transmission and severe disease from COVID-19" in light of the unique challenges correctional and detention facilities present. The Guidelines recommend various measures, including making available sufficient hygiene and cleaning supplies, frequently cleaning and disinfecting high-touch surfaces and objects, and implementing social distancing strategies where feasible, among many others. The Guidelines note, in bold font, that the "guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Additionally, in the section recommending the implementation of social distancing in jails, the CDC's guidance notes "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff."

The Cook County Sheriff, who is responsible for operating the Jail, took numerous proactive measures to prevent the spread of COVID-19. As early as January 24, Roland Lankah, the Sheriff's in-house Environmental Health Specialist and epidemiologist, began coordinating with the Cook County Health Infection Control Department to develop a plan for an outbreak. That plan involved increasing disinfection and sanitization, devising protocols to screen detainees for symptoms, and moving infected detainees to separate housing. Upon Governor Pritzker's declaration of Illinois as a disaster area on March 9, the Sheriff set up a space for new detainees to quarantine for seven to fourteen days before entering the general population. By mid-

Mays v. Dart, --- F.3d ---- (2020)
2020 WL 5361651

March, First Assistant Executive Director Michael Miller was working to open three closed divisions of the Jail to create more single-cell units and reduce density. The Sheriff also coordinated with Senator Durbin's office, the Federal Emergency Management Agency, and Governor Pritzker's office to receive priority access to the national stockpile of PPE in Illinois. The Sheriff engaged various consultants, including a former CDC Director, to improve sanitation policies, policies relating to medical screening, and use of PPE. In coordination with other stakeholders in the Cook County criminal justice system, the Sheriff undertook efforts to reduce the Jail population through securing release or electronic monitoring for over 1,200 detainees. And, on April 1, the Sheriff's Office contacted local authorities to obtain approval to administer Abbott Laboratories' rapid test at the Jail. Cermak Health Services, a division of the Cook County Health and Hospital Systems, began administering these tests soon thereafter.

**B. Procedural Background**

**\*3** On April 3, Anthony Mays and Kenneth Foster, two detainees at the Cook County Jail, sued Cook County Sheriff Thomas Dart on behalf of "all people who are currently or who will in the future be housed in the Cook County Jail for the duration of the COVID-19 pandemic." The class includes two subclasses: Subclass A, which consists of all people who are at an elevated risk of complications from COVID-19 due to age or an underlying medical condition, and Subclass B, which consists of all people housed on a tier where someone has tested positive for the virus. They assert violations of their rights under the Fourteenth Amendment to reasonably safe living conditions, bringing claims under 42 U.S.C. § 1983 and for writs of habeas corpus under 28 U.S.C. § 2241.

**1. Temporary Restraining Order**

Plaintiffs moved for a temporary restraining order, requesting that the district court order the Sheriff to enact multiple measures designed to prevent the spread of COVID-19. On April 9, after conducting a hearing via telephone and reviewing numerous affidavits Plaintiffs submitted, the district court issued a temporary restraining order, though one considerably narrower than the order Plaintiffs requested. This temporary restraining order compelled the Sheriff to do the following:

- To establish "a policy requiring prompt coronavirus testing of detainees who exhibit symptoms consistent with coronavirus disease as well as, at medically

appropriate times and to the extent feasible based on the acquisition of sufficient testing materials, detainees who have been exposed to others who have exhibited those symptoms or have tested positive for coronavirus."

- To enforce "social distancing during the new detainee intake process, including suspending the use of bullpens to hold new detainees awaiting intake."

- To provide "soap and/or hand sanitizer to all detainees in quantities sufficient to permit them to frequently clean their hands" and "adequate sanitation supplies to enable all staff and detainees to regularly sanitize surfaces and objects on which the virus could be present, including in all areas occupied or frequented by more than one person (such as two-person cells, as well as bathrooms and showers)."

- To establish "a policy requiring sanitization between all uses of frequently touched surfaces and objects as well as monitoring and supervision to ensure that such sanitization takes place regularly."

- To "provide facemasks to all detainees who are quarantined—i.e., those who have been exposed to a detainee who is symptomatic (even if not coronavirus-positive)."

