Terry W. Bird – Bar No. 49038
tbird@birdmarella.com
Dorothy Wolpert – Bar No. 73213
dwolpert@birdmarella.com
*Naeun Rim – Bar No. 263558
nrim@birdmarella.com
Shoshana E. Bannett – Bar No. 241977
sbannett@birdmarella.com
Kate S. Shin – Bar No. 279867
kshin@birdmarella.com
Oliver Rocos – Bar No. 319059
orocos@birdmarella.com
Christopher J. Lee – Bar No. 322140
clee@birdmarella.com
James S. Threatt – Bar No. 325317
jthreatt@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Peter J. Eliasberg – Bar No. 189110
peliasberg@aclusocal.org
Peter Bibring – Bar No. 223981
pbibring@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

Donald Specter – Bar No. 83925
dspecter@prisonlaw.com
Sara Norman – Bar No. 189536
snorman@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

Attorneys for Plaintiff-Petitioners

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

LANCE AARON WILSON; MAURICE SMITH; EDGAR VASQUEZ, individually and on behalf of all others similarly situated,

Plaintiff-Petitioners,

vs.

FELICIA L. PONCE, in her capacity as Warden of Terminal Island; and MICHAEL CARVAJAL, in his capacity as Director of the Bureau of Prisons,

Defendant-Respondents.

CASE NO. 2:20-cv-04451-MWF-MRWx

**PLAINTIFF-PETITIONERS' MOTION FOR PRELIMINARY INJUNCTION ON TESTING**

*[Filed Concurrently with Declaration of James S. Threatt and (Proposed) Order]*

Date: February 8, 2021
Time: 10:00 AM

Assigned to Hon. Michael W. Fitzgerald
Courtroom 5A

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on February 8, 2021, at 10:00 A.M., or as soon thereafter as the matter may be heard in the courtroom of Honorable Michael W. Fitzgerald, United States District Court Judge, located at 350 W. 1st Street, Los Angeles, California 90012, Courtroom 5A, Plaintiff-Petitioners Lance Aaron Wilson, Maurice Smith, and Edgar Vasquez (collectively, "Petitioners"), will, and hereby do, move the Court for a preliminary injunction against Defendant-Respondents ("Respondents") Felicia L. Ponce, in her capacity as Warden of Terminal Island, and Michael Carvajal, in his capacity as Director of the Bureau of Prisons, enjoining Respondents from continuing to violate Petitioners' rights under the Eighth Amendment to the United States Constitution in relation to Respondents' failed response to the COVID-19 crisis.

This motion is made pursuant to Federal Rule of Procedure 65 and Local Rule 65, and is based upon this Notice, the Memorandum of Points and Authorities, the Declarations of Scott Allen, M.D. and James S. Threatt, all accompanying exhibits, the filings in this action, the Proposed Order, which is being lodged in accordance with Local Rule 7-20, and any and all evidence, argument, or other matters that may be presented at the hearing.

DATED: January 11, 2021

Terry W. Bird
Dorothy Wolpert
Naeun Rim
Shoshana E. Bannett
Kate S. Shin
Oliver Rocos
Christopher J. Lee
James S. Threatt
Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By: */s/ James S. Threatt*
James S. Threatt
Attorneys for Plaintiff-Petitioners

# TABLE OF CONTENTS


**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .......... 6

I. INTRODUCTION .......... 6

II. FACTUAL BACKGROUND .......... 7

A. Terminal Island Suffered One of the Most Severe and Disastrous COVID-19 Outbreaks in the Nation. .......... 7

B. Terminal Island Continues to be Vulnerable to a Devastating Outbreak of COVID-19. .......... 8

C. BOP Recommends Institutions Implement Surveillance Testing. .......... 9

D. Testing Remains a Critical Unresolved Issue Between the Parties. .......... 10

III. ARGUMENT .......... 10

A. LEGAL STANDARD .......... 10

B. Petitioners Have Demonstrated Serious Questions that the Failure to Perform Surveillance Testing Violates the Eighth Amendment. .......... 11

