1  Terry W. Bird – Bar No. 49038
     tbird@birdmarella.com
2  Dorothy Wolpert – Bar No. 73213
     dwolpert@birdmarella.com
3  *Naeun Rim – Bar No. 263558
     nrim@birdmarella.com
4  Shoshana E. Bannett – Bar No. 241977
     sbannett@birdmarella.com
5  Christopher J. Lee – Bar No. 322140
     clee@birdmarella.com
6  Jimmy Threatt – Bar No. 325317
     jthreatt@birdmarella.com
7  BIRD, MARELLA, BOXER,
   WOLPERT, NESSIM, DROOKS,
8  LINCENBERG & RHOW, P.C.
   1875 Century Park East, 23rd Floor
9  Los Angeles, California 90067-2561
   Telephone: (310) 201-2100
10 Facsimile: (310) 201-2110

11 Peter J. Eliasberg – Bar No. 189110        Donald Specter – Bar No. 83925
     peliasberg@aclusocal.org                   dspecter@prisonlaw.com
12 Peter Bibring – Bar No. 223981             Sara Norman – Bar No. 189536
     pbibring@aclusocal.org                     snorman@prisonlaw.com
13 ACLU FOUNDATION OF                         PRISON LAW OFFICE
   SOUTHERN CALIFORNIA                        1917 Fifth Street
14 1313 W 8th Street                          Berkeley, California 94710
   Los Angeles, CA 90017                      Telephone: (510) 280-2621
15 Telephone: (213) 977-9500                  Facsimile: (510) 280-2704
   Facsimile: (213) 977-5297

16 Attorneys for Plaintiff-Petitioners

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LANCE AARON WILSON; *et al.*, | Case No. 2:20-cv-04451-MWF-MRW |
| Plaintiff-Petitioners, | |
| vs. | |
| FELICIA L. PONCE, *et al.*, | **DECLARATION OF SCOTT ALLEN, M.D.** |
| Defendant-Respondents. | |

I, Scott Allen, declare as follows:

28

**Experience and Expertise**

1.      I am a physician, board certified in internal medicine, with extensive experience in correctional and detention health care. I am a Professor Emeritus of Medicine, a former Associate Dean of Academic Affairs and former Chair of the Department of Internal Medicine at the University of California Riverside School of Medicine. From 1997 to 2004, I was a full-time correctional physician for the Rhode Island Department of Corrections; for the final three years, I served as the State Medical Program Director.

2.      I have published over 25 peer-reviewed papers in academic journals related to prison health care and am a former Associate Editor of the International Journal of Prisoner Health Care. I have consulted on detention health issues both domestically and internationally for the Open Society Institute and the International Committee of the Red Cross, among others. I have worked with the Institute of Medicine on several workshops related to detainee healthcare and serve as a medical advisor to Physicians for Human Rights. I am the co-founder and former co-director of the Center for Health and Justice Transformation (formerly the Center for Prisoner Health and Human Rights at Brown University (https://healthandjustice.org), and a former Co-Investigator of the University of California Criminal Justice and Health Consortium. I am also the founder and medical director of the Access Clinic, a primary care medical home to adults with developmental disabilities based at the Riverside County Hospital (RUHSMC). I am the court appointed monitor for the consent decree in litigation involving medical care at Riverside County Jails (*Grey v. Riverside*).  I am a medical subject matter expert for the Office of Civil Rights and Civil Liberties in the Department of Homeland Security, where I have inspected multiple immigration facilities across the country over the past six years.

3.      I also have extensive expertise in this emerging discipline of COVID-19 behind bars.  Since the beginning of the COVID-19 pandemic, as my colleagues

and I recognized that this virus would overwhelm our jails and prisons, I have made every effort to keep abreast of what is known about the virus, including daily review of the medical literature, news reports and public health websites. I have been in constant dialogue with multiple experts in the field including local partners within the Riverside County system and colleagues within my own extensive community health network. I regularly confer with a network of correctional health leaders nationally, including the former medical director of the Federal Bureau of Prisons and many current and former Medical Program Directors (including Zoom meetings and conference calls). I am in frequent contact with my colleagues at the Center for Health and Justice Transformation at Brown University and confer with public health and infectious disease experts at my own University of California system and academic colleagues across the nation.

4.      Throughout the epidemic, my expertise on the subject has been sought out regularly by correctional health colleagues, attorneys, legislators and staff in the U.S. Congress, the U.S. Department of Homeland Security, fellow academics and the press. My opinions and recommendations have been published and cited in the press and have been cited in legal filings and decisions related to detention and the pandemic. The U.S. Senate Committee on the Judiciary invited me to address them on June 2, 2020, regarding best practices for incarceration and detention during the COVID-19 pandemic.

5.      I am confident that the opinions expressed in this report represent the consensus of opinion among respected correctional and public health experts regarding management of COVID-19 in prisons and jails.

**Background**

6.      We are currently in the middle of an unprecedented global pandemic involving a novel corona virus known as COVID-19. While we now have effective vaccines we have barely begun to get the population vaccinated and consequently, infections, illness and deaths continue to rise. The total number of deaths in the U.S.

from COVID-19 is approaching 400,000, as we endure an extraordinary surge in cases, hospitalizations, and deaths and face the specter of a new strain of the virus that appears to spread even more quickly than the current strains. Southern California currently is a hotspot in the nation with record high numbers of new infections, hospitalizations and deaths.

7.     There is no proven curative treatment other than supportive care for the majority of COVID-19 cases. The virus is easily transmitted from person to person by droplet or aerosol spread. As the virus is novel, the vast majority of humanity has no immunity.

8.     Based on current knowledge, the majority of people infected with COVID-19 will have mild or no disease, roughly 20% will be sick enough to require hospitalization, and 5% of the total will require ICU level care.[1] We also know that those rates will be much higher for elderly people and those with chronic illness such as respiratory disease, heart disease, and hypertension.

9.     "Social distancing" is essential to slow the spread of the coronavirus to minimize the risk of infection and to try to reduce the number of those needing medical treatment from the already overwhelmed and inadequately prepared health care providers and facilities. However, social distancing is an oxymoron in congregate settings. The concentration of people in a close area with limited options for creating distance between detainees creates a very high risk for an outbreak of infectious disease.

10.     While all congregate settings (cruise ships, nursing homes, college dorms) carry high risk of rapid spread of infection, prisons carry an even higher risk because carceral settings have even closer living quarters where people simply cannot maintain the kind of distance that is necessary to prevent widespread transmission. In addition, staff come and go daily, providing a dangerous link to the

---

[1]  See https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

current uncontrolled spread in the community.  In prisons around the country, staff have been the primary vectors of transmission.

11.     A real danger to all prison healthcare systems, including F.C.I. Terminal Island, is the threat of a large number of people getting sick at the same time or within a short period. Rapid spread through a prison is a very real risk, due to the large number of people living at close quarters and the staff who go back and forth daily between the prison and the community, which is currently experiencing uncontrolled spread. Indeed, rapid spread has already occurred in an earlier outbreak at F.C.I. Terminal Island. Because COVID-19 can spread so quickly, those who contract the disease with symptoms that require medical intervention will need to be treated at local hospitals, thus increasing the risk of infection to the public at large and overwhelming treatment facilities. Local hospital systems in California are currently at or near their breaking point. Currently there are nearly 8000 COVID patients hospitalized in Los Angeles County, with 1714 patients in intensive care as a result of the virus.[2]  It is thus of the utmost importance to detect any outbreak early and prevent the spread.

**Asymptomatic (Surveillance) Testing**

12.     Early in the COVID-19 pandemic, two things became clear. First, traditional early detection (infection control measures like symptom-based screening and testing) were not working to prevent the spread within congregate facilities (like nursing homes and prisons). Outbreaks in jails and prisons have been documented across the country, with a staggering toll of death and disease.  To date, there have been 330,497 documented inmate cases of COVID infection in U.S. jails and

---

[2] See https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/los-angeles-county/.

prisons and an additional 76,210 known infections among staff members resulting in

over 2000 total deaths (1944 of these being inmate deaths).[3]

13.     Second, the reason that traditional measures of symptom based

screening failed was that there turns out to be a great deal of "silent spread" of

COVID-19 from asymptomatic individuals who have the virus to others who do not.

At least 50% of new infections appear to result from exposure from individuals

without symptoms.[4] Asymptomatic transmission has been called "the Achilles' heel

of current strategies to control COVID-19" in a New England Journal of Medicine

editorial recommending increased screening by testing of asymptomatic individuals

in congregate settings including jails and prisons.[5]

14.     This "silent spread" is why surveillance testing – systematic testing of

asymptomatic people – is essential for both staff and the incarcerated population.

The virus doesn't care which uniform you wear; the surveillance system must be

able to identify the virus as early as possible to allow for the containment methods

of isolation and quarantine to be effective.

15.     There is an exception to this rule. Based on what we currently know

about COVID-19, people who have already experienced the disease have a

significant level of immunity to reinfection for at least 90 days.  There have been

documented cases of reinfection, but they are rare and generally outside of the 90-

day window.  Given our current lack of conclusive data about the degree to which

the recovered population can be reinfected and can spread the disease, there is no

current consensus on testing that population.  Symptom-based testing is therefore a

defensible strategy for the recovered population in a correctional institution, and

---

[3] See https://covidprisonproject.com.
[4] See https://jamanetwork.com/journals/jamanetworkopen/fullarticle/
2774707?utm_source=For_The_Media&utm_medium=referral&utm_campaign=ftm_links&utm_term=010721
[5] New England Journal of Medicine, April 24, 2020, found at https://www.nejm.org/doi/full
/10.1056/ NEJMe2009758.

1    surveillance can appropriately be focused on the COVID-naïve population (those

2    who have not yet had the disease).

3         16.    The Centers for Disease Control and Prevention (CDC) has issued

4    guidance on testing in correctional institutions that is unfortunately not very

5    specific: it recommends surveillance testing but leaves the gaps to be filled in

6    appropriately by institutions based on their available resources and needs.[6] It is

7    notable that this overly vague guideline has been associated with the widespread

8    failure to control the spread of COVID in jails and prisons described above.

9         17.    It is essential to fill this gap with individually tailored surveillance

10   testing plans. For every one prisoner identified and isolated using symptom-based

11   screening, one, two, or maybe even eight or nine pass into – and eventually out of –

12   the facility without symptoms.  Therefore, we must test aggressively so we can

13   isolate infected individuals, monitor them and break the chain of transmission as

14   early as possible.

15        18.    The CDC has issued more specific recommendations for dealing with

16   outbreaks in nursing homes.[7] Those recommendations call for universal baseline

17   testing of all staff and residents once an outbreak has been identified, as well as

18   ongoing surveillance of all staff and residents going forward. In other words, they

19   recommend at least a one-time baseline universal testing of all asymptomatic

20   individuals (staff and residents) and ongoing periodic testing of asymptomatic

21   individuals in a congregate facility after that. These same public health methods also

22   apply to other congregate settings, as the virus spread is determined by its biology

23   and the closeness of congregate living spaces, not why people are housed together.

24

25   ---

26   [6] See https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[7] CDC, *Testing Guidance for Nursing Homes* (Updated May 19, 2020), available at

27   https://www.cdc.gov/coronavirus/2019-ncov/hcp/nursing-homes-testing.html  and echoed by
Centers for Medicare & Medicaid Services, *Nursing Home Reopening Recommendations for State*

28   *and Local Officials*, (May 18, 2020), available at https://www.cms.gov/files/document/nursing-home-reopening-recommendations-state-and-local-officials.pdf.

This is an appropriate public health-based standard, and there is no reason there should be a lesser standard for correctional and detention facilities, especially as control of outbreaks in all congregate environments impact the public's health.

19.     A testing-based containment strategy is founded on standard infectious disease containment methods and is consistent with current mitigation strategies being employed across the country and across the globe. Baseline universal testing, isolation and quarantine and ongoing surveillance testing is the standard strategy for containing viral spread in other congregate settings such as cruise ships and nursing homes with established outbreaks. As we learn more and more about COVID-19, it is also becoming the standard of care for jails and prisons.  See, for example, "Mass Testing for SARS-CoV-2 in 16 Prisons and Jails — Six Jurisdictions, United States, April–May 2020," Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report, August 21, 2020, 69(33); 1139–1143 (https://www.cdc.gov/mmwr/volumes/69/wr/mm6933a3.htm) (demonstrating that "mass testing irrespective of symptoms, combined with periodic retesting, can identify infections and support prevention of widespread transmission in correctional and detention environments" and noting that "testing staff members at regular intervals, regardless of symptoms, could become an important part of facilities' COVID-19 prevention and mitigation plans").