In imposing this relief, the district court made detailed factual findings about the policies the Sheriff had enacted and his successes and shortcomings in executing those policies. Throughout its decision, the district court relied heavily on the CDC Guidelines. Where the district court elected to impose the requested relief, the court noted that the evidence showed the Sheriff's collective actions fell short of those recommended in the CDC Guidelines.

In several instances, though, the district court declined to implement additional relief where the evidence revealed that the Sheriff already had a policy in place—such as one requiring a fourteen-day quarantine of all new detainees —or existing measures were sufficient—such as those to enforce the use of PPE by Jail staff who come into contact with detainees. The court also overruled Plaintiffs' requests for mandatory social distancing throughout the Jail and a directive to identify detainees who are at high risk for complications from COVID-19. In these instances, the court was unpersuaded that Plaintiffs were likely to succeed on the merits of their claim that the Sheriff's conduct posed a constitutional violation.

**\*4** Regarding social distancing in particular, the district court acknowledged the Sheriff's "ongoing effort[s] to modify custodial arrangements" at the Jail to "permit greater separation of detainees," but noted that "space constraints" at the Jail preclude "complete social distancing." The court cited the CDC Guidelines, which "expressly recognize that complete social distancing may not be possible in the sleeping areas of a jail." The court also acknowledged that "[s]pace constraints at the Jail do not allow for the more preferable degree of social distancing that exists in the community at large." The court thus concluded that "plaintiffs have [failed] to show a reasonable likelihood of success on their contention that the Sheriff is acting in an objectively unreasonable manner by failing to mandate full social distancing" and that this was "particularly so because the Sheriff's submission reflects an ongoing effort to modify custodial arrangements at the Jail in a way that will permit greater separation of detainees."

### 2. Preliminary Injunction

On April 14, Plaintiffs moved for entry of a preliminary injunction. Relevant to our decision today, Plaintiffs sought to extend the relief court imposed in the temporary restraining order and again requested a mandate for social distancing throughout the Jail. The Sheriff opposed the motion, and, regarding the request for social distancing, argued that his efforts were consistent with the CDC Guidelines, that he had already taken substantial steps to implement social distancing, and that further steps were impossible. The Sheriff submitted a progress report on efforts to contain the coronavirus. Regarding social distancing, the progress report described efforts to open previously closed divisions, transition 175 tiers to single-cell housing, and reduce dormitory capacity to below fifty percent, except for detainees in certain medical or restricted housing. The Sheriff also had worked with criminal justice stakeholders to secure the release of more than 1,200 detainees with appropriate bond conditions, increased single-cell housing at the Jail by approximately 545%, and decreased double-celled housing at the Jail by over 90%.

The district court conducted a preliminary injunction hearing via videoconference and permitted each side to call one witness in addition to submitting affidavits. The court ultimately granted Plaintiffs' motion in part. Regarding Plaintiffs' § 1983 claim, the court conditionally certified the proposed class to the extent Plaintiffs requested a conversion of the temporary restraining order to a preliminary injunction and a mandate requiring increased social distancing. The

court then proceeded to the question of whether Plaintiffs had demonstrated that they had a "better than negligible chance" of succeeding on their contention that the Sheriff's conduct in addressing the risks posed by exposure to the coronavirus is objectively unreasonable. The court acknowledged the "significant, and impressive, effort" the Sheriff had undertaken, and noted that, if this were an Eighth Amendment claim, this finding regarding the Sheriff's efforts would likely end the matter.