1. The Lack of Surveillance Testing Poses a Substantial Risk of Serious Harm. .......... 11

2. At a Bare Minimum, There are Serious Questions Whether Respondents are Acting with Deliberate Indifference. .......... 12

a. Respondents' Current Testing Plan is Insufficient. .......... 13

b. Dr. Allen's Proposal is Consistent With Medical Guidance and the Practices of Other Institutions. .......... 14

C. Petitioners Will Suffer Irreparable Harm Absent an Injunction. .......... 17

D. The Balance of Hardships and Public Interest Tip Sharply in Petitioners' Favor. .......... 18

E. The Prison Litigation Reform Act Does Not Bar the Relief Sought By Petitioners. .......... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......... 11

*Coreas v. Bounds*,
Nos. TDC-20-0780 & TDC-20-1304, 2020 WL 5593338 (D. Md. Sept. 18, 2020) .......... 17

*Farmer v. Brennan*,
511 U.S. 825 (1994) .......... 11, 12

*Fraihat v. U.S. Immigration and Customs Enforcement*,
445 F. Supp. 3d 709 (C.D. Cal. 2020) .......... 17

*Gray v. County of Riverside*,
5:13-cv-00444, ECF No. 202 (C.D. Cal. July 22, 2020) .......... 19

*Gray v. County of Riverside*,
No. 5:13-cv-0044 (C.D. Cal) .......... 13

*Helling v. McKinney*,
509 U.S. 25 (1993) .......... 11

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) .......... 18

*Martinez-Brooks v. Easter*,
459 F. Supp. 3d 411 (D. Conn. 2020) .......... 12

*Melendres v Arpaio*,
695 F.3d 990 (9th Cir. 2012) .......... 18

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 18

*Sierra On–Line, Inc. v. Phoenix Software, Inc.*,
739 F.2d 1415 (9th Cir. 1984) .......... 11

*Torres v. Milusnic*,
472 F. Supp. 3d 713 (C.D. Cal. 2020) .......... 12

*Winter v. Natural Resources Defense Council*,
555 U.S. 7 (2008) .......... 11

**Statutes**

18 U.S.C. § 3626(a)(1) .......... 19

Prison Litigation Reform Act .......... 18

**Other Authorities**

Eighth Amendment .......... 10, 11, 12

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff-Petitioners Lance Wilson, Maurice Smith, and Edgar Vasquez (collectively, "Petitioners") bring this motion after a lengthy failed effort to settle this case. Although there continues to be a host of problems with Respondents' practices, Petitioners have identified a single issue that, unless corrected, poses a significant current danger to inmates and staff at Terminal Island: the failure to perform targeted surveillance testing. As Petitioners' expert, Dr. Scott Allen, explains, asymptomatic carriers regularly spread the virus, with such transmission being the "Achilles' heel of current strategies to control COVID-19."[1] Surveillance testing solves this problem by testing randomly selected asymptomatic individuals. In a congregate setting like Terminal Island, adequate surveillance testing alerts officials when the virus has infiltrated the prison, the proverbial canary in a coal mine.

Respondents' testing plan includes no surveillance testing of any kind for staff and only very limited surveillance testing of inmates. In Dr. Allen's opinion, this is "wholly inadequate."[2] Particularly given the current surge in COVID-19 cases across southern California, staff members will likely unwittingly bring the virus into the prison. Once there, it can spread like wildfire and, in the absence of meaningful testing of asymptomatic staff or inmates, a significant outbreak could go

---

[1] Declaration of Scott Allen, M.D. ("Allen Decl.") ¶ 13. Dr. Allen is a board certified physician in internal medicine with extensive experience in correctional and detention health care. He is a Professor Emeritus of Medicine at the University of California Riverside School of Medicine and presently serves as the court-appointed monitor for a consent decree in litigation involving medical care at Riverside County jails. His declaration includes a summary of his qualifications. *See* Allen Decl. ¶¶ 1–4.