20.     For example, the California Department of Corrections and Rehabilitation (CDCR) requires surveillance testing for the incarcerated population based on guidance from the CDC and the California Department of Public Health (CPDH).  These requirements can be found at https://cchcs.ca.gov/covid-19-interim-guidance/.  The testing plan includes direction that "[p]atient care for COVID-19 includes routine viral testing of asymptomatic patients at high risk of exposure and/or transmission." This testing includes consideration of "at least monthly" tests "for patients aged 65 or older or with medical comorbidities that put them at risk for complications of COVID-19."  In addition, incarcerated workers in key positions,

such as kitchens and healthcare environments are tested weekly under the CDCR's plan, and weekly testing "should also be considered for essential inmate workers who have a high level of contact with staff or other inmates as part of their work that can result in high transmission risk to others (e.g., porters working outside their own cohort, and mail carriers)." Further, all patients in CDCR may request tests even if asymptomatic.

21.   CDCR requires surveillance testing for staff as well, grounded in CPDH guidance: specifically, "For all other CDCR institutions that do not have any newly diagnosed COVID-19 cases among patients or employees within the last 14 days, CDCR will follow CDPH recommendations regarding surveillance testing. CDPH recommends surveillance testing of employees every 14 days based upon risk of exposure, job classification, and /or areas worked within the institution to assess the frequency of asymptomatic infection." CDCR COVID-19 Employee Testing Guidance, October 30, 2020 (attached as Exhibit A) at 2.

22.   Riverside County, California, provides a different model for a testing regimen in its jails. I am the court-appointed monitor for a consent decree regarding medical care in Riverside's five jails. The County's COVID-19 response plan, which was approved by the Court, mandates that all people incarcerated in the jails who are medically vulnerable to serious complications or death from COVID-19 be offered a test every two weeks, and all others every month. The numbers of tests given is carefully monitored to ensure the process offers adequate surveillance of any silent spread. I believe that systematic testing of a percentage of the population, as is done in CDCR, is a better approach. But this model appears to be effective for Riverside County: in practice, the data I have reviewed shows that one third to one half the entire jail population is tested every week, which is sufficient to inspire

confidence that the surveillance will likely catch outbreaks early enough to adopt preventive measures.

23.    Riverside also provides for staff testing: the County offers tests to staff monthly at each jail, on site.  Again, the data is carefully reviewed to ensure staff are being tested in large enough numbers to provide confidence that surveillance is adequate.

**F.C.I. Terminal Island**

24.    I have reviewed the federal Bureau of Prisons (BOP) COVID-19 Pandemic Response Plan Module 3 on "Screening and Testing," dated December 16, 2020 (attached as Exhibit B) and Module 11 on "BOP Employee Management," dated December 9, 2020 (attached as Exhibit C).  I have also reviewed the document entitled "Inmate Covid-19 Surveillance for Terminal Island" (attached as Exhibit D), which I am told is the F.C.I. Terminal Island individualized testing plan.

25.    I have also reviewed information about the population of F.C.I. Terminal Island.  I am told that the prison currently houses approximately 750 people, of whom approximately 600 have recovered from COVID-19, leaving a population of 150 COVID-naïve people.  I am also told that the prison houses people who are designated Care Level 3 by the BOP.  That means they "have complex, and usually chronic, medical or mental health conditions" and "require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications"; in addition, "[s]tabilization of medical or mental health conditions may require periodic hospitalization" for these patients.[8] According to the BOP, typical Care Level 3 patients include people with "[c]ancer in partial remission, advanced HIV disease, severe mental illness in remission on medication, severe . . . congestive heart failure, and end-stage liver disease." *Id.* Care Level 3 patients also include people with persistent or poorly controlled

---

[8]"Care Level Classification for Medical and Mental Health Conditions or Disabilities," May 2019, downloaded from http://www.bop.gov/ resources/health_care_mngmt.jsp, at 3.

autoimmune disorders, dementia, chronic obstructive pulmonary disorder, severe persistent asthma. *Id.* at 6-7. This is therefore a medically fragile population, most if not all of whom are at enhanced risk of serious illness or death from COVID-19.

26. I fully agree with the statement in the BOP testing module that "With the increased availability of testing supplies and the increased understanding of the epidemiology of transmission, expanded TESTING STRATEGIES have become an important tool in the prevention and management of COVID-19 infections. This is especially true in congregate living and residential settings such as correctional facilities where social distancing may be difficult to achieve or maintain." Exhibit B at 5. I also fully agree with the statement in the Terminal Island-specific testing policy that "Surveillance is essential during a pandemic to assist in reducing SARS-COV-2 transmission." Exhibit D at 1.

27. Terminal Island's policy as set forth in the BOP testing plans appropriately includes symptomatic testing and contact tracing, which are two of the essential elements of any testing plan. Exhibit B at 5-6. I also endorse other BOP testing provisions for asymptomatic incarcerated people with no known contact with the virus, including institution-wide testing "where one or more inmate or staff cases of COVID-19 have been identified" and tests for incarcerated people newly arriving or departing from the prison and those in residential health care units. *Id.* at 6-7. However, the provisions for surveillance testing of asymptomatic people, an essential element of any testing plan, are wholly inadequate

28. *First*, there is no systematic surveillance testing for staff in the BOP module or the prison-specific plan. The BOP does not make testing readily available, but simply "strongly encourage[s]" individual prisons to "establish relationships with the local health department for testing." Exhibit C at 7. The policy notes that a "staff specific BOP national contract for COVID-19 testing" might also be an option, and that some places have "additional procedures to allow first responders to be tested for COVID-19." *Id.* But the BOP policy discourages

such efforts, instead directing prisons to have staff get tested on their own. I am
informed that F.C.I. Terminal Island has not made tests available to staff through a
national contract or on-site testing for first responders, but instead simply
encourages them to be tested through their health care providers or Los Angeles
County.

29.     In my opinion, the policy as set forth in Exhibit C and the Terminal
Island practice as described to me constitute a dereliction of responsibility. BOP can
provide testing to its staff, as the policy makes clear, but chooses not to do so at
Terminal Island, a prison that houses medically fragile people, including
approximately 150 COVID-naïve patients. As a result, there is no way of knowing
which staff may be silent spreaders of the disease.

30.     The BOP's failure to test asymptomatic staff actively ignores the risk
from the largest group of people who come and go every day between the prison and
the outside community. This failure is a huge hole COVID-19 defenses in the
prison, since staff infections are the biggest threat to the 150 COVID-naïve people
incarcerated there. At a time when cases throughout the country and particularly in
Southern California are at all-time highs, hospital beds are desperately lacking, and
a new highly infectious strain has been found in the region, the BOP must use every
measure at their disposal for early detection.

31.     The vast majority of correctional systems I am familiar with have a
system to ensure that staff are regularly screened for tuberculosis and regularly
provided flu shots. This well-established public health precedent must urgently be
applied to the current crisis. I strongly recommend that BOP ensure that at the very
least, staff are regularly offered on-site testing and the numbers are carefully tracked
to ensure that the majority of staff are tested monthly.

32.     *Second*, there is no adequate systematic surveillance testing for
incarcerated people. Terminal Island's "surveillance testing" for the incarcerated
population consists of the following: (a) people housed in long-term care units; (b)

people who are being released or transferred; (c) workers at high risk for contracting the virus, at a rate of 10% a month; and (d) people returning from outside hospitals, court appearances, or the community. Exhibit D at 2.

33.     I agree that people housed in long-term care units should be tested, but the policy does not say how many people this covers or how often the tests will be. I am told there are no such patients currently at Terminal Island. This provision thus has no value as a surveillance testing measure. Similarly, while it is useful to test people prior to release or transfer, with the extremely limited movement in the BOP at the present time this will yield minimal information about any silent spread of the virus in the prison. The other two provisions are beneficial but far too limited. Testing some workers at a rate of 10% per month and people returning from outside stays is simply not enough to lend confidence that we will have early detection of infectious outbreaks, particularly given that workers are often housed together in the same units of the prison, and there are currently

34.     Terminal Island's testing plan fails to properly address the central and critical questions we are confronted with in the face of an outbreak of COVID-19, including: how much COVID-19 is there in the prison and exactly who has the virus? Without answering these questions, the strategy of contact tracing, isolation and cohorting are seriously undermined and will likely fail to contain the spread of the virus.

35.     Terminal Island must have a robust surveillance of the COVID-naïve population, to give the institution a reasonable chance to actually catch the virus before it spreads widely and sows disaster.  In my opinion, an appropriate testing regimen for Terminal Island would require tests of 25% of the COVID-naïve population each week.  If that population is indeed only 150 people, this would be a testing burden of only 150 tests per month – surely a small price to pay for the confidence that new outbreaks can be detected in a timely manner.  Such regular surveillance has been demonstrated to be successful in higher education settings.  It

is also closely modeled on the CDC nursing home recommendations, which are particularly relevant when, as at Terminal Island, the population consists of people with serious medical conditions that make them particularly vulnerable to serious complications or death from COVID-19.

36.     Current screening and testing protocols have likely only identified a fraction of positive cases. In my expert opinion, the failure to determine the prevalence of COVID-19 in the face of uncontrolled community spread of an easily transmissible and potentially fatal disease in a prison facility shows an unconscionable disregard to a serious health threat and is not a reasonable response to the crisis created by the pandemic. The failure to test asymptomatic individuals (with the notable exceptions of some close contacts to known positive cases) gives rise to high risk of harm to incarcerated people and staff by allowing the silent spread of the virus throughout the facility, and eventually (if not already) back into the community.

37.     In conclusion, early detection in prisons is essential for the safety of everyone.  Correctional health is public health, and failure to control outbreaks in prisons will critically handicap our efforts to contain the spread of the virus in our communities.  Prisons are not islands – in fact, they are more like bus terminals with people coming and going constantly. People are processed in and released. Officers

and other staff arrive for work and leave for home in three shifts a day. Any of these people can be "silent spreaders" who carry the virus but do not have symptoms.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of January, 2021, in Riverside, California.

_____

Scott Allen, M.D.

# EXHIBIT A

**California Department of Corrections and Rehabilitation**
**COVID-19 Employee Testing Guidance**
October 30, 2020

COVID-19 testing does not replace or preclude other infection prevention and control interventions, including monitoring all employees and patients for signs and symptoms of COVID-19 prior to entry to facility, universal masking by employees and patients for source control, use of recommended personal protective equipment (PPE), maintaining appropriate physical distancing, and environmental cleaning and disinfection. When testing is performed, a negative test only indicates an individual did not have detectable infection at the time of testing; individuals might have COVID-19 infection that is still in the incubation period or could have ongoing or future exposures that lead to infection.

---

**All Institution Entrance Screening**

---

Employees who have symptoms that may be due to COVID-19 should seek medical attention and not report to work. In all institutions, all employees, contractors, and visitors shall be screened for fever and COVID-19 related symptoms[1] (new or worsening symptoms not caused by an underlying health care condition) and/or close contact[2] while not wearing appropriate PPE, with an individual with COVID-19 infection, each time they enter any institution. No one who screens positive shall be allowed to enter the institution, unless a 'yes' response to any screening question is related to an underlying health condition. In this instance the individual will have further triage by a licensed nurse to determine if the individual may be allowed entry. If an employee has a fever, possible COVID-19 related symptoms and/or has had close contact without appropriate PPE with an individual with COVID-19 infection, the employee shall be promptly provided information regarding testing. Symptomatic employees and those who test positive for COVID-19 shall follow the procedures set forth below, in the section entitled "Employee Testing Results."

---

**Institutions without COVID-19 Cases – Surveillance Testing**

---

The purpose of a surveillance testing strategy is to detect new cases, prevent spread, and mitigate outbreaks. This is especially relevant in COVID-19 due to the high proportion of asymptomatic cases.

Three California Department of Corrections and Rehabilitation (CDCR) institutions have been identified by the Receiver as providing Skilled Nursing Facility (SNF) level of care:  California Medical Facility (CMF), Central California Women's Facility (CCWF), and California Health Care Facility (CHCF).  These three institutions shall follow the Skilled Nursing Facility testing guidance issued by the California Department of Public Health (CDPH). The SNF protocol for routine surveillance testing is to test 100 percent of employees every 7 days. If there are no cases detected after two (2) weeks of testing all employees every 7 days, then testing can be reduced to testing all employees every 14 days.

---

[1] COVID-19 symptoms include fever of 100.4, cough, shortness of breath, unexplained or unusual fatigue, muscle or body aches, headache, loss of taste or smell, sore throat, congestion or a runny nose, nausea, vomiting, or diarrhea (3 or more loose stools within 24 hours).

[2] Close contact is defined as within less than 6 feet for a cumulative total of at least 15 minutes in a 24 hour period. See the COVID-19 Risk Assessment Exposure Guide (Attachment 1) for more information.