The court focused on Plaintiffs' renewed request for a policy precluding double celling and group sleeping arrangements to facilitate social distancing. The court first explained that the CDC Guidelines, which set a feasibility limitation on social distancing practices, are relevant but not dispositive. The court then determined that "group housing and double celling subject detainees to a heightened, and potentially unreasonable and therefore constitutionally unacceptable, risk of contracting and transmitting the coronavirus." Thus, after making a passing reference to the Sheriff's interest in discipline and security in the Jail and dismissing the Sheriff's contention that he faced feasibility limitations on further social distancing, the court concluded that Plaintiffs were reasonably likely to succeed on their contention that group housing and double celling is objectively unreasonable, except in certain situations. In arriving at this conclusion, the court did not discuss any other aspect of the Sheriff's response to COVID-19; instead, the court limited its discussion solely to the importance of social distancing. The court also rejected the Sheriff's argument that his compliance with the temporary restraining order rendered its extension into a preliminary injunction unnecessary because the court could not conclude that the constitutional violations would not recur absent such an extension. The court did not revisit any of its findings related to the measures it ordered in the temporary restraining order.

**\*5** Regarding the remaining preliminary injunction factors, the district court determined that Plaintiffs had shown that, without additional measures, they would likely suffer irreparable harm—including severe illness and death—and that damages could not fully remedy the risk they faced. Lastly, the district court determined the balance of harms weighed in favor of Plaintiffs. The court therefore issued a preliminary injunction extending all of the relief included in the temporary restraining order, with the additional requirement of a policy precluding group housing and double celling except in certain situations, such as when a medical or mental health professional has determined a detainee poses a

2020 WL 5361651

risk of suicide or self-harm if placed in a single cell or when a detainee requires medical treatment not available in socially distanced housing.

The Sheriff appealed, challenging the entire preliminary injunction but directing the bulk of his arguments to the prohibition against double celling and group housing.

**II. Discussion**

**[1]    [2]    [3]    [4]** "To obtain a preliminary injunction, a plaintiff must show that: (1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims." *Speech First, Inc. v. Killeen,* 968 F.3d 628, 637 (7th Cir. 2020) (quoting *Courthouse News Serv. v. Brown,* 908 F.3d 1063, 1068 (7th Cir. 2018)). If a plaintiff makes such a showing, the court proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it. *Courthouse News Serv.,* 908 F.3d at 1068. This balancing process involves a "sliding scale" approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa. *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 895 (7th Cir. 2001). Mandatory preliminary injunctions— those "requiring an affirmative act by the defendant"—are "ordinarily cautiously viewed and sparingly issued." *Graham v. Medical Mut. of Ohio,* 130 F.3d 293, 295 (7th Cir. 1997); *see also Pashby v. Delia,* 709 F.3d 307, 319 (4th Cir. 2013) (review of a preliminary injunction is "even more searching" when the injunction is "mandatory rather than prohibitory in nature.")

**[5]    [6]    [7]** While we review the district court's balancing of the harms for an abuse of discretion, we review its legal conclusions de novo and its findings of fact for clear error. *C.Y. Wholesale, Inc. v. Holcomb,* 965 F.3d 541, 545 (7th Cir. 2020). "[A] factual or legal error may alone be sufficient to establish that the court 'abused its discretion' in making its final determination." *Lawson Prod., Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1437 (7th Cir. 1986). "Absent such errors," however, "we afford a district court's decision 'great deference.' " *Speech First, Inc.,* 968 F.3d at 638 (quoting *Valencia v. City of Springfield,* 883 F.3d 959, 966 (7th Cir. 2018)).

**A. Socially Distanced Housing**

We first address the portion of the preliminary injunction aimed at socially distanced housing because that is the thrust of the Sheriff's appeal. The parties do not dispute the district court's conclusions regarding the first two elements of the preliminary injunction standard: that Plaintiffs would suffer irreparable harm and that traditional legal remedies would be inadequate. Rather, the debate focuses entirely on the likelihood of success on the merits of their claim that the Sheriff's actions (or inaction, as Plaintiffs contend) in response to COVID-19 are objectively unreasonable. We therefore limit our discussion to this threshold requirement.

**[8]** We conclude that the district court committed three distinct legal errors: the court failed to consider the totality of the circumstances, the court failed to afford proper deference to the Sheriff's judgment in adopting policies necessary to ensure safety and security in the Jail, and the court recited an incorrect legal standard when evaluating the likelihood that Plaintiffs' contentions will succeed on their merits. We address each of these errors in turn.