[2] Allen Decl. ¶ 27.

undetected until it is too late to stem the spread and save lives. In short, Respondents' current testing plan means they will learn about an outbreak only after it is too late for meaningful action.

Given the uniquely vulnerable population at Terminal Island, the consequences could again be devastating. In the previous (smaller) surge of cases in southern California, 10 inmates at Terminal Island died. Through Respondents' "dereliction of responsibility,"[3] history is likely to repeat itself. Accordingly, Petitioners seek a preliminary injunction requiring Respondents to implement an appropriate regimen of targeted surveillance testing.

## II. FACTUAL BACKGROUND

### A. Terminal Island Suffered One of the Most Severe and Disastrous COVID-19 Outbreaks in the Nation.

Terminal Island has suffered through one of the most severe outbreaks of COVID-19 in the country. With 10 inmate deaths since the onset of the pandemic, Terminal Island has had the fourth most deaths of any BOP institution.[4] At the time the Complaint in this action was filed in May 2020, BOP reported that 697 of 1042 inmates at Terminal Island had tested positive for COVID-19—nearly 70%.[5]

The outbreak's severity was not surprising. Terminal Island is a Level 3 care facility meant to house inmates "who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications."[6] BOP provides the following as examples of such conditions:

---

3 Allen Decl. ¶ 29.

4 Federal Bureau of Prisons, COVID-19 (10 inmate deaths at Terminal Island), https://www.bop.gov/coronavirus/ (last accessed Jan. 10, 2021).

5 *See* Complaint ¶ 6, ECF No. 1, May 16, 2020.

6 *See* Federal Bureau of Prisons, Clinical Guidance, Care Level Classification for

"Cancer in partial remission, advanced HIV disease . . . severe (NYHA Class III) congestive heart failure, and end-stage liver disease."[7] Terminal Island, in other words, is essentially a locked nursing home.

### B. Terminal Island Continues to be Vulnerable to a Devastating Outbreak of COVID-19.

Nor is Terminal Island's potential for a devastating outbreak safely in the past. According to BOP, approximately 550 inmates at Terminal Island are now "recovered" after previously contracting COVID-19, leaving approximately 150 inmates who are "COVID-naïve" and have never contracted the virus.[8] Putting aside the uncertainty of the extent to which infection creates immunity, these 150 COVID-naïve inmates remain at serious risk of harm from Respondents' failures.

The conditions of the local community in southern California also cannot be overlooked. Corrections officers and other staff, after all, enter Terminal Island every day from the local community before returning home. Seemingly with each new day, southern California surpasses its previous record for the most confirmed cases of COVID-19 and deaths in a given day and two week-period. In the week ending January 10, Los Angeles County *averaged* 200 COVID-19 deaths every day

---

Medical and Mental Health Conditions or Disabilities, at p. 3, https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf (last accessed Jan. 10, 2021).

[7] *See* Federal Bureau of Prisons, Clinical Guidance, Care Level Classification for Medical and Mental Health Conditions or Disabilities, at p. 3, https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf (last accessed Jan. 10, 2021).

[8] *Compare* Federal Bureau of Prisons, COVID-19 (noting 541 inmates are "recovered"), https://www.bop.gov/coronavirus/ (last accessed Jan. 10, 2021) *with* Federal Bureau of Prisons, FCI Terminal Island (700 inmates presently at Terminal Island), https://www.bop.gov/locations/institutions/trm/ (last accessed Jan. 10, 2021).