For all other CDCR institutions that do not have any newly diagnosed COVID-19 cases among patients or employees within the last 14 days, CDCR will follow CDPH recommendations regarding surveillance testing. CDPH recommends surveillance testing of employees every 14 days based upon risk of exposure, job classification, and /or areas worked within the institution to assess the frequency of asymptomatic infection. For optimal benefit, testing turnaround times must be as short as possible and no longer than 48 hours from the time collected.

In addition, specific testing is recommended for the following groups:

1) All employees who have <u>not</u> had a prior laboratory-confirmed COVID-19 infection within the prior 90 days and who are regularly assigned to work in a Correctional Treatment Center, Outpatient Housing Unit, Hospice, Psychiatric Inpatient Program, or Mental Health Crisis Bed shall be tested per the SNF testing guidance issued by CDPH, which includes testing 100 percent of employees regularly assigned to these areas every 7 days. If there are no cases detected after two (2) weeks of testing all regularly assigned employees every 7 days, then testing can be reduced to testing all regularly assigned employees every 14 days.

2) All transportation and hospital custody coverage employees who have <u>not</u> had a prior laboratory-confirmed COVID-19 infection within the prior 90 days shall be tested every 7 days.

**NOTE:** CCHCS may adjust the scope and frequency of employee testing for a particular institution based on community spread data and prevalence of the virus in the institution.

| Institutions with COVID-19 Cases - Response Testing |
|---|

Institutions that have been designated as providing SNF level of care (CMF), (CCWF), and (CHCF): When one or more COVID-19 positive individual (patient or employee) is identified in an institution, contact tracing shall be initiated and serial retesting of all employees shall be performed every 7 days until no new cases are identified in two (2) sequential rounds of testing.

All other institutions:  Immediately upon being made aware of a positive COVID-19 test result in an employee or patient, contact tracing shall be initiated and serial retesting of all exposed persons shall be performed every 7 days until no new cases are identified in two (2) sequential rounds of testing. If there are positive cases across multiple yards at any given institution, all employees across all yards shall be tested every 7 days until no new cases are identified in two sequential rounds of testing. The institution may then resume their regular surveillance testing schedule as outlined above.

To the extent possible, movement of employees between yards shall be minimized. Employees shall wear appropriate personal protective equipment at all times.

| **Employee Testing Results** |
|---|

*Employees who are exposed and identified as close contacts of a case:*

Employees who have been determined to have been a close contact of a confirmed case, while not wearing appropriate PPE, shall quarantine at home for 14 days. A negative test does not shorten this quarantine period, as infection could still develop later in the incubation period. At the end of that time, the employee can return to work as long as they are asymptomatic for at least 24 hours and have a negative COVID-19 test.

*Employees who test positive:*

Employees who test positive for COVID-19 by polymerase chain reaction (PCR), are not severely immunocompromised, and have NO symptoms shall be instructed to isolate themselves at home and shall not return to work until the following condition is met:

- At least 10 days have passed since the date of the positive COVID-19 diagnostic test.

Employees who test positive for COVID-19 by PCR, are not severely immunocompromised, and either had mild to moderate symptoms or developed mild to moderate symptoms during their 10-day home isolation period may return to work once the following conditions are met:

- At least 10 days have passed since symptoms first appeared; **AND**
- At least 24 hours have passed since recovery, defined as resolution of fever without the use of fever-reducing medications; **AND**
- Improvement in symptoms[3] (e.g., cough and shortness of breath).

Employees who test positive for COVID-19 by PCR, are severely immunocompromised or had severe symptoms initially or developed severe symptoms during their 10-day home isolation period may return to work once the following conditions are met:

- At least 20 days have passed since symptoms first appeared; **AND**
- At least 24 hours have passed since recovery, defined as resolution of fever without the use of fever-reducing medications; **AND**
- Improvement in symptoms[3] (e.g., cough and shortness of breath).

Employees should be provided information in writing about how to appropriately quarantine and isolate within their home.

| **Testing of New Employees or Employees Returning from a Leave of Absence** |
|---|

All new institution-based employees or employees returning from an extended leave shall be added into the testing cycles referenced above for COVID-19.

---

[3] It is possible that individuals may still have residual respiratory symptoms despite meeting the criteria to discontinue isolation.

| **Testing of Employees Redirected to Assist with a COVID-19 Outbreak** |
| --- |

In the event the employee must be redirected to another COVID-19 outbreak institution, the employee must be tested prior to arriving at the new work location. If the test is negative and the employee is asymptomatic, they may return to work with self-monitoring of symptoms and test again at 14 days.

All employees redirected to assist an institution that has a COVID-19 outbreak (employee or patients), must be tested prior to arriving back to their home institution.

**This policy is subject to change as CDC and CDPH guidelines are updated as well as PPE availability and testing resources and availability change statewide.**

**Employee Health Program**

## COVID-19 Risk Assessment Exposure Guide

The following COVID-19 Risk Assessment Exposure Guide applies to all CDCR staff, including those at youth facilities and those who interact with parolees.  These guidelines in combination with the existing CCHCS guidance Recommended PPE for Staff and Inmates in the Institutions dated 7/2/2020, will categorize the level of exposure for staff and provide guidance for managing exposures.

| Table 1.<br>COVID: Level of Exposure[1] in Correctional Facilities | Minimal Risk | Medium Risk | High Risk |
|---|---|---|---|
| IF SOURCE (i.e. resident/inmate/youth/parolee or coworker with COVID) IS MASKED[2], and, there is prolonged close contact[1], with: | | | |
| Staff wearing all full and appropriate PPE | X | | |
| IF SOURCE (i.e. resident/inmate/youth/parolee or coworker with COVID) IS NOT MASKED, and, there is prolonged close contact[1], with: | | | |
| Staff **with** appropriate respiratory protection[2] **BUT NO** Eye Protection | | X | |
| IF SOURCE (i.e. resident/inmate/youth/parolee or coworker with COVID) IS NOT MASKED, and, there is prolonged close contact[1], with: | | | |
| Staff **without** appropriate respiratory protection[2]  +/- Eye Protection | | | X |

[1]Exposure to a COVID + person is defined as close prolonged contact, which is being less than 6 feet in distance **AND** for 15 minutes or longer.  If you are closer than 6 feet but only interacting for 5-10 minutes, this is not an exposure; if you are farther than 6 feet for longer than 15 minutes, this is not considered an exposure.
[2]Masked and appropriate respiratory protection is minimally a CDPH-approved cloth face covering for residents/inmates or a surgical mask, an N95 when providing direct patient care/transport or an N95 in outbreak situations.

**Employee Health Program**

COVID-19 Risk Assessment Exposure Guide

| Table 2. Aerosol Generating Event/Procedure PPE Worn by the Person Exposed | | | | | |
|---|---|---|---|---|---|
| COVID: Level of Exposure in Aerosol Generating Event/Procedure[3] | Level of PPE | Unmasked/ NO N95 | Face mask[4] and NO eye protection | Face mask[4] and eye protection | N95 and eye protection |
| **PPE Worn by Source** | Unmasked | High risk | High risk | Medium risk | Minimal risk |

[3]For aerosol generating events/procedures, **any duration** should be considered prolonged. Examples of aerosol generating events/procedures include: CPR, nebulizer treatments, CPAP/BIPAP, dental procedures and certain behaviors, including screaming, shouting, and coughing.

[4]Face mask refers to either an approved CDPH cloth face covering or a surgical mask.

| Table 3. Everyday Activities at Work, if one person is COVID+ | | | |
|---|---|---|---|
| COVID: Level of Exposure if closer than 6 feet, BOTH PEOPLE UNMASKED | Carpooling | Break Room | Lunch |
| **15 minutes or less** | Minimal risk | Minimal risk | Minimal risk |
| **15 minutes or more** | High risk | High risk | High risk |

| Table 4. Precautionary Removal Guidance per Level of COVID Exposure | |
|---|---|
| COVID: Level of Exposure | Guidance |
| **Minimal Risk** | Return to work |
| **Medium Risk** | Return to work with symptom monitoring and testing x 1 (1st test < 48 hrs from exposure) |
| **High Risk** | Home quarantine for 14 days, with symptom monitoring and testing x 2 (1st test < 48 hrs from exposure and then again at 5-7 days from 1st test) |

# EXHIBIT B

# MODULE 3. SCREENING AND TESTING

## WHAT'S NEW

- Updates to **SECTION B.1 DIAGNOSTIC TESTS** to include BinaxNOW Ag card POC test

- Changes to **SECTION B. 3 SPECIMEN COLLECTION**: Abbott ID NOW respiratory samples must be processed within one hour of collection and may not be refrigerated for later testing.

- **EXPIRATION DATES:** All testing supplies should be checked for expiration dates prior to use and returned to Central Fill and Distribution (CFAD) if expired.

- New section **C. INFLUENZA TESTING** added

- Changes made throughout the document to include BinaxNOW Ag card testing where needed.

- COVID-19 Asymptomatic Novel Coronavirus lab order no longer an available test in BEMR. References to this test have been removed.

## MODULE 3 TABLE OF CONTENTS

**A. SCREENING INMATES FOR COVID-19** ........................................................................................... **2**
    1. INDICATIONS FOR SCREENING........................................................................................... 2
    2. SCREENING PROCESS ...................................................................................................... 2
    3. TEMPERATURE CHECK PROTOCOL ..................................................................................... 3

**B. COVID-19 TESTING**................................................................................................................ **4**
    1. DIAGNOSTIC TESTS ........................................................................................................ 4
    2. INDICATIONS FOR TESTING .............................................................................................. 5
    3. SPECIMEN COLLECTION ................................................................................................... 7
    4. LABORATORY ORDERING AND DOCUMENTATION ................................................................ 10
    5. ALGORITHM FOR SELECTING THE APPROPRIATE LAB TEST ................................................... 11
    6. SCREENING AND TESTING PROCEDURES SUMMARY ............................................................ 12
    7. MANAGING INMATES WHO REFUSE TESTING ..................................................................... 14

**C. INFLUENZA TESTING** ............................................................................................................. **16**

## A. SCREENING INMATES FOR COVID-19

### 1. INDICATIONS FOR SCREENING

- **INTAKE SCREENING:** All new inmate arrivals at any BOP facility.
  - ➜ *Inmates returning from routine day trips ordinarily do not need to be screened upon return to the facility.*
  - ➢ Includes all new intakes (detainees and commitments, writ returns, parole violators, bureau intra-system transfers, etc.), regardless of their mode of arrival (voluntary surrender, USMS/JPATS, ICE, BOP, etc.).
  - ➢ COVID-19 screening is recommended early in the intake screening process, preferably before entering the building.
  - ➢ Documentation of the COVID-19 symptom screen and temperature check for new intakes will be recorded in the BEMR Intake note, along with disposition to either quarantine or isolation.
- **EXIT SCREENING:** All inmates leaving (i.e., transferring, going to RRC, releasing, etc.) a BOP facility.
- **SCREENING AS PART OF CONTACT INVESTIGATION:** Close contacts of a COVID-19 case.
- **QUARANTINE AND MEDICAL ISOLATION:** Refer to MODULE 4 for monitoring of patients in quarantine and medical isolation.

### 2. SCREENING PROCESS

- **SYMPTOM SCREENING**
  - ➢ Chills, cough, shortness of breath
  - ➢ Fatigue, muscle or body aches, headache
  - ➢ New loss of taste or smell
  - ➢ Sore throat, congestion, or runny nose
  - ➢ Nausea, vomiting, or diarrhea

- Inmates who are symptomatic or have a temperature (see below) need to be isolated promptly. (Refer to MODULE 4 and the **Medical Isolation Checklist** in the APPENDICES.)

- TEMPERATURE CHECK (see *Temperature Check Protocol* below): A "temperature" depends on the kind of thermometer used:
  - ➢ Oral: ≥ 100.4˚F
  - ➢ Ear: ≥101˚F
  - ➢ Forehead: ≥ 100˚F

- PPE FOR INMATE SCREENINGS: Staff who are conducting inmate screenings will wear PPE including gown, disposable gloves, surgical mask and face shield/eye protection (goggles or face shield that fully covers the front and sides of face), in accordance with CDC guidance.

- USE OF NON-HEALTH CARE STAFF: To assist health care staff in completing screenings, non-health care staff can be trained to obtain temperatures, record yes/no answers to a symptom screen, and document on a roster.
  - ➜ *Any positive screening is reported promptly to health care staff for further assessment, planning, and intervention.*
  - ➢ Training videos for non-health care providers to check temperatures can be found on the BOP Sallyport COVID-19 guidance page.
  - ➢ Upon completion of a temperature video, staff should complete the Opinio Survey also found on the BOP Sallyport COVID-19 guidance page, so that the training can be added to the staff person's training record.