*1. Totality of the Conduct*

**\*6    [9]** We start with the proper scope of the analysis under the more recent objective reasonableness inquiry for pretrial conditions of confinement claims. In *Kingsley v. Hendrickson,* 576 U.S. 389, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), the Supreme Court concluded that, when bringing an excessive force claim, a "pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable," rather than demonstrate deliberate indifference. *Id.* at 396–97, 135 S.Ct. 2466. Recognizing "that the Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees," we held in *Miranda v. Cty. of Lake,* 900 F.3d 335 (7th Cir. 2018), that a pretrial detainee's claims of inadequate medical care also "are subject only to the objective unreasonableness inquiry identified in *Kingsley.*" *Id.* at 352. We saw "nothing in the logic the Supreme Court used in *Kingsley*" to support a "dissection of the different types of claims that arise under the Fourteenth Amendment's Due Process Clause." *Id.* We likewise subsequently expanded this holding to encompass conditions of confinement claims under the Fourteenth Amendment Due Process Clause. *Hardeman v. Curran,* 933 F.3d 816, 823 (7th Cir. 2019) (citing *Kingsley,* 576 U.S. at 396–97, 135 S.Ct. 2466). Accordingly, we must analyze Plaintiffs' claim under the objective reasonableness inquiry articulated in *Kingsley.*[1] *Id.*

**[10]** The Supreme Court described the application of the objective reasonableness standard in *Kingsley*: "A court (judge or jury) cannot apply this standard mechanically. Rather, objective reasonableness turns on the facts and circumstances of each particular case." 576 U.S. at 397, 135 S.Ct. 2466. We reiterated this principle in *McCann v. Ogle Cty., Illinois*, 909 F.3d 881 (7th Cir. 2018), explaining that, when evaluating whether challenged conduct is objectively unreasonable, courts must "focus on the totality of facts and circumstances." *Id.* at 886.

**[11]** The district court erred by narrowly focusing its objective reasonableness analysis almost exclusively on social distancing instead of considering the totality of facts and circumstances, including all of the Sheriff's conduct in responding to and managing COVID-19. Citing *McCann*, the district court wrote, "To succeed on their claim, the plaintiffs must show that the Sheriff's conduct in addressing the risks posed by exposure to coronavirus is objectively unreasonable *in one or more respects*." (emphasis added). The district court then went on to emphasize social distancing and the Sheriff's efforts to implement social distancing to the exclusion of the Sheriff's other actions. This analysis incorrectly ignored the totality of the circumstances. It may very well be the case that a particular aspect of an action is so lacking that the failing on this one factor will lead a court to correctly conclude the entire course of challenged conduct as objectively unreasonable. It may also be that some actions or inactions are more consequential than others. But that does not mean that the court should evaluate each aspect of the disputed actions in a vacuum, especially in a case involving a systemic claim like here. Rather, the court must consider the total of the circumstances surrounding the challenged action.

In addition, the district court hinged its decision to impose a social distancing directive on the basis of one, and only one, key factual finding: "At the current stage of the pandemic, group housing and double celling subject detainees to a heightened ... risk of contracting and transmitting the coronavirus." We do not suggest that this finding was erroneous: the district court had before it a voluminous evidentiary record about the importance of social distancing to reducing transmission of COVID-19. Instead, we take issue with what was missing: absent from the district court's reasoning was any mention of the totality of the measures the Sheriff already had taken to combat the spread of COVID-19, including those regarding social distancing. By the time the district court issued the preliminary injunction, the Sheriff had already implemented several such measures. Notably, and as the district court initially acknowledged in its temporary restraining order, these included substantial efforts to increase social distancing, such as opening shuttered divisions of the Jail, creating new single-cell housing, and decreasing the capacity of dormitories. The Sheriff had also undertaken extensive other measures to prevent and manage the spread of COVID-19 at the Jail. By failing to evaluate the request for a policy precluding double celling and group housing in light of the other aspects of the Sheriff's COVID response, the district court did not properly consider the totality of the facts and circumstances when evaluating the objective unreasonableness of the Sheriff's actions.