(or about one every seven minutes) and 14,270 new infections every day.[9] And the impact of the more contagious COVID-19 variant, recently identified in Britain, has yet to be fully assessed, though its presence in southern California has already been confirmed.[10]

**C. BOP Recommends Institutions Implement Surveillance Testing.**

The Bureau of Prisons, while leaving details to institutions, has issued testing requirements. In fact, the most recent version of BOP's Pandemic Response Plan, released on December 16, 2020, emphasizes the importance of testing: "With the increased availability of testing supplies and the increased understanding of the epidemiology of transmission, expanded testing strategies have become an important tool in the prevention and management of COVID-19 infections."[11]

For inmates who are asymptomatic and have no known contact with COVID-19, BOP recommends *institution-wide* surveillance testing (e.g., for all inmates) even when there are no confirmed cases at a given institution.[12] If such testing is not feasible, BOP encourages at least "periodic testing of certain [asymptomatic] groups such as inmates with risk factors for severe COVID-19 illness"—in other

[9] Los Angeles Times, Tracking the Coronavirus in Los Angeles County, https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/los-angeles-county/ (last accessed Jan. 10, 2021).

[10] Los Angeles Times, New, Potentially More Contagious Variant of the Coronavirus Spreads in California, https://www.latimes.com/california/story/2021-01-05/new-potentially-more-contagious-variant-of-the-coronavirus-spreads-in-california (last accessed Jan. 10, 2021).

[11] Declaration of James S. Threatt ("Threatt Decl."), Exh. A at p. 5 (BOP COVID-19 Pandemic Response Plan, Module 3, updated December 16, 2020).

[12] Threatt Decl., Exh. A at p. 7 (BOP COVID-19 Pandemic Response Plan, Module 3, updated December 16, 2020).

words, precisely the people housed at Terminal Island.[13]

**D. Testing Remains a Critical Unresolved Issue Between the Parties.**

Respondents' current testing plan is woefully short on specifics, and includes only a bare amount of surveillance testing. The plan largely hinges on testing symptomatic inmates and staff, as well as those identified through contact tracing. It also provides for testing of the following limited groups: (1) inmates who are ill and being admitted to long-term care units; (2) inmates who are about to be released or transferred to other facilities; (3) inmates on work details at "high risk" of contracting or transmitting COVID-19, at a rate of 10% per month; and (4) inmates returning from excursions into the community.[14]

This is not an adequate surveillance testing plan. Respondents are not testing the hundreds of asymptomatic individuals who are living in Terminal Island in communal settings unless they fall under one of the above four categories. Particularly in light of Terminal Island's history, its surveillance testing plan (or lack thereof) raises significant concerns. Just last week, on January 5, the Court affirmed the legitimate concerns Petitioners have about the conditions at Terminal Island in denying Respondents' motion to dismiss as to Petitioners' Eighth Amendment claim. The failure to perform targeted surveillance testing remains a serious risk to the health and safety of medically fragile residents of Terminal Island.

## III. ARGUMENT

### A. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

---

[13] Threatt Decl., Exh. A at p. 7 (BOP COVID-19 Pandemic Response Plan, Module 3, updated December 16, 2020).

[14] Threatt Decl., Exh. B at p. 2 (Terminal Island testing plan).

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). The Ninth Circuit employs a "sliding scale" approach to *Winter's* four-element test. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Under this approach, a preliminary injunction may issue if the plaintiff raises at least "serious questions going to the merits" and demonstrates that "the balance of hardships tips sharply in the plaintiff's favor," but only so long as the plaintiff also satisfies the other *Winter* factors. *Id*. A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

**B. Petitioners Have Demonstrated Serious Questions that the Failure to Perform Surveillance Testing Violates the Eighth Amendment.**

The Eighth Amendment protects those in detention against conditions of confinement that are "very likely to cause serious illness and needless suffering." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Prison officials violate a prisoner's Eighth Amendment right to humane conditions of confinement when two conditions are met. First, under the "objective" component of the analysis, "the alleged deprivation must be, 'objectively,' sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 825–26 (1994). Second, under the "subjective" component, prison officials must have acted with a "sufficiently culpable state of mind," namely, "'deliberate indifference' to inmate health or safety." *Id*. at 834.

**1. The Lack of Surveillance Testing Poses a Substantial Risk of Serious Harm.**

To establish the "objective" element of an Eighth Amendment violation "based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *See Farmer*, 511 U.S. at 834. This standard is easily met here.