## 3. TEMPERATURE CHECK PROTOCOL

- Perform HAND HYGIENE (see MODULE 1)
- Don PPE (see MODULE 2)
- CHECK INDIVIDUAL'S TEMPERATURE:
  - ➢ Non-contact or disposable thermometers are preferred over reusable oral thermometers.
  - ➢ If DISPOSABLE OR NON-CONTACT THERMOMETERS are used and the screener did not have physical contact with the individual, the screener's gloves do not need to be changed before the next individual is temperature-checked.
    - ➜ *Non-contact thermometers should be cleaned routinely for infection control.*
  - ➢ If performing ORAL TEMPERATURE CHECKS on multiple individuals, ensure that a clean pair of gloves is used for each individual being checked and that the thermometer is used with disposable probe tips.
- Remove and discard PPE.
- Perform HAND HYGIENE.

---

SOURCE CONTROL IS CRITICALLY IMPORTANT.

- If inmates are identified with symptoms of COVID-19, immediately have them put on a FACE COVERING and perform HAND HYGIENE.

- Escort staff will don appropriate PPE (refer to MODULE 2) and escort the inmate to the designated RESPIRATORY MEDICAL ISOLATION area.

---

*Federal Bureau of Prisons (BOP)*
*MODULE 3. SCREENING AND TESTING*

*COVID-19 Pandemic Response Plan*
*December 16, 2020, version 3.0*

## B.  COVID-19 TESTING

### 1. DIAGNOSTIC TESTS

The primary diagnostic test for the **SARS-COV-2 VIRUS** that causes COVID-19 is a molecular test performed on respiratory secretions, using nucleic acid amplification technology (**NAAT**), usually a reverse transcriptase-polymerase chain reaction (**RT-PCR OR PCR**). COVID-19 viral antigen tests, are also available for testing of respiratory secretions.

- Based on the available evidence and published recommendations, the **BOP-PREFERRED SAMPLE** for symptomatic and asymptomatic cases is a swab from the **nasopharynx, mid-turbinate, or anterior nares**.

  ➢ A lower respiratory tract specimen is usually reserved for testing in a hospital setting or for patients whose upper respiratory tract specimen has tested negative despite a high degree of clinical suspicion.

  ➢ Sputum induction is not recommended in the outpatient setting due to increased risk for exposure to respiratory droplets or aerosols.

  ➢ In general, the BOP does not recommend the use of antibody testing unless it is required by civilian health care entities for a patient to be evaluated.

- **COVID-19 COMMERCIAL PCR TESTS** are sent out to a lab for processing after institution staff collect the swab sample, and then appropriately label and package it. These "send-out" PCR tests are processed using an FDA-approved test.

  ➔ *Utilization of the BOP national laboratory contract for COVID-19 testing is required for commercial testing.*

- **RAPID, POINT-OF-CARE (POC) TESTS** that are FDA-approved are also available for detection of viral nucleic acid or antigen.

  *ABBOTT ID NOW SYSTEM*

  ➢ CLIA-waived for COVID-19 molecular testing.

  ➢ Also equipped to test for influenza. See **MODULE 7** for additional information.

  ➔ *The major advantage of using the Abbott ID Now system is obtaining rapid test results. Potential limitations include false negative test results, limited specimen viability (1 hour from time of collection), and the time required to run individual tests (10 to 15 minutes per test).*

  *ABBOTT BINAXNOW COVID-19 AG CARD*

  ➢ CLIA-waived for COVID-19 antigen testing.

  ➢ May be used for broad-based COVID-19 testing in a manner similar to the Abbott ID NOW.

  ➔ *The major advantage of using the BinaxNOW COVID-19 AG CARD is obtaining rapid test results. Potential limitations include false negative test results and these tests may be less sensitive than NAAT tests. The amount of antigen in a sample may decrease as the duration of illness increases and specimens collected after day 7 of illness may be more likely to be negative compared to a RT-PCR assay.*

  ➔ *Negative results from patients with symptoms should be treated as preliminary and confirmed with a molecular assay, if necessary, for patient management.*

- **Institutions are strongly encouraged to identify a variety of sources** for obtaining swabs/viral transport media, high volume PCR lab testing, and testing materials.  If institutions require

additional testing supplies and are unable to obtain them, they should consult with their local contract laboratory representative, regional healthcare team —and then send the request to *BOP-HSD/AIMS@bop.gov*.

## 2. INDICATIONS FOR TESTING

With the increased availability of testing supplies and the increased understanding of the epidemiology of transmission, expanded TESTING STRATEGIES have become an important tool in the prevention and management of COVID-19 infections. This is especially true in congregate living and residential settings such as correctional facilities where social distancing may be difficult to achieve or maintain.

➜ *The indications for testing for the SARS-CoV-2 virus in a correctional environment include both ASYMPTOMATIC and SYMPTOMATIC inmates with compelling reasons or priorities for testing.*

Specific INDICATIONS FOR TESTING in the BOP are listed below in FIVE (A–E) CATEGORIES. If there are limitations on the number of tests that can be performed at a given location, prioritization of testing indications may be needed and should be done in consultation with the Regional Medical Director, the Regional Health Services Administrator, and the Regional Infection, Prevention, and Control Consultant.

➜ *Refer to MODULE 4, MEDICAL ISOLATION AND QUARANTINE, for further guidance regarding (1) testing inmates in and out of medical isolation and quarantine and (2) other criteria for releasing inmates from medical isolation and quarantine.*

### A. SYMPTOMATIC INMATES

➜ *Testing SYMPTOMATIC INMATES is the primary reason for use of the ABBOTT ID NOW or BINAXNOW COVID-19 tests in the BOP. However, a negative test result from an Abbott ID Now or BinaxNOW system should NOT be used as the sole basis for patient management decisions, due to concerns about FALSE NEGATIVE RESULTS.*

- Symptomatic inmates whose Abbott POC test (ID NOW or BinaxNOW) is POSITIVE should be placed in MEDICAL ISOLATION.

  ➜ *A POSITIVE Abbott POC test result does NOT require confirmation with a commercial PCR test.*

- Symptomatic inmates whose Abbott test is NEGATIVE require CONFIRMATION. Another specimen is collected and sent out for commercial PCR lab testing.

  ➜ *Until the confirmation commercial PCR test results are known, the symptomatic patient is placed into MEDICAL ISOLATION—but separate from symptomatic patients whose Abbott test was positive. If the commercial PCR test result is positive, the inmate may be cohorted in medical isolation with other COVID-19 positive cases. Clinical judgment will be needed if the commercial lab test result is negative and consultation with Regional Health Services staff is recommended.*

- Testing for release from COVID-19 medical isolation is NOT recommended.

  ➜ *Refer to MODULE 4 for criteria used for releasing inmates from medical isolation.*

### B. ASYMPTOMATIC INMATES WITH KNOWN OR SUSPECTED CONTACT WITH A COVID-19 CASE

- When a staff or inmate case of COVID-19 is identified at an institution, CONTACT TRACING of both inmates and staff should be performed expeditiously.

- All inmates identified as CLOSE CONTACTS of the index case should be assessed for symptoms and tested using either the Abbott ID NOW POC test, BinaxNOW POC test, or a commercial PCR test.

  ➢ SYMPTOMATIC CONTACTS should be tested (and placed in medical isolation, as necessary), as described above under *2.A. Symptomatic inmates*.

  ➢ ASYMPTOMATIC CONTACTS should be tested and placed into exposure quarantine, or into medical isolation if their COVID-19 test is positive. (See MODULE 4 for more information.)

- TESTING IN HOUSING UNITS:  Because COVID-19 is very contagious and may be spread by asymptomatic as well as symptomatic individuals, expanded testing of all inmates in an entire housing unit should be considered—especially if the unit has open sleeping areas (rather than cells with solid walls and doors) or common areas where inmates have close contact.

- INSTITUTION-WIDE TESTING of inmates may be considered where one or more inmate or staff cases of COVID-19 have been identified.

  ➢ This is recommended especially if substantial transmission is confirmed beyond the index case, or if staff or inmates have moved about the institution.

  ➢ Institutions should consult with their regional infection prevention and control (IPC) officer prior to initiating expanded testing strategies.

- RETESTING DURING WIDESPREAD TRANSMISSION:  Retesting of close contacts who previously tested negative—or retesting more broadly—is recommended when there is widespread institution transmission. A testing frequency of every 3 to 7 days is recommended, whenever feasible, in consultation with the Regional IPC and the Regional Medical Director.

### C. ASYMPTOMATIC INMATES WITH NO KNOWN OR SUSPECTED CONTACT WITH A COVID-19 CASE

- A QUARANTINE TEST-IN/TEST-OUT STRATEGY is used for all inmates being admitted to and discharged from any type of quarantine

  ➔ *See MODULE 4, for further guidance on testing in and out of quarantine.*

- ALL INMATE INTAKES, RELEASES, AND TRANSFERS (including to BOP Medical Referral Centers) should be tested.

  ➔ *Refer to MODULE 6 for specific guidance regarding testing procedures for INMATE MOVEMENT.*

  ➢ Regardless of the test result, all new BOP admissions/intakes must be placed in a full 14-day quarantine.

  ➢ While a commercial PCR test for intake/release quarantine may be used instead of an Abbott test, outside processing has the disadvantage of a longer turnaround time, causing a possible delay of placement into isolation and/or a prolonged quarantine period for the inmate.

  ➢ If test turnaround time (TAT) is greater than 7 days, the Abbott POC test may be used for TRANSFERS to other BOP facilities or in the case of IMMEDIATE RELEASES. (In such cases, a negative result on the Abbott POC test does not require confirmation with a PCR test.)

- INMATES RETURNING FROM THE COMMUNITY should be tested. Examples include an extended time in an emergency department or crowded waiting area; residing overnight in the community or alternative setting including hospitalization or furlough; work release; and court appearances.

➜ *Inmates with frequent or regular trips to the community (e.g., court hearings, work release), may need to be housed in a separate housing group and tested periodically (e.g., once every three to seven days).*

- HEALTH-CARE RELATED TESTING:

  ➢ Inmates may be required to be tested in order to be seen at a CIVILIAN HEALTH CARE SYSTEM.

  ➢ For RESIDENTIAL HEALTH CARE UNITS AT MRCs (e.g., Nursing Care Center units) without any known or suspected cases of COVID-19, BASELINE TESTING of inmate residents is recommended by the CDC in conjunction with PERIODIC RETESTING. Institutions should consult with their regional IPC to determine frequency of testing.

- INSTITUTION-WIDE SURVEILLANCE TESTING involves testing all inmates at an institution without any known COVID-19 cases.

  ➢ The effectiveness, feasibility, and role of this type of testing in a correctional setting is not clearly defined and requires considerable resources. Low participation rates are likely to limit its effectiveness, and institution health care staffing levels are likely to be insufficient to accomplish it.

  ➢ ALTERNATIVE STRATEGIES: When institution-wide surveillance testing of inmates is not feasible, alternative strategies may be considered such as PERIODIC TESTING OF CERTAIN GROUPS such as inmates with risk factors for severe COVID-19 illness, CPAP users, inmates who work in groups or who may interact with large numbers of staff or inmates as part of their duties (e.g., food service, orderlies), inmates housed in a residential health care unit, etc.

  ➢ Institutions should consult with their regional IPC to determine frequency of testing.

### D. RELEASE FROM QUARANTINE

- The preferred method to test out of any quarantine status is a commercial PCR test no earlier than day 14.
- However, if TAT is greater than 7 days, an Abbott POC test (either ID NOW or BinaxNOW) may be used for TRANSFERS to other BOP facilities or in the case of IMMEDIATE RELEASES. (In such cases, a negative result on the Abbott POC test does not require confirmation with a PCR test.)
- ➜ *Refer to* MODULE 4 *for further guidance on releasing inmates from quarantine.*

## 3. SPECIMEN COLLECTION

The following information applies to specimen collection for either an Abbott POC test or a PCR test that is processed by an outside lab. Training videos, fact sheets and manufacturer website links for these tests are available on the Sallyport COVID-19 guidance page.

➜ *Handle* LABORATORY WASTE *from testing suspected or confirmed COVID-19 patients the same as all other biohazardous waste in the laboratory. Currently, there is no evidence to suggest that this laboratory waste needs any additional packaging or disinfection procedures.*

*Federal Bureau of Prisons (BOP)*                                    *COVID-19 Pandemic Response Plan*
MODULE 3.  SCREENING AND TESTING                          *December 16, 2020, version 3.0*

### A. USE OF THE ABBOTT POC TESTS (ID NOW AND BINAXNOW)

- All staff performing testing using the Abbott POC machines must demonstrate competency to perform testing.
  → *Refer to the APPENDICES for the Abbott ID NOW Competency and Performance Assessment and Abbott ID NOW Training Log forms. BinaxNOW Assessment and training logs are forthcoming.*

- Staff using the Abbott ID NOW machines must perform quality control (**QC**) tests as specified by the CLIA waiver and the manufacturer.
  → *Refer to the QUICK REFERENCE INSTRUCTIONS for using the Abbott ID NOW machine and running QC tests, available at:*
  *https://dam.abbott.com/en-us/homepage/coronavirus/38993-ID-NOW-QRG-r4-HD.pdf*

- Staff using the Abbott BinaxNOW COVID-19 Ag Card should refer to PROCEDURE CARD and QUICK REFERENCE SHEET available at: *https://www.globalpointofcare.abbott/en/product-details/navica-binaxnow-covid-19-us.html*

### B. LOCATION FOR SPECIMEN COLLECTION

**When collecting diagnostic respiratory specimens (e.g., nasopharyngeal (NP) swabs) from a patient with possible COVID-19, the following should occur:**

- Specimen collection should be performed outdoors if possible. If not feasible, testing should be performed in an examination room with no carpet, solid walls, the door closed—and within a negative airflow room, if available.