### *2. Deference to Correctional Administrators*
**\*7** **[12]** **[13]** **[14]** **[15]** We turn to a second error: the failure to defer to correctional administrators in a matter implicating safety and security concerns. "When evaluating reasonableness, ... courts must afford prison administrators 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " *Henry v. Hulett*, 2020 WL 469188, (7th Cir. 2020) (en banc) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Likewise, a court must "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained." *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466. Thus, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Bell*, 441 U.S. at 548, 99 S.Ct. 1861 (quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)). Correctional administrators must have "substantial discretion to devise reasonable solutions to the problems they face," particularly when safety and security interests are at stake. *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012). Thus, "as part of the objective reasonableness analysis ... deference to policies and practices needed to maintain order and institutional security is appropriate." *Kingsley*, 576 U.S. at 399–400, 135 S.Ct. 2466.

**[16]** When evaluating Plaintiffs' request for a policy precluding group housing and double celling, the district court made a passing reference to its obligation to "account for and give deference to the Sheriff's interest in managing the Jail facilities and to practices that are needed to preserve

Mays v. Dart, --- F.3d ---- (2020)

2020 WL 5361651

order and discipline and maintain security." The district court, however, did not discuss in a meaningful way how, if at all, the considerable deference it owed to the judgment of prison administrators impacted its analysis. Undoubtedly, safety and security concerns play a significant role in a correctional administrator's housing decisions: jails and prisons require some degree of flexibility in choosing cell assignments, as they need to ensure, for example, that detainees are assigned to the living quarters corresponding with their security classifications and factoring in particular vulnerabilities that increase security risks. This is especially true at the Jail where the population fluctuates daily given the number of bookings and releases that take place. Correctional officers similarly must have the freedom to quickly reassign inmates when fights or other emergency situations occur that threaten the safety of staff and inmates. This is perhaps no more important than at a facility like the Cook County Jail, which houses a wide range of detainees accused of committing up to the most serious of violent offenses. Given the deference courts owe to correctional administrators on matters implicating safety concerns and the substantial role that security interests play in housing assignments, the failure to consider these interests was a legal error.

### 3. Likelihood of Success on the Merits

Lastly, we address a third issue: the proper standard for evaluating the likelihood of success on the merits when considering a motion for a preliminary injunction. The district court began its analysis of Plaintiffs' request for a policy requiring socially distanced housing by noting that, to demonstrate a likelihood of prevailing, Plaintiffs must show "only a better than negligible chance of success." The district court explained this is a "low threshold."

As we just explained in *Illinois Republican Party v. Pritzker*, ––– F.3d –––––, –––––, 2020 WL 5246656, at *2 (7th Cir. Sept. 3, 2020), "the 'better than negligible' standard was retired by the Supreme Court," and is not the proper standard to apply when evaluating the likelihood of success on the merits in a preliminary injunction motion. The standard originated in *Omega Satellite Prod. Co. v. City of Indianapolis*, 694 F.2d 119 (7th Cir. 1982). But like many instances of selectively quoted phrases, we did not use this phrase as an unadorned statement of the applicable standard. We said in *Omega*:

> **\*8** If the harm to the plaintiff from denial of the preliminary injunction would be very great and the harm to the defendant from granting it very small, then the injunction should be granted even if the defendant has a better chance of prevailing on the merits than the plaintiff, provided the plaintiff's chances are better than negligible; and vice versa.

*Id.* at 123. As readily apparent, in context, we were explaining no more than what has become known as our sliding scale approach. Since *Omega*, though, we have at times—confusingly—cited the "better than negligible" phrase as if it were the proper standard for evaluating the likelihood of success on the merits at the preliminary injunction stage. *See Ill. Republican Party*, ––– F.3d at –––––, 2020 WL 5246656 at *2 (collecting cases).