Simply put, the risks of serious harm due to the COVID-19 outbreak are

undeniable. We have already witnessed firsthand the substantial risk to inmates housed at Terminal Island, with 70% of inmates having tested positive and 10 having died.[15] As a BOP-designated Level 3 Care Facility, Terminal Island combines the vulnerability of a nursing home population with the limitations of any prison in preventing the spread of COVID-19. "The failure to test asymptomatic individuals," according to Petitioners' expert, Dr. Allen, "gives rise to high risk of harm to incarcerated people and staff by allowing the silent spread of the virus throughout the facility."[16]

Indeed, recognizing both COVID-19's ferocious attack on the human body and its extreme infectiousness, exacerbated in congregate settings like prisons, courts across the country have found that COVID-19 specifically presents a substantial risk of serious harm to prisoners. *See*, *e.g.*, *Torres v. Milusnic*, 472 F. Supp. 3d 713, 727–28 (C.D. Cal. 2020); *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 439–40 (D. Conn. 2020).

**2. At a Bare Minimum, There are Serious Questions Whether Respondents are Acting with Deliberate Indifference.**

Sentenced inmates bringing claims under the Eighth Amendment can show deliberate indifference through evidence that the Respondent was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," that the Respondent actually "dr[ew] the inference" and "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 837, 847.

Respondents' current testing regimen exhibits their deliberate indifference.

---

[15] *See* Complaint ¶ 6, ECF No. 1, May 16, 2020; Federal Bureau of Prisons, COVID-19 (10 inmate deaths at Terminal Island), https://www.bop.gov/coronavirus/ (last accessed Jan. 10, 2021).

[16] Allen Decl. ¶ 36.

Respondents will learn of any outbreak only after it is too late to prevent the kind of serious illness and death that happened last spring. As Dr. Allen concludes, "the failure to determine the prevalence of COVID-19 in the face of uncontrolled community spread of an easily transmissible and potentially fatal disease in a prison facility shows an unconscionable disregard to a serious health threat."[17]

**a. Respondents' Current Testing Plan is Insufficient.**

Respondents' current plan almost exclusively involves testing inmates and staff who are symptomatic or who are identified through contact tracing. As stated above, the only other limited groups of inmates Respondents are testing at Terminal Island are: (1) inmates admitted to long-term care units; (2) inmates on pre-release including transfers to other facilities; (3) inmates on work details at high risk of contracting or transmitting COVID-19, at a rate of 10% each month; and (4) inmates returning from the community.[18]

Dr. Allen has reviewed Respondents' current plan. A board certified physician in internal medicine, Dr. Allen has extensive experience in correctional and detention health care. He is presently the court-appointed monitor for the consent decree in *Gray v. County of Riverside*, No. 5:13-cv-0044 (C.D. Cal), one component of which is testing for COVID-19. Since the onset of the pandemic, Dr. Allen has closely monitored the evolving medical literature, one reason he was invited to testify before the U.S. Senate Committee on the Judiciary regarding best practices for incarceration and detention during the COVID-19 pandemic.[19] In Dr. Allen's view, Respondents' plan is "wholly inadequate."[20]

---

[17] Allen Decl. ¶ 36

[18] Threatt Decl., Exh. B at p. 2 (Terminal Island testing plan).

[19] Allen Decl. ¶¶ 1–4.

[20] Allen Decl. ¶ 27.

*First*, there is no systematic surveillance testing of staff members, which "actively ignores the risk from the largest group of people who come and go every day between the prison and the outside community."[21] The lack of staff testing represents a "huge hole [in Terminal Island's] COVID-19 defenses."[22] *Second*, the inmate surveillance testing, while "beneficial," is "far too limited."[23] "Testing some workers at a rate of 10% per month and people returning from outside," Dr. Allen elaborates, "is simply not enough to lend confidence that we will have early detection of infectious outbreaks, particularly given that workers are often housed together in the same units of the prison."[24]

Instead, "an appropriate testing regimen for Terminal Island would require": (1) making tests available to all staff members once a month on site and (2) testing at least 25% of the COVID-naïve population each week.[25] Significantly, the COVID-naïve population is only about 150 inmates, and yet Respondents refuse to conduct regular surveillance testing on this limited and vulnerable population. Dr. Allen focuses on these inmates, in part, due to the uncertainty over when the non-naïve population has become vulnerable again to the virus. By testing this small sample on a weekly basis, Respondents will also be alerted to any outbreaks at their inception, instead of days or weeks later at which point the virus will have spread like wildfire throughout the institution.