- If a room is repeatedly used for consecutive testing of inmates, a method of purifying the air is recommended—such as an airborne infection isolation room (AIIR) or a room with a portable high-efficiency particulate air (HEPA) air purifier:
  ➢ Use a HEPA filter that is sufficient for the size of the room (consult with HVAC), and base the wait time between individuals on the clean air delivery rate (CADR) for the filters.
  ➢ In rooms without HEPA filtering, coordinate with the facilities department to determine if the air flow in the room(s) can be adjusted to vent to the outside or to increase the rate of air exchange.

### C. PPE FOR STAFF

**Staff performing the testing and/or handling of specimens should wear an N95 respirator, eye protection (face shield or goggles), gloves, and a gown.**

- If the supply of N95 respirators is limited, they should be prioritized for procedures at higher risk for producing infectious aerosols (e.g., intubation). In this case, staff should use surgical masks.

- Staff should remove PPE when leaving the testing area.

- Gloves should be changed after each patient, and hand hygiene should be performed prior to donning new gloves.

- Avoid contact of the gown with inmates during swabbing, to minimize contamination of the gown. If a gown becomes soiled (e.g., inmate sneezes on the gown during specimen collection):

*Federal Bureau of Prisons (BOP)*
*MODULE 3. SCREENING AND TESTING*

*COVID-19 Pandemic Response Plan*
*December 16, 2020, version 3.0*

- ➢ Doff the gown in the collection room and perform hand hygiene.
- ➢ Doff the gloves (both pairs if double gloved) and perform hand hygiene.
- ➢ Proceed directly to exit and perform hand hygiene upon exiting.
- ➢ Don a new gown and gloves outside the testing area.
- If eye protection is also soiled:
  - ➢ Doff gloves and perform hand hygiene.
  - ➢ Don clean gloves.
  - ➢ Doff eye protection using strap from the back.
  - ➢ Eye protection can either be disposed of in trash or cleaned with an EPA disinfectant wipe.
  - ➢ Doff gloves and dispose of in trash and perform hand hygiene
  - ➢ Don new gloves and face shield or goggles outside the testing area.

➔ *If a staff member needs to take a break and leave the testing area, the procedure will be the same as above, with all PPE doffed and hand hygiene performed inside the room before leaving.*

➔ *Refer to MODULE 2 for additional information on PPE, including donning and doffing procedures.*

### D. PREPARATION FOR SPECIMEN COLLECTION

- **INMATES** should wear their BOP-issued cloth face covering in the testing area and pull it down below their nose, leaving their mouth covered during the collection of the specimen.

- **ESSENTIAL STAFF ONLY:** The number of staff present during the procedure should be limited to only those essential for patient care and procedure support. Place a notice on the door that COVID testing is being conducted. Only authorized personnel can enter.

- **WAITING AREA:** Inmates will stand on marked areas, which will be ≥6 ft apart in front of the screening table, and maintain social distancing while waiting.

- **ROOM PREPARATION:**
  - ➢ 30 minutes prior to specimen collection, testing rooms will be disinfected.
  - ➢ Place a countertop splash guard (if available) in front of the machine, if collecting and running tests in same room.
  - ➢ Place a chux on the floor in front of the machine (if available), and dispose of it at the end of each day.

- **EXPIRATION DATES:** All testing supplies should be checked for expiration date prior to use. If expired, supplies should be returned to the BOP Central Fill and Distribution (CFAD).

### E. SPECIMEN COLLECTION PROCEDURE:

- ➢ Orient the inmate being swabbed toward a wall so that, if they cough or sneeze, the respiratory droplets will not be directed toward another person or a space where others will walk.
- ➢ Before the NP swabbing, ask the inmate to blow their nose and provide them with tissues, as well as hand sanitizer to use afterwards.
- ➢ Proceed to the screening questions and explain the procedure, allowing time to answer the inmate's questions.
- ➢ Collect the NP swab (allow 3–5 minutes, including packaging of sample).
- ➢ Discard the used swabs as biohazardous waste.

➤ Work surfaces such as the chair and table within a 6-foot radius of the swabbing location should be cleaned and decontaminated after each inmate.

➤ If excessive coughing or sneezing occurs during the collection process, in addition to wiping down surfaces, there will be a 10-minute wait before the next individual enters the testing room.

→ *Abbott ID NOW and BinaxNOW Ag Card respiratory samples must be processed within ONE HOUR of collection and MAY NOT be refrigerated for later processing.*

### F. DECONTAMINATION OF THE TESTING AREA

- Follow the manufacturer's guidelines for cleaning the Abbott ID NOW machines.

- At the end of the swab testing, the room will be cleaned and wiped down and mopped with appropriate EPA-approved disinfectant per manufacturers' directions for dilution, contact time, and safe handling.

→ *Refer to MODULE 1 for additional cleaning and decontamination guidance.*


## 4. LABORATORY ORDERING AND DOCUMENTATION

### A. POINT OF CARE (POC) ABBOTT TESTS

- COVID-19 RNA results (e.g. Abbott ID NOW test) are documented in the EMR Flow Sheets under COVID-19 RNA.

- COVID-19 antigen results (e.g. Abbott BinaxNOW) are documented in the EMR Flow Sheets under COVID-19 antigen.

- POC testing does not require an NMOS order.

→ *Refer to the BEMR user document "COVID-19 Flow Sheet" for step-by-step instructions, available on BOP Sallyport.*

### B. SEND-OUT TESTING

- There is only one SEND-OUT commercial COVID-19 Lab Test available under the Laboratory Information System (LIS) Tests tab in BEMR:

  ➤ COVID-19 Novel Coronavirus

- Type **COVID** in the Lab Test Search box.

  → *If lab orders were incorrectly ordered using a different test and typing "COVID" in the comments, those must be D/C and reordered using one of the two tests listed above.*

| PUBLIC HEALTH NOTIFICATION OF POSITIVE TESTS |
|---|
| • COVID-19 is a REPORTABLE DISEASE and must be reported to civilian health authorities in accordance with individual state reporting requirements. |
| • Contact the local health department to ascertain reporting requirements and methods for sharing data. |

*Federal Bureau of Prisons (BOP)*
*MODULE 3.  SCREENING AND TESTING*

*COVID-19 Pandemic Response Plan*
*December 16, 2020, version 3.0*

5.  ALGORITHM FOR SELECTING THE APPROPRIATE LAB TEST



* **Negative POC test results for** SYMPTOMATIC **patients must be verified with a commercial PCR test.**

## 6. SCREENING AND TESTING PROCEDURES SUMMARY

| WHO (Type of Quarantine or Medical Isolation) | AT ADMISSION | DAILY SCREENING REQUIREMENTS | AT DISCHARGE | DOCUMENTATION |
|---|---|---|---|---|
| COMMUNITY RETURNS (community work details, court hearings, hospitalizations, etc.)[1] (INTAKE QUARANTINE) | • SS/TC[2] • Abbott ID-NOW or BinaxNOW Ag Card or commercial PCR test[3,5] | • Documentation and daily medical rounds are not required. | • SS/TC within 24 hours of discharge from quarantine. • Commercial PCR test on day 14 or after. | • Document temperature and symptom screening in EMR chart or the screening section of the intake and exit summaries (intakes and transfers).[7] • Ordering of test and test results, dependent upon test type in BEMR. |
| INTAKES (new commitments, detainees, writ returns, parole violators) regardless of mode of arrival (USMS, ICE, voluntary surrender, etc.) (INTAKE QUARANTINE) | | | | |
| INMATES LEAVING A BOP FACILITY (transferring, going to RRC, releasing home, transfers to ICE, etc.) (RELEASE/TRANSFER QUARANTINE) | | | • SS/TC within 24 hours of discharge from quarantine. • Commercial PCR test[3] | |
| ASYMPTOMATIC INMATES with known or expected exposure (EXPOSURE QUARANTINE) | • SS/TC[2] • Abbott ID-NOW or BinaxNOW Ag Card or commercial PCR test[3,5] | • SS/TC twice-daily is preferred. • Once-daily is acceptable when large numbers in quarantine or substantial staffing shortages. | • SS/TC within 24 hours prior to discharge from quarantine. • Commercial PCR test. | • Document temperature and symptom screening in the EMR chart upon intake and exit from exposure quarantine.[7] • Ordering of test and test results dependent upon test type. |
| SYMPTOMATIC INMATES (MEDICAL ISOLATION) | • SS/TC[2] • Abbott ID-NOW or BinaxNOW Ag Card or commercial PCR test[3,5] | • SS/TC and clinical assessment daily. • May include pulse oximetry, respirations, pulse, etc. | • Testing for release from COVID-19 medical isolation is NOT recommended.[6] | • Document daily SS/TCs and status in the clinical encounter note or the EMR chart.[7] • A clinical encounter in the EMR, reviewing time in isolation and symptom screen is required upon release from medical isolation. • Update health problem code to "resolved" and SENTRY code to "recovered." |
| *(continued on next page)* | | | | |

*Federal Bureau of Prisons (BOP)*
*MODULE 3.  SCREENING AND TESTING*

*COVID-19 Pandemic Response Plan*
*December 16, 2020, version 3.0*

| WHO (TYPE OF QUARANTINE OR MEDICAL ISOLATION) | AT ADMISSION | DAILY SCREENING REQUIREMENTS | AT DISCHARGE | DOCUMENTATION |
|---|---|---|---|---|
| | | *(continued from previous page)* | | |
| ASYMPTOMATIC INMATES with a positive COVID-19 test (MEDICAL ISOLATION) | • SS/TC[2]<br>• Abbott ID-NOW or BinaxNOW Ag Card or commercial PCR test[3,5] | • SS/TC daily | • Testing for release from COVID-19 medical isolation is **NOT** recommended.[6] | • Document interval SS/TCs in the EMR chart.[7]<br>• Clinical encounter reviewing time in isolation and symptom screen is required upon release from medical isolation.<br>• Update health problem code to "resolved" and SENTRY code to "recovered." |
| INSTITUTION SURVEILLANCE[4] | Testing and screening procedures are dependent on recommendations from Regional Medical Director and Regional IPC. | | | |

[1]  INMATES WITH FREQUENT OR REGULAR TRIPS TO THE COMMUNITY (e.g., court hearings, work release) may need to be housed in a separate housing group and tested periodically (e.g., at intervals or weekly; 14 days after last court date, etc.). Certain workers may be screened prior to or at end of each work day (e.g., town drivers, milk delivery, inmates working at military bases, etc.).

[2]  SS/TC = Symptom screen and temperature check; may be performed by health services staff or trained non-health services staff.

[3]  ABBOTT RAPID (POC) TESTS are preferred when an inmate is symptomatic OR when the expected turnaround time (TAT) for a PCR test is prolonged (e.g. > 7days).

[4]  NEGATIVE POC TEST RESULTS for symptomatic patients should be verified with a commercial PCR test.

[5]  If inmates become SYMPTOMATIC DURING QUARANTINE, they should be re-tested (Abbott or PCR) and placed in medical isolation immediately.

[6]  Patients must meet the CDC Isolation discontinuation time and/or symptom-based criteria.  See: *https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html*.

[7]  COVID-19 screening will be available through the BEMR intake, exit summary, and chart functions beginning October 6, 2020. Until that time, screening should be documented in BEMR flow sheets.

Page 13

## 7. MANAGING INMATES WHO REFUSE TESTING

Inmate refusal of testing may be a concern that requires management, not just for the sake of the inmate's individual healthcare, but also to aid in management decisions that could involve the healthcare of others. **As such, it is considered not just a refusal for medical treatment, but also an act that affects the safe and orderly running of the institution.**

➜ *Program Statement 6190.04, Infectious Disease Management, states, "The Bureau tests an inmate for an infectious or communicable disease when the test is necessary to verify transmission following exposure to bloodborne pathogens or to infectious body fluid. An inmate who refuses diagnostic testing is subject to an incident report for refusing to obey an order."*

### A. ADMINISTRATIVE MANAGEMENT OF INMATES WHO REFUSE TESTING

Although not every potential scenario can be anticipated, the information below provides some guidance and principles for the management of inmates who refuse COVID-19 testing.