The Supreme Court has invoked a higher standard. In *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), the Court stated that "[a] plaintiff seeking a preliminary injunction must establish that he is *likely* to succeed on the merits." *Id.* at 20, 129 S.Ct. 365 (emphasis added). Similarly, when discussing the requisite showing to establish irreparable injury, the Court explained that its standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22, 129 S.Ct. 365 (emphasis in original) (rejecting the Ninth Circuit's "possibility" standard as "too lenient"). The Court provided further guidance in *Nken v. Holder*, 556 U.S. 418, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009), which set forth the standard governing motions for a stay pending appeal. Though a different context, "[t]here is substantial overlap between [the traditional stay factors] and the factors governing preliminary injunctions." *Id.* at 434, 129 S.Ct. 1749 (citing *Winter*, 555 U.S. at 24, 129 S.Ct. 365). This is "not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Id.* The Court reiterated that under the "traditional" standard for a stay, the first factor asks "whether the stay applicant has made a strong showing that he is likely to succeed on the merits." *Id.* at 425–26, 129 S.Ct. 1749 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)). For that showing, the Court made clear, "[i]t is not enough that the chance of success on the merits be 'better than negligible,' " quoting with disapproval this court's decision in *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999). *Id.* at 434, 129 S.Ct. 1749.

**[17]  [18]**  We thus reiterate that a plaintiff must demonstrate that "its claim has some likelihood of success on the merits," *see, e.g.*, *Eli Lilly and Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018), not merely a "better than negligible" chance. What amounts to "some" depends on the facts of the

case at hand because of our sliding scale approach. *See Ty, Inc.*, 237 F.3d at 895.

Here, in reliance on our prior precedent, the district court recited the incorrect "better than negligible" standard several times. In various instances, though, the district court's analysis indicates that it, in fact, applied a higher standard. In particular, the district court at times used language that Plaintiffs were "reasonably likely to succeed on their contention," and the court ultimately concluded that Plaintiffs had "far surpassed" the "better than negligible" standard. Thus, were the recitation of the incorrect standard the district court's only error, we could not say that the district court abused its discretion in imposing the social distancing requirement. But, when coupling this with the district court's other errors, we cannot be certain that Plaintiffs' showing of the likelihood of success on the merits of their claim would have surmounted the appropriate standard. We therefore reverse the portion of the preliminary injunction precluding double celling and group housing at the Jail.

**\*9** We emphasize that we do not address the merits of whether Plaintiffs have demonstrated that they have suffered a constitutional violation. Indeed, our discussion solely addresses the legal errors the district court committed in the course of its preliminary injunction analysis. We reverse this portion of the preliminary injunction on the basis of these legal errors alone.

## B. Remaining Relief

In the temporary restraining order, the district court granted several measures of relief to Plaintiffs, including requirements that the Sheriff implement procedures and policies related to sanitation, testing, and provision of face masks to detainees in quarantine. When the district court issued the preliminary injunction, it did not revisit its analysis on any of these measures. Because the discussion pertaining to these measures resides in the temporary restraining order, we turn there for our analysis.

We affirm the aspects of the preliminary injunction that the district court converted from the temporary restraining order. In that order, the district court made detailed factual findings about the risks of COVID-19, the Sheriff's existing policies, and the execution of these policies, relying on hearing testimony and affidavits from Plaintiffs' experts, detainees, and correctional administrators. Importantly, the district court assessed the requested relief considering the totality of the Sheriff's conduct, rather than reviewing it in

isolation. For example, the district court declined Plaintiffs' request to mandate testing of new detainees since the Sheriff already had in place a policy requiring detainees to quarantine for fourteen days upon their arrival to the Jail.

**[19]** The district court also carefully considered the Sheriff's conduct in light of the CDC Guidelines and hewed closely to the Guidelines in its explanation of each measure of relief it ordered. The CDC Guidelines—like other administrative guidance—do not themselves set a constitutional standard. *See Bell*, 441 U.S. at 543 n.27, 99 S.Ct. 1861 (noting that recommendations of a Department of Justice task force "regarding conditions of confinement for pretrial detainees are not determinative of the requirements of the Constitution"); *cf. J.K.J. v. Polk Cty.*, 960 F.3d 367, 384 (7th Cir. 2020) (en banc) (concluding that the guidelines set by the Prison Rape Elimination Act do not set a constitutional parameter under the more demanding *Monell* deliberate indifference standard). Indeed, "while the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." *Bell*, 441 U.S. at 543 n.27, 99 S.Ct. 1861. But even if not dispositive, implementation (and proper execution) of guidelines that express an expert agency's views on best practices are certainly relevant to an objective reasonableness determination. *United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017) (noting that evidence of policy or procedure may be relevant to an objective reasonableness inquiry, even though it does not set the constitutional standard). This is particularly true here, where the CDC Guidelines provide the authoritative source of guidance on prevention and safety mechanisms for a novel coronavirus in a historic global pandemic where the public health standards are emerging and changing.