**b. Dr. Allen's Proposal is Consistent With Medical Guidance and the Practices of Other Institutions.**

---

[21] Allen Decl. ¶ 30.

[22] Allen Decl. ¶ 30.

[23] Allen Decl. ¶ 33.

[24] Allen Decl. ¶ 33.

[25] Allen Decl. ¶¶ 31, 34–35.

Dr. Allen's proposal is also consistent with a host of authoritative medical sources as well as the practices of other prisons and jails, some of which have implemented more robust surveillance testing regimens.

For example, the CDC Guidelines recommend asymptomatic surveillance testing for both inmates and staff.[26] As Dr. Allen explains, however, the CDC guidance for detention facilities is "not very specific: it recommends surveillance testing but leaves the gaps to be filled in appropriately by institutions based on their available resources and needs."[27] It is also "notable" that the CDC Guidelines have been "associated with the widespread failure to control the spread of COVID in jails and prisons . . . It is essential to fill this gap with individually tailored surveillance testing plans."[28] Significantly, the CDC Guidelines for nursing homes—instructive given Terminal Island's vulnerable population—provide more detailed guidance, requiring universal baseline testing of staff and residents, followed by ongoing surveillance testing.[29]

Dr. Allen's recommendation is also similar to the testing strategies implemented by other prisons and jails. Even BOP, while leaving specifics to each

[26] *See* Centers for Disease Control and Prevention, Guidance for Correctional & Detention Facilities ("Consider strategies for testing asymptomatic incarcerated/detained persons without known SARS-CoV-2 exposure for early identification of SARS-CoV-2 in the facility."; "Consider strategies for testing asymptomatic staff without known SARS-CoV-2 exposure for early identification of SARS-CoV-2 in the facility."), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed Jan. 10, 2021).

[27] Allen Decl. ¶ 16.

[28] Allen Decl. ¶ 17.

[29] Allen Decl. ¶ 18.

institution, asserts the crucial role played by surveillance testing.[30] Likewise, the California Department of Corrections and Rehabilitation ("CDCR") recommends "regular (e.g., at least monthly) testing for patients aged 65 or older or with medical comorbidities that put them at risk for complications of COVID-19."[31] With respect to staff, CDCR requires an even more robust plan than Dr. Allen: "surveillance testing of employees every 14 days based upon risk of exposure, job classification, and/or areas worked within the institution to assess the frequency of asymptomatic infection."[32] Riverside County has also implemented surveillance testing in its jails by offering tests every two weeks to all high-risk people and once a month to all other inmates.[33] The result is that half the Riverside inmate population is tested every week.[34] As for staff, Riverside similarly offers tests on site once a month, with careful tracking of the numbers to ensure adequate surveillance is taking place.[35]

Finally, certain higher education institutions have adopted similar surveillance testing plans, to great success.[36] Furman College, for instance, required each student to test negative before returning to campus and has since tested 20% of

---

[30] Threatt Decl., Exh. A at p. 7 (BOP COVID-19 Pandemic Response Plan, Module 3, updated December 16, 2020).

[31] California Correctional Health Services, COVID-19 and Seasonal Influenza: Interim Guidance for Health Care and Public Health Providers, https://cchcs.ca.gov/covid-19-interim-guidance/#testing (last accessed Jan. 10, 2021).

[32] Allen Decl. ¶ 21.

[33] Allen Decl. ¶ 22.

[34] Allen Decl. ¶ 22.