- A distinction should be made between those who simply refuse testing and those who are willing to be tested, but are unable to tolerate testing via nasopharyngeal, oropharyngeal, nasal mid-turbinate or anterior nares swabbing. Follow CDC instructions on proper sample collection and handling: *https://www.cdc.gov/coronavirus/2019-ncov/lab/guidelines-clinical-specimens.html#specimen*

- If an inmate refuses testing, the first action is to EDUCATE the inmate on the importance of testing, why it is being conducted, and the potential risks and benefits of testing vs. refusal.

- Except where noted under "B. Clinical Management" below, if an inmate continues to refuse COVID testing, they should be given a DIRECT ORDER to submit to testing.
  - If an inmate refuses the direct order, an INCIDENT REPORT should be generated. A sample **Incident Report** is provided in APPENDICES.
  - A **Medical Treatment Refusal Form** should also be completed.
  - Due to the risk of exposure for staff, a use of force to involuntarily obtain a sample is generally not recommended.

### B. CLINICAL MANAGEMENT OF INMATES WHO REFUSE TESTING

Clinical management of inmates refusing COVID-19 testing will vary depending on a variety of factors:

- **SYMPTOMATIC PATIENTS:**  Place in single-cell MEDICAL ISOLATION until they clear CDC symptom-based criteria for release from isolation. Ideally, this isolation should be separated from both suspected and known positive COVID-19 isolation cases.
  - ➜ *Refer to MODULE 4 for information regarding medical isolation.*

- **ASYMPTOMATIC CLOSE CONTACTS:**  Place in single-cell quarantine for 14 days.
  - ➤ If the inmate becomes SYMPTOMATIC at any time during the quarantine, follow guidance for symptomatic patients in the bullet above.
  - ➤ If the inmate remains ASYMPTOMATIC, testing should be made available throughout the 14-day quarantine.

- If the inmate submits to TESTING prior to the full 14-day quarantine and tests NEGATIVE, they may be placed in regular exposure quarantine for remainder of the 14-day quarantine period.

- If the inmate submits to TESTING prior to the full 14-day quarantine and tests POSITIVE, they should be placed in MEDICAL ISOLATION and follow time-based criteria for release from isolation.

- If the inmate continues to REFUSE TESTING, they should remain in single-cell quarantine for the full 14 days. On Day 14 of this initial quarantine, TESTING TO RELEASE from quarantine should be offered.

  - If the inmate submits to testing and tests NEGATIVE, they may release from quarantine.

  - If the inmate submits to testing and tests POSITIVE, they should be placed in medical isolation and follow CDC criteria for release from medical isolation.

  - If the inmate continues to REFUSE TESTING, they should be placed in CONTINUED QUARANTINE for another 10 days. They may submit to testing at any time during this 10-day period. If they test positive, they go to medical isolation. If they test negative, they may be released from quarantine. If they continue to refuse, they may be released at the end of 10 days if they remain asymptomatic.

- **ASYMPTOMATIC NEW BOP INTAKES:** Follow guidance for **ASYMPTOMATIC CLOSE CONTACTS** above.

- **ASYMPTOMATIC INMATES REFUSING TO "TEST-OUT" PRIOR TO RELEASE FROM INTAKE QUARANTINE:** Follow guidance above for **ASYMPTOMATIC CLOSE CONTACTS** who refuse testing to release from the first 14-day quarantine period.

- **ASYMPTOMATIC INMATES REQUIRED TO BE TESTED IN ORDER TO BE SEEN AT A CIVILIAN HEALTH CARE SYSTEM:** Educate the inmate on the need for testing in order to be seen at civilian health care system.

  - If inmate continues to refuse, have inmate sign refusal for testing and for the medical trip. Document in BEMR that inmate was educated on the testing requirements of the outside facility and that inmate refused.

  - Educate the inmate to notify Health Services if they change their mind about testing so that they can go on the medical trip. In this instance, since testing would not otherwise be indicated, **NO** direct order or Incident Report should be given for refusal.

  - It is also important to note that even if an inmate has previously refused COVID-19 testing, if experiencing a MEDICAL EMERGENCY, they should still be taken to a community hospital.

- **ASYMPTOMATIC INMATES TRANSFERRING TO/ARRIVING AT A BOP MEDICAL REFERRAL CENTER (MRC):**

  - When feasible, follow the above guidance for **ASYMPTOMATIC CLOSE CONTACTS**.

  - In some instances, the medical condition may preclude prolonged quarantine period at the sending facility. In these instances, MRCs may need to take the patient and perform quarantine on arrival. With these cases, it is imperative that the sending and receiving institutions are in direct communication to ensure a smooth, timely and appropriate transfer.

- ASYMPTOMATIC INMATES DEPARTING A **BOP** FACILITY FOR HOME CONFINEMENT, REGIONAL REENTRY CENTER, OR FULL TERM/GOOD CONDUCT TIME RELEASE, especially if there are any cases of COVID at the institution:

  - ➢ Follow the above guidance for ASYMPTOMATIC CLOSE CONTACTS prior to release. Note that this may delay an inmate's release, and inmate should be educated as such.

  - ➢ If circumstances require IMMEDIATE RELEASE or it is mandated without enough time to fulfill quarantine requirements, the receiving facility, home and/or local health department must be notified of the patient's COVID-19 status. Direct order and Incident Report for refusal of testing in this situation does **NOT** apply.

- ASYMPTOMATIC INMATES DEPARTING A **BOP** FACILITY AS A TRANSFER TO ANOTHER **BOP** FACILITY OR OTHER CORRECTIONAL JURISDICTION:  Follow above guidance for ASYMPTOMATIC CLOSE CONTACTS.

- TESTING INMATES AS PART OF AN INSTITUTION-WIDE SURVEILLANCE PROGRAM:  Follow above guidance for ASYMPTOMATIC CLOSE CONTACTS.

## C. INFLUENZA TESTING

- For patients with acute respiratory symptoms, it may be difficult to distinguish between symptoms of influenza and COVID-19. This is an especially important consideration when high seasonal influenza activity overlaps with the COVID-19 pandemic.  During such times, the BOP recommends testing for both COVID-19 and influenza A/B.

- Facilities may test for influenza via commercial (Quest) testing, department of health flu testing, or the Abbott ID NOW.

  - ➢ The Abbott ID NOW influenza tests have been CLIA waived for institutions with a current, valid CLIA certificate of Waiver. Similar to COVID-19 tests, influenza tests will be purchased through HSD and delivered to institutions as needed. Please submit requests for influenza tests to *bop-hsd/AIMS@bop.gov*

  - ➢ Information regarding the Abbott ID NOW Influenza test can be found here: *https://www.globalpointofcare.abbott/en/product-details/id-now-influenza-ab-2.html*

  - ➢ Training for the Abbott ID NOW influenza test processing must be completed prior to use. Institutions should contact the National Laboratory Administrator for training guidance.

# EXHIBIT C

# MODULE 11.  BOP EMPLOYEE MANAGEMENT

## WHAT'S NEW

### VERSION 2.0

- "COVID-19 Enhanced Screening Form" title changed to "COVID-19 Screening Tool for Staff/ Contractors/Visitors"
- Reference to Appendix "COVID-19 Tips for Official Travel Using Commercial Vendors" added

### VERSION 3.0

- SECTION C. GUIDANCE FOR STAFF WITH POTENTIAL EXPOSURE TO COVID-19: the following statements added:
  - *The BOP relies on the local Health Department or the individual's healthcare provider to delineate the method used to release COVID-19 positive staff back to work in accordance with CDC guidance.*
  - *A negative COVID-19 test is not required for staff to return to work. Follow guidance below for return to work requirements.*
- Added Section C. 3 and C.4 Asymptomatic Staff with a Positive COVID-19 Test
- Updates to SECTION D. ALGORITHM FOR SYMPTOMATIC BOP STAFF to clarify procedures for positive COVID-19 test and no hospitalization.

### VERSION 4.0

- Updates to SECTION E. STAFF TESTING to include additional information regarding BOP National Contract for staff testing

## MODULE 11 TABLE OF CONTENTS

A. DEFINITIONS...................................................................................................................3

B. ENHANCED EMPLOYEE SCREENING FOR GAINING ENTRY.....................................................3

C. GUIDANCE FOR STAFF WITH POTENTIAL EXPOSURE TO COVID-19 .......................................4
   1. ASYMPTOMATIC INSTITUTION STAFF REPORTING POTENTIAL EXPOSURE TO COVID-19 ..................4
   2. ASYMPTOMATIC NON-INSTITUTION STAFF REPORTING POTENTIAL EXPOSURE TO A COVID-19 .........4
   3. ASYMPTOMATIC INSTITUTION STAFF WITH POSITIVE COVID-19 TEST........................................4
   4. ASYMPTOMATIC NON-INSTITUTION STAFF WITH POSITIVE COVID-19 TEST .................................4
   5. SYMPTOMATIC STAFF .............................................................................................5

D. ALGORITHM FOR SYMPTOMATIC BOP STAFF.......................................................................6

E. GUIDANCE FOR STAFF TESTING.........................................................................................7
   1. INDICATIONS AND PRIORITIES FOR TESTING.............................................................................7
   2. STAFF TESTING NATIONAL CONTRACT.....................................................................................8
   3. QUEST DIAGNOSTICS STAFF TEST RESULTS...........................................................................8

F. TDY AND OFFICIAL TRAVEL ............................................................................................9
   1. FOR EMPLOYEES RETURNING TO AN INSTITUTION FROM TDY AND OFFICIAL TRAVEL......................9
   2. FOR EMPLOYEES RETURNING TO A NON-INSTITUTION SETTING FROM TDY AND OFFICIAL TRAVEL.......9

G. TEMPORARY JOB MODIFICATIONS (TJM) ..........................................................................10

H. GUIDANCE FOR LEAVE ASSIGNMENTS ..............................................................................10

I. RECOMMENDATIONS FOR FAMILY OR OTHERS IN THE EMPLOYEE'S HOUSEHOLD ...................10

J. RIDESHARE/VANPOOL GUIDANCE ...................................................................................11

K. RESOURCES FOR STAFF..................................................................................................11
   1. STAFF SUPPORT LINE .........................................................................................................11
   2. FAMILIES FIRST CORONAVIRUS RESPONSE ACT (FFCRA) ........................................................12

## A. DEFINITIONS

- **BOP INSTITUTION STAFF:**  BOP employees who work within the correctional setting.

- **BOP NON-INSTITUTION STAFF:**  BOP employees who work outside the correctional setting, i.e., Regional Office, Central Office, Grand Prairie, Staff Training Academy, Management and Specialty Training Center.

- **POTENTIAL EXPOSURE:**  Having close contact within 6 feet of an individual with confirmed or suspected COVID-19 for greater than 15 minutes while not wearing recommended PPE. The timeframe for potential exposure includes the 48-hour period before the individual became symptomatic.

## B. ENHANCED EMPLOYEE SCREENING FOR GAINING ENTRY

➜ *COVID-19 could gain entrance to a facility through infected employees. Staff should be educated to stay home if they have fever and/or respiratory symptoms. If employees become sick at work, they should be advised to promptly report this to their supervisor and go home. Institutions should work with executive staff and human resources to develop a local contingency plan for reduced staffing.*

**All employees must be screened upon arrival with a temperature check, as well as questions about respiratory and other COVID-related symptoms and whether they have had contact with a known COVID-19 case.**

➜ *A COVID-19 ENHANCED SCREENING TOOL FOR STAFF/CONTRACTORS/VISITORS is available in the Appendices. This form can be laminated so that the screening staff can read the questions to the employees being screened and accept their responses verbally.*

➜ *Given the public health emergency, staff who REFUSE the enhanced health screening will be denied entry and charged leave—and may be subject to disciplinary action.*

- Employee screenings do not require written documentation unless the person responds "YES" to any question or has a temperature, as described below.

- The temperature check should ideally be taken with a no-touch, infra-red thermometer. If an employee registers a temperature of greater than or equal to 100 degrees (Fahrenheit), they will be denied entry to the facility and put on sick leave. They should be advised to consult with their healthcare provider. (See the *Algorithm for Symptomatic BOP Staff*.)

- If the temperature is out of range, (<93.7°F or >108.1°F or screen reads "HI" or "LOW") the employee should be asked to stand aside for 10 minutes and then the temperature should be remeasured.

- Temperature and symptom screening can be performed by non-health care personnel trained to measure temperature.

  ➤ Training videos for non-healthcare providers to check temperatures can be found on the BOP Sallyport COVID-19 Guidance page.

  ➤ Upon completion of the Temperature Video(s), staff should complete the Opinion Survey also found on the BOP Sallyport COVID-19 guidance page so that the training can be added to the training record.

- Information regarding screening of volunteers and contract staff can be found in **MODULE 10**.