**\*10** The CDC Guidelines differ in material ways from the police department regulations at issue in our decision in *Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006). In *Thompson*, we determined that a policy on the use of force established by the police department did not dictate the constitutional standard for the use of force. *Id.* at 454; *see Brown*, 871 F.3d at 537 (clarifying the holding of *Thompson*). But the CDC Guidelines, arising from an expert, independent agency, are entitled to greater weight than a police department's internally-crafted regulations. *See Brown*, 871 F.3d at 537 ("[I]f compliance with departmental policy were the applicable legal standard, the police department itself would become the arbiter of Fourth Amendment reasonableness—a prospect that would have horrified those

Mays v. Dart, --- F.3d ---- (2020)

2020 WL 5361651

responsible for the Amendment's ratification."). The district court thus properly relied on these Guidelines in the course of its preliminary injunction analysis.

We note that, as it did with its discussion of Plaintiffs' request for an order precluding double celling and group housing arrangements, the district court made only a passing reference to the Sheriff's interest in managing Jail facilities and its obligation to defer to policies and practices necessary to preserve order and security. Likewise, the court did not meaningfully discuss this deference in its analysis. We are less troubled, though, given the nature of the relief ordered. Whereas safety and security concerns are fundamental to housing assignments, this is not true to the same degree for measures pertaining to sanitation, testing, and providing facemasks. We therefore do not find legal error.

**[20]** **[21]** Lastly, we address a motion by the Sheriff to supplement the record with a CDC report—entitled "Outbreak of COVID-19 and Interventions in One of the Largest Jails in the United States—Cook County, IL, 2020"—and, alternatively, the Sheriff's request that this Court take judicial notice of it. We deny the motion to supplement the record as the district court has yet to consider this document in the first instance. *See Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 684 n.1 (7th Cir. 2020). We similarly decline to take judicial notice. "The Federal Rules of Evidence permit a court to take judicial notice of a fact that is 'not subject to reasonable dispute' because it is 'generally known' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.' " *United States v. De La Torre*, 940 F.3d 938, 952 (7th Cir. 2019) (quoting Fed. R. Evid. 201(b)). The contents of this report —the Sheriff's COVID-19 interventions and their purported impact—are not " 'generally known,' at least to us." *Id.* Further, we cannot determine if the sources can reasonably be questioned because the parties dispute who authored the report and the district court has not had the opportunity to make any factual findings on the author. Nor are the contents "incontrovertible," as its authors "were not subject to *Daubert* challenges, cross-examined, or tested with competing expert testimony." *Id.* The contents of the report are thus "arguably subject to reasonable dispute," and therefore are not a proper subject of judicial notice.

### III. Conclusion

We commend Judge Kennelly for his handling of the motion, particularly in light of the many novel issues posed by the onset of COVID-19 and the case's emergent nature. We nevertheless REVERSE in part and VACATE the portion of the preliminary injunction precluding double celling and group housing because of the legal errors that arose as the district court applied the objective reasonableness standard recently announced in *Kingsley*. We AFFIRM the remainder of the preliminary injunction ruling.

**All Citations**

--- F.3d ----, 2020 WL 5361651

Footnotes

1    Both the Sixth Circuit and the Eleventh Circuit have recently addressed conditions of confinement claims involving the coronavirus in prison settings. *See Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020), in *Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020). These Circuits, however, apply an Eighth Amendment deliberate indifference standard to pretrial detainee conditions of confinement claims rather than the objectively unreasonable claim that we apply, and thus focus on a subjective element that is not at issue here.

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

38