[35] Allen Decl. ¶ 22–23.

[36] Allen Decl. ¶ 35.

students every week.[37]

In sum, Dr. Allen's opinion represents the consensus among correctional decision-makers as seen in a range of different sources. Indeed, Dr. Allen's plan is eminently reasonable in light of (1) the small number of Terminal Island inmates who would need to be tested; (2) the now widespread availability of tests, which even BOP recognizes; and (3) the limited duration during which testing would need to be performed given the anticipated vaccine distribution to the most vulnerable inmates. In short, there is no good reason for Respondents not to adopt a system of targeted surveillance testing. Their refusal is highly probative of Respondents' deliberate indifference to Petitioners' safety. *See, e.g.*, *Coreas v. Bounds*, Nos. TDC-20-0780 & TDC-20-1304, 2020 WL 5593338, at *20 (D. Md. Sept. 18, 2020) (court would revise its decision if defendants "fail[ed] to follow up with a regular surveillance testing program" as the court "relied significantly" on the surveillance testing then being conducted).

**C. Petitioners Will Suffer Irreparable Harm Absent an Injunction.**

It is axiomatic that a substantial risk of serious illness or death, such as that posed here, constitutes irreparable harm. "The Constitution protects those in detention against a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Fraihat v. U.S. Immigration and Customs Enforcement*, 445 F. Supp. 3d 709, 749 (C.D. Cal. 2020). Indeed, courts around the country, including the Central District of California, have concluded that incarcerated individuals "established they will suffer the irreparable harm of increased likelihood of severe illness and death" from COVID-19 "if a preliminary injunction is not entered." *Id.*

Here, while it is possible fewer inmates will become sick and die than in the

[37] Furman University, COVID Testing, https://www.furman.edu/furman-focused/health-resources/covid-testing/ (last accessed Jan. 10, 2021).

spring given the number of inmates who have already contracted COVID-19, the potential consequences for the approximately 150 COVID-naïve inmates in a widespread outbreak (i.e., hospitalization and/or death) are just as severe.

**D. The Balance of Hardships and Public Interest Tip Sharply in Petitioners' Favor.**

Where the government is the opposing party, balancing of the harm and the public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the balance of hardships and public interest tip sharply in Petitioners' favor.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). There can be no public interest in exposing vulnerable persons to increased risks of severe illness and death. "Faced with such a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)). And the fate of Terminal Island inmates and citizens in the local community are inevitably intertwined during this public health crisis. As Dr. Allen explains, "early detection in prisons is essential for the safety of everyone. Correctional health is public health, and failure to control outbreaks in prisons will critically handicap our efforts to contain the spread of the virus in our communities."[38]

In sum, both the hardships and the public interest tip sharply in Petitioners' favor.

**E. The Prison Litigation Reform Act Does Not Bar the Relief Sought By Petitioners.**

Finally, the relief sought by Petitioners is not barred by the Prison Litigation Reform Act. The injunctive relief sought by Petitioners is the least intrusive means

[38] Allen Decl. ¶ 37.

available to correct this constitutional violation. Surveillance testing is an essential step Respondents can take that will materially prevent another disastrous outbreak. In fact, the Riverside County surveillance testing program, which entails testing twice the portion of inmates now sought by Petitioners, was explicitly found by Judge Virginia Phillips to be the least restrictive means available, even though the relief there also included a host of other forms of injunctive relief related to the conditions inside the jails. *See Gray v. County of Riverside*, 5:13-cv-00444, ECF No. 202 (C.D. Cal. July 22, 2020). Accordingly, the relief sought by Petitioners comports with 18 U.S.C. § 3626(a)(1).

DATED: January 11, 2021

Terry W. Bird
Dorothy Wolpert
Naeun Rim
Shoshana E. Bannett
Kate S. Shin
Oliver Rocos
Christopher J. Lee
James S. Threatt
Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By: */s/ James S. Threatt*
James S. Threatt
Attorneys for Plaintiff-Petitioners