## C. GUIDANCE FOR STAFF WITH POTENTIAL EXPOSURE TO COVID-19

- The Infection Control person in charge will determine whether the employee has had POTENTIAL EXPOSURE (see *definition* above) to a COVID-19 case and requires further assessment.

- Any staff (civil service or PHS) who are subject to or received movement restrictions at the direction of public health authorities should provide this information to their supervisor and institution Human Resources and not return to work until instructed to do so.

- Any questions regarding leave flexibilities should be forwarded to the Staffing and Employee Relations Section (SERS) for further guidance.

- The BOP relies on the local Health Department or the individual's healthcare provider to delineate the method used to release COVID-19 positive staff back to work in accordance with CDC guidance.

- A negative COVID-19 test is not required for staff to return to work. Follow guidance below for return to work requirements.

➔ **If the employee becomes symptomatic in any of the below scenarios, see the *Algorithm for Symptomatic BOP Staff* below.**

### 1. ASYMPTOMATIC INSTITUTION STAFF REPORTING POTENTIAL EXPOSURE TO COVID-19

BOP employees are considered to be part of the critical infrastructure of the institution. To ensure continuity of operations of essential functions, the CDC advises that CRITICAL INFRASTRUCTURE WORKERS are permitted to continue work following potential exposure to COVID-19, provided they remain asymptomatic.

- The exposed employee should report to work and go through the enhanced screening at the institution.

- The employee should monitor their health status with continual awareness of development of COVID-19 symptoms and twice daily temperature self-checks.

### 2. ASYMPTOMATIC NON-INSTITUTION STAFF REPORTING POTENTIAL EXPOSURE TO A COVID-19

- Staff who currently have an approved telework agreement (regular or situational) are expected to continue telework at their home.

- The employee should monitor their health status with continual awareness of development of COVID-19 symptoms and twice daily temperature self-checks.

### 3. ASYMPTOMATIC INSTITUTION STAFF WITH POSITIVE COVID-19 TEST

- Asymptomatic staff who test positive for COVID-19 may return to work after 10 days have passed since first positive COVID-19 test.

### 4. ASYMPTOMATIC NON-INSTITUTION STAFF WITH POSITIVE COVID-19 TEST

- Staff who currently have an approved telework agreement (regular or situational) are expected to continue telework at their home.

- The employee should monitor their health status with continual awareness of development of COVID-19 symptoms and twice daily temperature self-checks.

*Federal Bureau of Prisons (BOP)*
*MODULE 11. BOP Employee Management*

*COVID-19 Pandemic Response Plan*
*December 9, 2020, version 4.0*

5. SYMPTOMATIC STAFF

Due to the widespread prevalence of COVID-19-infected persons, staff with symptoms suggestive of COVID-19 infection may not be aware if a potential exposure has occurred. The *Algorithm for Symptomatic BOP Staff* on the following page shows the steps that should be taken if a BOP employee has symptoms suggestive of COVID-19.

- The BOP relies on the local Health Department or the individual's healthcare provider to release COVID-19 positive staff from isolation *in accordance with CDC guidance.*

- If the provider has cleared a staff member to return to work and the staff member refuses, the individual should be charged AWOL. The individual can also be issued an 8-point letter after consultation with the Occupational Safety and Health Branch.

## D. ALGORITHM FOR SYMPTOMATIC BOP STAFF

**SYMPTOMATIC INSTITUTION STAFF**
- If at home, employee immediately notifies supervisor & does **NOT** report to work.
- If already at work, employee immediately notifies supervisor in order to be relieved of post & return home.
- Employee is required to take leave (FFCRA or sick leave).

**SYMPTOMATIC NON-INSTITUTION STAFF**
- If not approved for telework & at home, employee immediately notifies supervisor & does **NOT** report to work.
- If not approved for telework & already at work, employee immediately notifies supervisor to be relieved of post & return home.
- Employees with approval for telework are to continue work at home unless prevented by illness, whereby employee is required to take leave (FFCRA or sick leave).

**Employee should contact their LOCAL HEALTH DEPARTMENT or personal HEALTHCARE PROVIDER (HCP).**

**IF TESTING IS INDICATED:**
- Employee is expected to report this information to management, AND
- Employee will communicate testing status to Human Resource in a timely manner, AND
- Management will follow directions from local Health Department or HCP regarding quarantine and/or isolation for employee.
- Employees should advise supervisor to confirm and approve the use of FFCRA for up to 80 hours.

**IF TESTING IS NOT INDICATED:**
- The employee is expected to report this information to management, AND
- If symptoms do not allow the employee to perform their duties in a safe manner, then they are expected to **NOT** report to work and to request leave.

**POSITIVE COVID-19 TEST & NO HOSPITALIZATION:**

Staff with positive COVID-19 test & symptoms that did not require hospitalization may return to work if **ALL** these criteria are met:
- If employee had a fever, then at least 1 day (24 hours) has passed since recovery *(resolution of fever)* without use of fever-reducing medications.
- Improvement in any symptoms (complete resolution is not required).
- 10 days have passed since the first date symptoms appeared.

**POSITIVE COVID-19 TEST & HOSPITALIZATION:**

Staff with positive COVID-19 test who require hospitalization for COVID-19 related symptoms may return to work if **ALL** of these criteria are met:
- At least 1 day (24 hours) has passed since recovery from fever *(resolution of fever)* without the use of fever-reducing medications.
- Improvement in respiratory symptoms (e.g., cough, shortness of breath).
- At least 20 days have passed since the symptoms first appeared.

**NEGATIVE COVID-19 TEST:**

If symptoms do not allow the employee to perform their duties in a safe manner, then they are expected to **NOT** report to work and to request leave.

*Federal Bureau of Prisons (BOP)*  
*MODULE 11. BOP Employee Management*

*COVID-19 Pandemic Response Plan*  
*December 9, 2020, version 4.0*

## E. GUIDANCE FOR STAFF TESTING

Refer to MODULE 3 SCREENING & TESTING for information regarding types of COVID-19 tests available.

**All institutions are advised to identify methods for staff to be voluntarily tested for COVID-19.**

- Institutions are strongly encouraged to establish relationships with the local health department for testing. Utilization of a staff specific BOP national contract for COVID-19 testing is a secondary option.

  → *Staff may locate community testing sites through the following link:* *https://www.hhs.gov/coronavirus/community-based-testing-sites/index.html.*

- **Several locales have established additional procedures to allow first responders to be tested for COVID-19.** Institutions are encouraged to become familiar with the procedures and locations of these resources to augment, or in lieu of, testing with DOHs or BOP national contract. Some of these locations may require a memo or letter from the individual's employer verifying their status as someone working in a Critical Infrastructure Industry. Please use the *Critical Infrastructure Memo to Local DOH for Employee Testing* memo template located in the Appendices to satisfy this requirement, as needed.

- Once testing options are identified, staff should be made aware of their options in a direct and prominent fashion.

- Per **PS6701.01**, all employees are required to report their diagnosis to their employer (e.g. submission of lab report or screen shot indicating diagnosis)

- Staff who test positive have the option of being placed on leave under Family Friendly Coronavirus Relief Act (FFCRA) when available.

- **Questions related to staff testing**, should be routed through the regional Emergency Operations Center.

### 1. INDICATIONS AND PRIORITIES FOR TESTING

Specific indications for testing staff in the BOP are listed below in TWO MAIN CATEGORIES. If there are limitations in the number of tests that can be performed at a given location, prioritization of testing indications may be needed and should be done in consultation with the Central Office Occupational Safety & Health Branch and Infectious Disease Prevention & Control Staff.

- **SYMPTOMATIC**
  - All staff with symptoms consistent with or suggestive of COVID-19 should be referred to their private physician or health department for evaluation/testing.

- **ASYMPTOMATIC  WITH KNOWN OR SUSPECTED CONTACT WITH A COVID-19 CASE**
  - → *As a reminder, the primary testing modality used in this category should be that of the local health department when possible.*
  - When a case of COVID-19 is identified at an institution, a contact tracing of both staff and inmates should be performed expeditiously.
  - All staff identified as close contacts of the initial case will be referred to local Department of Health or contract testing provider (if activated at the local institution).
  - **Asymptomatic staff will continue to report to work** and go through enhanced screening to gain entrance to the institution while awaiting testing results and complying with all local requirement regarding use of face covering at all times.

➢ Institution-wide testing of staff may be considered by the Warden, in consultation with the local health department, where one or more staff cases of COVID-19 have been identified, where there is substantial transmission confirmed beyond the initial (index) case, or if the individual has moved about the institution.

## 2. STAFF TESTING NATIONAL CONTRACT

The BOP has awarded a national contract with Quest Diagnostics to provide COVID-19 molecular diagnostic (PCR).  For institutions that utilize/activate the national contract, Quest Diagnostics will provide an initial shipment of self-collection kits to each BOP facility which will be replenished based on availability.

Wardens at each facility will assign an ADMINISTRATOR and BACKUP ADMINISTRATOR for this contract.

- ADMINISTRATOR responsibilities will include:
  - ➢ Provide contact information to Quest Diagnostics in order to set-up a username and password for administrator online access.
  - ➢ Receive initial training by Quest.
  - ➢ Provide self-collection kits to BOP staff meeting indications for testing listed above, utilizing Quest Diagnostic's online pre-registration process, and assisting in the shipment of self-collection kits.
  - ➢ Review registration information for completion.
  - ➢ Create testing requisitions and provide to staff, along with the self-collection kit, utilizing Quest Diagnostic's online portal.
  - ➢ Hold all signed consents at each BOP facility in Human Resources Department.
  - ➢ Arrange FedEx Overnight pick-up of the packages/samples that have been collected on that day.
- BOP STAFF meeting indications for testing listed above will:
  - ➢ Be provided a link to complete registration by locally assigned Administrator.
  - ➢ Register via Quest Diagnostic's online portal with their demographic information as prompted.
  - ➢ Sign the required Consents for testing and release of results to the BOP per Employee Health care Policy (PS6701).
  - ➢ Package the sample/paperwork according to provided instructions once the specimen is self-collected and paperwork is complete.
  - ➢ Provide the completed package to the ADMINISTRATOR to arrange for pick-up by FedEx
- Once the sample has been collected, Quest Diagnostics will manage shipment, processing, testing, and resulting of all samples.

## 3. QUEST DIAGNOSTICS STAFF TEST RESULTS

- Staff will have access to their results through a secure on-line portal provided by Quest Diagnostics.
- All staff with a positive test result will be notified via phone immediately by a Quest Diagnostics provider.  In the event the staff is not available by phone, he/she will be notified via overnight mailing of results.
- Through a secure electronic method, Quest Diagnostics will provide a nightly aggregate report of staff results to the appropriate BOP representative.
- Report will be provided in Excel format (csv) with de-identified and/or identified information as per consent signed.

## F. TDY AND OFFICIAL TRAVEL

- Guidance for **COVID-19 TIPS FOR OFFICIAL TRAVEL USING COMMERCIAL VENDORS** is available in the Appendices

- **Regardless of duty location, upon returning from travel, staff should self-monitor their health status twice per day** through temperature checks and evaluation for symptoms such as coughing, shortness of breath, chills, muscle pain, or new loss of taste and smell.

- Also, regardless of duty location, staff shall notify their supervisor immediately if they believe they had prolonged contact with any COVID-19 positive individual in the workplace while they were not properly supplied and/or protected with PPE.

### 1. FOR EMPLOYEES RETURNING TO AN INSTITUTION FROM TDY AND OFFICIAL TRAVEL

**(Where screening *is* performed to gain entrance)**

- **If ASYMPTOMATIC and had been assigned to one of the following duty locations:** a Quarantine Unit, Medical Isolation Unit, Hospital Duty, or Inmate Transport, they shall be placed on Weather & Safety Leave for 14 calendar days, unless otherwise determined by the CEO of their home institution because of critical staffing needs.

- **If ASYMPTOMATIC and had not been assigned to a post described above,** staff are to report to work, wear a cloth face covering and proceed through the enhanced screening at the institution per CDC guidance on critical infrastructure workers found here: *https://www.cdc.gov/coronavirus/2019-ncov/downloads/critical-workers-implementing-safety-practices.pdf*

- **If an employee in any scenario becomes SYMPTOMATIC at any time during the 14 days post-TDY:**
  - ➤ They should not report to work.
  - ➤ They should give notice to their Supervisor.
  - ➤ They should alert the Local Health Department or their personal Healthcare provider.
  - ➡ *See the Algorithm for Symptomatic BOP Staff above.*

### 2. FOR EMPLOYEES RETURNING TO A NON-INSTITUTION SETTING FROM TDY AND OFFICIAL TRAVEL

**(Where screening IS NOT performed to gain entrance such as Regional Office, Central Office, Grand Prairie, Staff Training Academy, or Management and Specialty Training Center)**

- **If telework ready and ASYMPTOMATIC,** staff should telework.

- **If not telework ready and ASYMPTOMATIC and had not been assigned to a post described above,** staff should return to work and wear a cloth face covering while at work in addition to any required enhanced screening.

- **If not telework ready and asymptomatic and had been assigned to such a post described above,** they should be placed on Weather & Safety Leave for 14 calendar days unless otherwise determined by the CEO of their home institution because of critical staffing needs.

- **If an employee becomes symptomatic at any time:**
  - ➤ They should not report to work.
  - ➤ They should give notice to their supervisor.
  - ➤ They should alert the Local Health Department or their personal Healthcare provider.
  - ➡ *See the Algorithm for Symptomatic BOP Staff above.*

*Federal Bureau of Prisons (BOP)*  
Module 11. *BOP Employee Management*

*COVID-19 Pandemic Response Plan*  
*December 9, 2020, version 4.0*

## G. TEMPORARY JOB MODIFICATIONS (TJM)

Staff who have indicated high-risk medical issue(s) should be given the **COVID-19 Medical Condition Self Reporting Tool** (in the Appendices) to submit to the OSH mailbox: BOP_HSD/Employee Health for processing. The subject line of the email should be "High risk staff declaration form- [Last name, First name]." The employee should continue to report to work or use personal leave until the employee is notified that a determination has been made.

## H. GUIDANCE FOR LEAVE ASSIGNMENTS

### WEATHER & SAFETY LEAVE

- Weather and Safety Leave is to be used for TDY leave until the staff member becomes symptomatic.  It is not appropriate to use Weather and Safety Leave for staff who have tested positive for COVID-19.
- Staff are entitled to Weather & Safety Leave if they are placed in quarantine status by the Agency
- The granting official for Weather and Safety leave is the local Warden.

### FAMILIES FIRST CORONAVIRUS RESPONSE ACT (FFCRA)/EMERGENCY PAID SICK LEAVE (EPSL) LEAVE

- Staff are entitled to the FFCRA/EPSL Leave if they are isolated (tested positive for COVID-19) or quarantined by a health care professional or federal, state or local government notice.
- The maximum leave granted through FFCRA/EPSL is 80 hours.  OPM has not allowed for any additional hours at this time.

### CONTINUATION OF PAY (COP)/OFFICE OF WORKERS' COMPENSATION PROGRAM (OWCP) LEAVE

- Once a staff member files for OWCP, they can no longer use EPSL leave and must use COP.  COP leave is for a maximum of 45 days when medically indicated.
- If OWCP is denied, a time and attendance correction can be made to use the FFCRA/EPSL leave if documentation for isolation/quarantine was received to include a letter of recommendation from a medical provider.

## I. RECOMMENDATIONS FOR FAMILY OR OTHERS IN THE EMPLOYEE'S HOUSEHOLD

Employees in isolation or quarantine should be directed to the CDC guidelines on practicing social distancing and good hand-hygiene for the 14-day period. See also the CDC recommendations for coping with daily life at: *https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/index.html*

## J. RIDESHARE/VANPOOL GUIDANCE

- **Practice every-day protective measures:**
  - ➤ Wear a cloth face covering over nose and mouth.
  - ➤ Use proper hand hygiene. Wash your hands regularly with soap and water for at least 20 seconds, or use an alcohol-based hand sanitizer containing at least 60% alcohol.
  - ➤ Avoid touching your eyes, nose, or mouth.
- **Avoid Ridesharing and Vanpools when possible.**
- **When using vanpools, implement the following measures:**
  - ➤ Wear a cloth face covering over nose and mouth at all times during the ride.
  - ➤ Maximize physical distancing among passengers when possible.
  - ➤ Windows should be cracked open at least one inch.
  - ➤ The air conditioning unit should be set on FRESH AIR, and NOT on recirculated air.
  - ➤ To the extent possible, avoid contact with surfaces frequently touched by others such as door frame/handles, windows, seat belt buckles, steering wheel, gearshift, signaling levers, and other vehicle parts before they are cleaned and disinfected. These surfaces should be cleaned and disinfected after each use. Avoid touching your face until you have washed or sanitized your own hands.

## K. RESOURCES FOR STAFF

As a result of the Coronavirus, staff have most likely been rebalancing personal, family, school, work, and community demands to protect themselves and loved ones. Staff may have concerns about becoming infected, passing on an infection, being isolated at home, spouses and family members losing jobs, and having children out of school. Times of great change, such as these, can cause fear, worry, moodiness, sleeplessness, and agitation. These are normal reactions to a new and constantly changing situation. Resources to help support efforts at healthy coping maybe located on the Sallyport COVID-19 Guidance page and through the CDC.

### 1. STAFF SUPPORT LINE

**During the current COVID-19 pandemic, the lives of all persons around the globe and, in particular, BOP staff, are being touched directly and indirectly by this deadly disease.** Some staff have been infected with COVID-19 already. Many know someone who is, or has been infected. With a pandemic of this magnitude, it is possible that staff will lose loved ones, or even that the Bureau may suffer the loss of staff members to the virus. The stress evoked by COVID-19 weighs on us all.

**We recognize that most staff have COVID-related concerns.** Some concerns may be related to the workplace. Other concerns may be connected to their family or home life. These concerns can cause stress, worry, or other difficult emotions. As law enforcement professionals, Bureau staff are accustomed to working under stressful conditions. However, the COVID-19 pandemic presents challenges that may, at times, appear overwhelming to many staff members.

To offer a helpful outlet for staff members to openly discuss their concerns, the agency activated a **24-HOUR STAFF SUPPORT LINE -** contact information available on Sallyport. You will not be asked to identify

*Federal Bureau of Prisons (BOP)*                                    *COVID-19 Pandemic Response Plan*
MODULE 11. *BOP Employee Management*                                *December 9, 2020, version 4.0*

yourself, but you may if you wish. The person you speak to will be a Bureau staff member, with institution experience. You will be given an opportunity to share your concerns, receive support, and engage in problem solving. We believe that talking about your concerns, rather than silently carrying them inside, is a better way to cope with the stress of the COVID-19 pandemic.

The Bureau recognizes its responsibility to the workforce that fulfills its custody mission day after day, no matter how challenging. WE ENCOURAGE YOU TO USE THE 24-HOUR STAFF SUPPORT LINE. This is one way we take care of our own.

## 2. FAMILIES FIRST CORONAVIRUS RESPONSE ACT (FFCRA)

THE FAMILIES FIRST CORONAVIRUS RESPONSE ACT (FFCRA) was signed into law by President Trump and creates a new benefit for workers to receive paid sick leave **between April 1 and December 31, 2020**.

- Under FFCRA, employees are eligible for an additional two weeks (up to 80 hours) of paid sick leave in response to the economic impacts of the ongoing coronavirus pandemic.

- Leave will be paid at the EMPLOYEE'S REGULAR RATE OF PAY where the employee is unable to work because the employee:

  ➢ Is subject to a Federal, State, or local quarantine or isolation order related to COVID-19; or

  ➢ Has been advised by a health care provider to self-quarantine related to COVID-19; or

  ➢ Is experiencing COVID-19 symptoms and is seeking a medical diagnosis.

- Leave will be paid at **2/3** THE EMPLOYEE'S REGULAR RATE OF PAY where the employee is unable to work because the employee:

  ➢ Is caring for an individual subject to a Federal, State or local quarantine or isolation order or is caring for an individual that has been advised by a health care provider to self-quarantine as described above; or

  ➢ Is caring for a child whose school or place of care is closed (or child care provider is unavailable) for reasons related to COVID-19; or

  ➢ Is experiencing any other substantially-similar condition specified by the Secretary of the U.S. Department of Health and Human Services.

As a reminder, supervisors have the authority to approve advanced sick leave for a maximum of 240 hours (30 days) to full-time employees in accordance with DOJ Order 1630.1B, Leave Administration, and P.S. 3630.02, Leave and Benefits. For additional information, The Federal Employee Rights FFCRA poster may be accessed here:

*https://www.dol.gov/sites/dolgov/files/WHD/posters/FFCRA_Poster_WH1422_Non-Federal.pdf*

# EXHIBIT D

Inmate Covid-19 Surveillance for Terminal Island

 **The purpose of COVID-19 surveillance is to monitor the current state of the pandemic.** It involves **measuring** epidemiological (disease-related) aspects of the pandemic in order to **manage** it appropriately. -Public health surveillance is the ongoing systematic collection, analysis, and interpretation of data, closely integrated with the timely dissemination of these data to those responsible for preventing and controlling disease and injury.
 Surveillance is essential during a pandemic to assist in reducing SARS-COV-2 transmission.

SYMPTOMATIC: People with confirmed COVID-19 have reported a wide range of symptoms that typically appear 2–14 days after exposure to the virus. People with confirmed or suspected COVID-19 infection presenting with any of the following symptoms are considered symptomatic:

- Fever or chills
- Cough
- Shortness of breath or difficulty breathing
- Fatigue
- Muscle or body aches
- Headache
- New loss of taste or smell
- Sore throat
- Congestion or runny nose
- Nausea or vomiting
- Diarrhea

## SYNDROMIC SURVEILLANCE

Syndromic surveillance includes the following:
 Clinicians reporting on inmates presenting to sick call with acute respiratory complaints, fevers, or other symptomatic complaints as seen above. The Infectious disease Nurse will be notified. These inmates will be placed in isolation and Abbott rapid tested. If the inmate is positive he will isolate for 10 days per Bureau of Prisons (BOP) protocol. If the inmate receives a negative rapid test he will be continued to be isolated until a second nasal PCR test will be performed and sent to LA County Department of Health. If negative he will be released back to general population if clinically appropriate. The BOP's electronic surveillance dashboard assists with monitoring of respiratory complaints and Covid-19 positive inmates.

 Clinician and laboratory reporting on the number of inmate COVID-19 positive and negative cases are reported to the LA County Department of Health monthly using a database. All positive cases are reported within 24 hours to the department of health. All Covid-19 labs are either sent to the Los Angeles Department of Health laboratory or if this agreement changes a BOP contracted laboratory.

 Reporting on inmate hospitalization and discharges. All inmates sent for hospitalization and discharge are closely monitored by the Clinical Director. The Warden and Infectious Disease Nurse will be notified of any positive Covid-19 result within the hospital.  If an inmate returns from the hospital and has a positive test the Clinical Director must be notified if isolation has not been completed, so the inmate can continue isolation. If the inmate is stable and isolation has been completed the inmate may go back to

general population if clinically appropriate. If an inmate is discharged greater than 24 hours and has not been positive for Covid-19 in the past 90 days, the inmate will be quarantined either in a quarantined area or short-stay.  A rapid or nasal PCR will be performed on day 0 and a nasal PCR on/after day 14. If asymptomatic the inmate will be returned to the general population if both the results are negative. If symptomatic the inmate will be observed until asymptomatic. If positive the inmate will be placed on isolation for 10 days.

▢ Reporting on inmates COVID-19 related deaths. All inmates deaths are reported to the Clinical Director and Warden.


## CONTACT TRACING

Contact tracing will be performed:

➢   When there is a SMALL NUMBER OF INFECTED INDIVIDUALS (staff or inmate)—such as in a particular work unit or housing unit. The infected individuals are placed in isolation for 10 days.  Individuals from the work unit who were exposed will be returned to their unit. This unit will then be placed on EXPOSURE QUARANTINE and tested per quarantine protocol.

➢   When the infected individual (staff or inmate) has had CLOSE CONTACT WITH INDIVIDUALS FROM OTHER HOUSING OR WORK UNITS. These inmates placed on EXPOSURE Quarantine and tested per BOP protocol.

➢   When the infected individual (inmate) has recently been in a COMMUNITY SETTING, identifying close contacts can help reduce transmission from the facility to the community. The Infectious Disease Nurse will work with the LA County Department of Health to help with community identification of close contacts.

▢ If there is a LARGE NUMBER OF INDIVIDUALS WITH COVID-19 in the facility, contact tracing may become difficult to manage:

➢   Under such conditions, BROAD-BASED TESTING will be performed in order to identify infections and prevent further transmission. Decisions for expanded testing should be made in consultation with the Regional Infection Prevention and Control Officer (IPC) and Medical Director.


## SURVEILLANCE TESTING

SURVEILLANCE TESTING assists in identifying asymptomatic or mildly symptomatic spread that may elude symptom-based surveillance.

▢ Inmates admitted to long-term care units.

▢ Inmates on pre-release including transfers to other facilities will be quarantined and tested per BOP protocol.

▢ Inmates on work details at high risk for contracting COVID-19 or transmitting it to others such as orderlies, sanitation workers, food service workers, town drivers, trash details, or UNICOR. Ten percent of these inmates will be tested randomly, monthly from each department.

▢ Inmates returning from prolonged hospitalizations, writ returns, court appearances, furloughs, or any large community activity will be tested and quarantined upon return.